**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT     DEC 1 3 2022

FOR THE DISTRICT OF NEW MEXICO     MITCHELL R. ELFERS
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | )     18-CR-02945-WJ |
| | ) |
| vs. | ) |
| | ) |
| LUCAS MORTON | ) |
| | ) |
| | ) |
| Defendant, | ) |

## DEFENDANT'S MOTION TO DISMISS INDICTMENT WITH PREJUDICE AS A RESULT OF VIOLATIONS OF THE 1st , 2nd , 4th , 5th , 6th and 14th AMENDMENTS OF THE CONSTITUTION AND THE RELIGIOUS FREEDOM RESTORATION ACT (" RFRA") PERPETRATED BY LAW ENFORCEMENT OFFICIALS

COME NOW, Defendant Lucas Morton (Morton), pursuant to the U.S. Const. Amendment's 1st , 2nd , 4th , 5th ,6th and 14th Amendments and Religious Freedom Restoration Act, respectfully moves this court to dismiss the indictment with prejudice due to the constitutional violations perpetrated by law enforcement officials. In support thereof, Defendant submits the following:

## INTRODUCTION

"Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." As we noted in Lewis, the official conduct "most likely to rise to the conscience shocking level" is the "conduct intended to injure in some way unjustifiable by any government interest." Id., at 849, 140 L Ed 2d 1043, 118 S Ct 1708. The conclusion that the Self-Incrimination Clause is not violated until the government seeks to use a statement in some later criminal proceeding strips the Clause of an essential part of its force and meaning.

1

This is no small matter. It should come as an unwelcome surprise to judges, attorneys, and the citizenry as a whole that if a legislative committee or a judge in a civil case demands incriminating testimony without offering immunity, and even imposes sanctions for failure to comply, that the witness and counsel cannot insist the right against compelled self-incrimination is applicable then and there. Justice Souter and Justice Thomas, I submit, should be more respectful of the understanding that has prevailed for generations now. To tell our whole legal system that when conducting a criminal investigation police officials can use severe compulsion or even torture with no present violation of the right against compelled self-incrimination can only diminish a celebrated provision in the Bill of Rights. A Constitution survives over time because the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom.

Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

"[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Mapp v. Ohio, 367 U.S. 643, 648, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961).

Where, but-for the illegal conduct perpetrated by FBI, TCSO, CYFD and other law enforcement officials who swore an oath to uphold the constitution, defendants would not have been incarcerated for 4 years. It is imperative that the Court hone in on these constitutional violations perpetrated by law enforcement officials. It is because of their flagrant disregard for defendants constitutional rights why we are here. The contested evidence would not have been discovered.

2

**FACTUAL BACKROUND**

On August 2, 2018 , Taos County Sheriff Jerry Hogrefe ( the " Affiant"), submitted a search warrant affidavit ( the " Affidavit" ) to New Mexico District Court Judge Sarah Backus. ( Exhibit A, BN 23619). The Affidavit requested authorization to search Unit 2 Lot 28 ( the " Subject property"), a 10-acre parcel of Costilla meadows subdivision in Taos County, New Mexico. ( Exhibit A, BN 23616) The Affiant alleged probable cause existed that (1) " Siraj Wahhaj and others are likely on the property described above and that both an arrest order and child pickup order exist" and (2) " there is now information that the children are being neglected of food and/ or basic needs and the totality of what is presented in this affidavit rises to the need for law enforcement to enter and search the property for the missing child, the wanted felon, and to check the welfare of any persons/ children that may be present." ( Exh, A,BN 23618).

The Affidavit's factual basis contained various false statements and material omissions. Specifically, the Affiant averred that on May 15, 2018, he became aware of a missing child bulletin from Clayton County, Georgia and that Siraj Ibn Wahhaj ( Mr. " Wahhaj" ) and his son, Abdul- Ghani Wahhaj ( "AG"), may be residing in New Mexico ( "N.M"). (Exhibit A, BN 23617).

The Affiant, however, was aware much earlier than May 15 that Mr. Wahhaj and his son may be in New Mexico. Indeed, on January 2, 2018, the Affiant sent Taos County Sheriff's Office ( " TCSO")  Sergeant Jason Rael an email indicating Mr. Wahhaj and AG may be residing in Costilla, N.M. ( Exhibit B. BN 233790)

Further, the Affiant represented that the bulletin stated Mr. Wahhaj may have abducted his son, AG, who suffers from Hypoxic Ischemic Encephalopathy (HIE), and it was unknown if his son had been receiving his medication. ( Exhibit  A, BN 23617). Affiant also averred that the child is described as having a " limp," but the Affaint knew AG could not walk. ( Exhibit A, BN 23617). Ironically, the Affaint attached two documents indicate that AG's mother stated AG" cannot walk." ( Exhibit A, BN 23621, 236230.

The Affidavit goes on to described law enforcement's purported investigation, noting that during the investigation, TCSO officers Flores and Rael received information, on an unknown date, that the father, child, and others may be residing at property in Costilla, N.M. ( Exhibit A, BN 23617). Affiant wrote that officers traveled to Costilla, N.M. Where area residents told the officers that persons who "resemble" Mr. Wahhaj and his son occupy a property on Juniper Road. ( Exhibit A, BN 23617).

3

However, neither officer Flores or Rael's report makes any mention that any area residents told them persons who" resemble" Mr. Wahhaj and his son occupy a property on Juniper Road. (Exhibit C, BN 2689-92;  Exhibit B, BN 23786- 23799).

Affiant further attested law enforcement determined the legal description of the property and contacted the registered owner, Jason Badger. ( Exhibit A, BN 23617). according to the Affiant, Badger told investigators that while he and his wife ( the Badgers) owned the Subject property, Mr. Wahhaj, Lucas Morton [sic], and others occupied it. ( Exhibit A, BN 23617). Badger explained that Mr. Morton owned the adjacent property and had accidentally built the living residence on the Badgers' property, but they were in negotiations to exchange properties. ( Exhibit A, BN 23617). However, the Affaint omitted from the Affidavit that on May 14, 2018, Mr. Badger admitted he had actually only seen Mr. Wahhaj " once," ( Exhibit D, Axon Video 22;00- 22: 30), and had not seen him or AG " in a long time." ( Exhibit B, BN 23793).

Affiant continued by attesting that FBI aerial surveillance ("AS") documented adult males, females, and children present on the Subject property. ( Exhibit A, BN 23618). However, the FBI surveillance provided not depicted more than one adult male. ( Exhibit E, surveillance video). Additionally, the Affiant indicated that the FBI AS depicted one child walking with a "limp."( Exhibit A, 23617). Surprisingly, the Affiant materially omitted that the child walking with the " limp" was not AG. Law enforcement showed AG's mother the photos, and she told them the child was NOT her son well before the Affidavit was made. ( Exhibit B, BN 23794; Exhibit F, BN 772)

The Affiant also indicated that in December 2017, Siraj Wahhaj had been involved in an accident somewhere and that officers had observed guns and body armor. ( Exhibit A, BN 23618). However, the Affiant failed to note that Mr. Wahhaj was not prohibited from possessing firearms. Additionally, the Affiant labels Mr. Wahhaj as a "wanted felon," however, Mr. Wahhaj was not and is not felon. ( Exhibit A, BN 23618).

The Affiant stated according to the investigation approved by the Georgia courts the father was to preform an exorcism on the child and deny him his prescribe medications. (Exhibit A,BN 2483 Affidavit for search warrant). The Affiant knew that ██████, the mother states that the father made it known before absconding that he wanted to preform an exorcism on said child because he believes that the child is possessed by the devil. (Exhibit A, BN 2485 Affidavit for search warrant Attachment C). The Affiant falsely added that defendant wanted to deny his child prescription medication to create an impression of exigent circumstances and child abuse, when in fact there was none.

Finally, the Affaint wrote that on August 2, 2018, detective Porter stated he was provided with photographs of messages from one of the females asking for help, stating the family was starving and needed money for food. ( Exhibit A, BN 23618). However, the female sent messages that she needed money because she was starving. (Exhibit G, 2-21273). Mr. Hogrefe falsely mentioned that the messages said the family was starving.

Ultimately, the Affaint included a multitude of false statements and material omissions hidden to Judge Backus to create the impression of probable cause. Unaware of such false statements and omissions, Judge Backus construed the Affidavit as establishing cause and signed the warrant. ( Exhibit A, BN, 23619, 236250.

Following Judge Backus's authorization, law enforcement searched the premises. ( Exhibit A, BN 23626). The Defendants and eleven children were found on the Subject property. ( Exhibit A, BN 23626). Law enforcement arrested Mr. Wahhaj and Morton. (Exhibit A, BN 23626). Additionally, law enforcement seized several weapons from the Subject Residence, ( Exhibit A, BN 23626). Following the search, law enforcement used information obtained in the search to obtain additional search warrants.

In this case, law enforcement constitutionally violated the Defendants' Fourth Amendment rights when they executed a search warrant containing a multitude of misleading information, which falsely created the impression of probable cause. The Affaint's Affidavit contained various intentionally and recklessly made false statements and material omissions. These false statements and omissions purposefully misled Judge Backus into concluding that the search warrant affidavit established probable cause, when it did not. After excising such false statements and including such material omissions, the Affidavit's true character reveals its failure to establish probable cause. There, the evidence derived from the illegal search and seizure of the Subject property described in the search warrant must be suppressed, the evidence obtained in the searches following the first search must also be suppressed, as evidentiary fruits of the first search. Defendants respectfully request this Court suppress all evidence seized as a result of the illegal search including any and all evidentiary fruits obtained thereafter.

# ARGUMENT

### *First Amendment*

The First Amendment provides that Congress shall make no law respecting an establishment of religion. U.S. Const. amend. 1.

To assess an Establishment Clause challenge, courts follow the tripartite test from the Lemon decision. As the United States Court of Appeals for the Tenth Circuit has explained, government action does not violate the Clause if: (1) it has a secular purpose, (2) its principal or primary effect is one that neither advances nor inhibits religion, and (3) it does not foster an excessive government entanglement with religion. The Tenth Circuit interprets the first and second prongs of the Lemon test in light of Justice O'Connor's endorsement test. That is, the court asks whether government's actual purpose is to endorse or disapprove of religion, and whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. The Tenth Circuit evaluates the government's actions from the perspective of a reasonable observer who is aware of the history, purpose, and context of the act in question. The test is conjunctive: failing any prong of the Lemon test means that the government action cannot withstand Establishment Clause scrutiny. The Tenth Circuit therefore considers each prong separately.

I am a Muslim of the Islamic faith who follows the Quran revealed over 1400 years ago from Allah the Creator of the heavens and earth and everything in between; delivered by Angel Jibril ( Gabriel ) to Prophet Muhammad ("S.A.W"may GOD's peace and blessings be upon him) the seal of prophet-hood, which has a population of 2 billion Muslims worldwide. Freedom to practice religion;I have a right to live where I want establishing residency/ homesteading living off the land trying to enhance my spiritual connection to GOD. The government alleges future religious prophecies that are separated by space and time depending first on events to happen to be fulfilled as crimes. They classify ruqyah the act of placing ones hands over a body or body parts reciting some passages of the Quran as violation of the law. The Government may not burden the free exercise of religious practices. Because practice of religion is protected by the First amendment, I may not lawfully suffer any legal disabilities or discrimination by virtue of serving GOD, such as to become a target of surveillance under the Foreign Surveillance Intelligence Act ( FSIA), it is a known fact that the defendant Mr. Wahhaj was under extensive surveillance since 2003.  FBI NY opened a full investigation into Wahhaj in 2003 and closed in 2009 opened back up in 2015. (Exhibit H BN# 3150)

The Quran is literally GOD'S words and because it is HIS words it is current. It talks about past, present and future events ( prophecies). The Quran is a guide, mercy, and healing for mankind. The Quran is the final revelation in a succession of revelations that came before it. Muslims believe in all of GOD's books in its original form. The Scrolls revealed to Abraham, the Psalms to David, the Torah to Moses, Gospels to Jesus, and the Quran to Prophet Muhammad may GOD's peace and blessings be upon all of them. The message was the same but the law was different. Every prophet / messenger taught the same belief monotheism; none has the right to be worshiped but GOD alone and to warn against polytheism. They were all brethren with the same call to worship GOD alone. When we ask we ask from GOD alone; when we rely we rely on GOD alone. The laws were different each prophet/ messenger was sent to his own people with the exception of the Quran. The Quran is the final revelation and it is for all of mankind for every nationality, illiterate, learned, for the young, old and for the Jinn.

The Prophet Muhammad S.A.W is the seal of prophet hood, there is no prophet coming after him and he was sent to all of mankind. The Quran is GOD's words it was preserved by GOD Himself not one word has been changed since 1400 years ago. It gives mankind hope, shows us everything, how to pray, eat, sleep, use the restroom, conduct ourselves with our family, neighbors, co workers. The Quran gives rights to the parents, family, orphans, poor, wayfarer, the weak. There is no separation between church and state. The Quran and Sunnah ( examples of Prophet Muhammad S.A.W) shows us how to conduct ourselves in private as well in our political affairs. We use the Quran and Sunnah to heal ourselves from physical as well as spiritual ailments. For example ruqyah is divine speech as a means of curing physical and spiritual illnesses. You recite some passages from the Quran ( GOD's Words) over the sick person's whole body or body parts. The objection of the recitation is for healing. This religious activity is protected by the First Amendment. Prophecies are very common in the Quran. It is also protected by the First Amendment of the Constitution. Again belief in the second coming of Jesus, ruqyah, prophecies are all protected by the First Amendment of the constitution. As a Muslim you are required to believe in the second coming resurrection of (Isa) Jesus son of Mary May GOD be pleased with them both. There is no guess work in Islam just strictly follow the Quran and Sunnah of the Prophet Muhammad (S.A.W.) and that is true success.

Prophecies in the Quran are no different from prophecies that came down before in GOD's other original books. For example in Jeremiah chapter 29) 17-19 :17) Thus says the Lord of hosts: behold, I will send on them the sword, the famine and pestilence, and will make them like rotten figs that cannot be eaten, they are so bad. 18) And I will pursue them with the sword, with famine, and with pestilence, and I will deliver them to trouble among all the kingdoms of the earth- to be a curse, an astonishment, a hissing, and a reproach among all the nations where I have driven them, 19) because they have not heeded My words, says the Lord, which I sent to them by My servants the prophets rising up early and sending them, neither would you heed, says the Lord. I believe this is the prophecy of Covid -19. Everything related to Covid- 19 wrecking havoc on the world economies, famine effecting the nations, earth is parallel to this verse. When the government mocks, burden religious prophecies, ruqyah, second coming resurrection of (Isa) Jesus son of Mary, May GOD be pleased with them both, and the practices of Muslims it is no different than the religious persecution other members of faith had to endure before defendants. The government wants to present the defendants as religious fanatics, that is further from the truth. The government's whole indictment burdens the defendants free exercise of religion which is protected by the First Amendment of the constitution and the RFRA.

## *Second Amendment*

Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees "an individual right to keep and bear arms" and for "law-abiding, responsible citizens to use arms in defense of hearth and home." District of Columbia v. Heller, 554 U.S. 570, 595, 635, 128 S. Ct. 2783, 171 L. Ed. 2D 637 (2008) Held:1) The Second Amendment protect an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self defense within a home a) The Amendment's prefatory clause announces a purpose, but does not limit or expands the scope of the second part, the operative clause. **" The militia" comprised all males physically capable of acting in concert for the common defense.**

The Anti federals feared that the federal government would disarm the people in order to disable the citizens' militia, enabling a politicized standing army or a select militia to rule. The response was to deny Congress power to abrogate the ancient right of individuals to keep and bear arms, so that the ideal of a citizens militia would be preserved. The Second Amendment extend, prima facie, to all instruments that constitute bearable arms. An instrument need not have existed at the time of the founders to fall within the amendment's ambit, but it must fit the founding era definition of an "arm".

As we stated in Heller and repeated in <u>McDonald</u>," individual self – defense is ' the central component ' of the Second Amendment Right," <u>MC Donald, 561 U.S. , at 767 (</u> quoting <u>Heller, 554 U.S., at 599</u>); see also id, <u>at 628</u> ( " the inherent right of self-defense has been central to the Second Amendment right")

Then and now that means, the Second Amendment covers weapons of offense, or armor of defense, or anything that as man wears for his defense, or takes into his hand, or useth in wrath to cast at or strike another. The Second Amendment never put a restriction on the number of guns and ammunition you can own. The Defendant is not a felon prohibited from owning, carrying, or transporting firearms. Per ATF records All of defendant's firearms were purchased legally from a licensed dealer. Defendants' first purchase was in February 14, 2011 and last purchase was May 22, 2018, all purchases were approved by the FBI from 2011 to 2018 while defendant was under full (Mr.Wahha) investigation. It defies logic that the FBI would have approved every back ground check to a suspected terrorist. ( Exhibit I  ATF Trace reports BN 0697- 0708)

## NMRA 14-5190

A person who is defending against attack, defending another from attack or defending property need not retreat. In the exercise of the right of self defense, defense of another or defense of property, a person may stand the person's ground and defend herself/himself/another of the person's habitation or property.

(Mr.Wahhaj)
It is a corroborated fact that the defendant's family fled their home because of an imminent attack. The defendants have a constitutional right to defend themselves. They also have a constitutional right to train their members of their household in self defense. The defendant (Mr.Wahhaj) never left his property; he taught his sons self defense techniques to defend themselves and their property against any intruder without proper credentials who wishes to do them harm.

(Mr.Wahhaj)
The heart of the matter is this; defendant is a practicing Muslim; he is also an advocate of the Second amendment, because the government had launched an illegal investigation into Muslims nationwide they are extremely concerned about Muslims practicing their Second amendment right.

FBI NY opened a full investigation into Wahhaj in 2003 based on information indicating he was involved in training activities related to sutra teams (closed in 2009). FBI ATL opened a preliminary investigation into Wahhaj in July 2015 based on information indicating Wahhaj was engaging in firearms training. (Exhibit H BN #3150)

9

Mr. Wahhaj

Defendant has many security credentials attained throughout the years from reputable schools. He acquired security licenses in multiple states. He also acquired his arm-guard, private investigator's license, conceal carriers permit accepted in 28 states. (GA conceal carry permit F0601705173) He successfully completed executive protection courses, Community Emergency Response Team (" CERT") training, CPR, contractor's course, NRA gun safety, firearms training everything perfectly legal and constitutional.( See Attachment 1 security credentials) The FBI listed defendant's occupation as armed security. ( See Exhibit J BN 2730)

## *Fourth Amendment*

At the very heart of a suppression motion is the fundamental right to freedom from unreasonable search and seizure by the government. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Evidence seized in violation of the Fourth Amendment is precluded under the exclusionary rule. Mapp v. Ohio, 367 U.S. 643, 648, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961). This rule excludes evidence obtained through the original "'illegal search or seizure,'" as well as "'evidence later discovered and found to be derivative of an illegality,' the so-called "'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061, 195 L. Ed. 2D 400 (2016) (quoting Segura v. United States, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2D 599 (1984)).

In determining whether a violation has occurred, the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2D 650 (2006) (citing Flippo v. West Virginia, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L. Ed. 2D 16 (1999) (per curiam)). True to the measurement of reasonableness, "[t]his exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits." Strieff, 136 S. Ct. at 2059. "Suppression of evidence . . . has always been our last resort, not our first impulse." Id. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56(2006)).

The Fourth Amendment protects individuals against unreasonable search and seizures. See U.S. Const. amend. IV. In conducting a search, agents are limited to the scope of the applicable warrant and have a duty to execute a search in a reasonable manner. United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993); United States v. Mendoza, 817 F.3d 695 (10th Cir. 2016); United States v. Basham, 268 F.3d 1199 (10th Cir. 2001); Lawmaster v. Ward, 125 F.3d 1341 (10th Cir. 1997). Failure to conform to these requirements violates an individual's Fourth Amendment rights. Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985).

It is important to note, however, that not every constitutional violation, and not every 4th Amendment violation, necessarily results in the suppression of evidence. See Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2D 441 (1963); United States v. Shareef, 100 F.3d 1491, 1508 (10th Cir. 1996). As a remedy for 4th Amendment violations, suppression of evidence is designed to deter future unconstitutional police conduct. Davis v. United States, 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2D 285 (2011).

Suppression is often characterized as a "last resort," primarily because exclusion of evidence comes at substantial societal cost, often resulting in the guilty avoiding conviction. Hudson v. Michigan, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2D 56 (2006). Therefore, to be entitled to a remedy of suppression, a defendant must first establish that there was a violation of his 4th Amendment rights, and second, that suppression is the appropriate remedy. United States v. Leon, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2D 677 (1984) ("Whether the exclusionary rule is appropriately imposed . . . is a separate issue from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct"); United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); United States v. Orozco, 575 F.Supp.2d 1191, 1207 (D. Colo. 2008).

Generally, suppression is warranted only where there is a causal connection between the illegal police conduct and the evidence obtained; in other words, where, but-for the illegal conduct, the contested evidence would not have been discovered. See, e.g., Hudson, 547 U.S. at 592; United States v. Hargus, 128 F.3d 1358, 1363 (10th Cir. 1997) ("If evidence is illegally seized, the general rule is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was flagrant disregard for the terms of the warrant"). In circumstances where a 4th Amendment violation occurs but suppression is not warranted, the individual may instead seek civil damages through an action under Bivens or 42 U.S.C. ɛ 1983. See, e.g., Wilson v. Layne, 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2D 818 (1999); Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2D 978 (1999).

Where, but-for the illegal conduct perpetrated by law enforcement officials who swore an oath to uphold the constitution defendants would not have been incarcerated for over ~~almost~~ 4 years. It is imperative that the defendants hone in on the constitutional violations perpetrated by law enforcement officials. It is because of their flagrant disregard for defendants constitutional rights why we are here. The contested evidence would not have been discovered.

A. Suppression Resulting From Flagrant Disregard for Warrant's Limitations

11

In cases where police misconduct is particularly egregious, broad (or, as some courts have described, "blanket") suppression may be warranted even without a causal connection between the misconduct and the evidence. "Blanket suppression" is typically reserved for instances where officers completely ignore a warrant's limitations and treat a search as a general "fishing expedition," rummaging through property for any indication of broad criminal activity. See United States v. Webster, 809 F.3d 1158 (10th Cir. 2016) (blanket suppression is warranted where searches conducted pursuant to a warrant turn into general searches in disregard of the particularity requirement); United States v. Le, 173 F.3d 1258, 1270 (10th Cir. 1999); United States v. Moraga, 76 Fed App'x 223, 229 (10th Cir. 2003); see also United States v. Shi Yan Liu, 239 F.3d 138, 140-41 (2d Cir. 2000) (the rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith essentially becomes an impermissible general search); United States v. Squillacote, 221 F.3d 542, 556 (4th Cir. 2000) ("The extraordinary remedy of blanket suppression of all evidence seized should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search") (quoting United States v. Chen, 979 F.2d 714, 717 (9th Cir. 1992)).

The seminal case in the 10th Circuit for this proposition is United States v. Medlin, 842 F.2d 1194 (10th Cir. 1988). There, federal officials obtained a warrant to seize "illegally possessed and/or stolen firearms" from the defendant. The federal officials, accompanied by local police, executed the warrant, seizing 130 firearms. However, during the search, the local officers also proceed to search for any other stolen property that might be evidence of state crimes, eventually seizing more than 600 additional items, none of which were covered by the warrant. After concluding that the federal officers were responsible for the seizures made by the local officials, the 10th Circuit took up the question of whether suppression of the properly-seized firearms was warranted. Describing the general rule as "evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit 'flagrant disregard' for its terms," the court found that standard to be satisfied by the local officers' conduct. Id. at 1198-99. The court's reasoning was that "[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." Id. at 1199.

12

The rule in Medlin has been consistently applied in similar cases. For example, in United States v. Foster, 100 F.3d 846, 849 (10th Cir. 1996), officers flagrantly disregarded the scope of a warrant authorizing seizure of marijuana and guns, searching and seizing all items of "value," such as electronics, videotapes, a lawn mower, coins, knives, and jewelry. See Foster, 100 F.3d at 849-50. Finding that "the officers here flagrantly disregarded the terms of the warrant in seizing property," and relying in Medlin, the court concluded that suppression of the otherwise properly-seized marijuana and weapons was required. Id. at 851. (The court also rejected an argument that suppression was appropriate only if officers both sought and executed the warrant in bad faith. Id.). By contrast, the 10th Circuit found that "no "indiscriminate rummaging or hours of ransacking" occurred where officers, armed with a warrant to seize a rifle and accompanying ammunition that had been used in a prior shooting, proceeded to discover the stated evidence in proximity to numerous other firearms, other weapons and paraphernalia, (both firearms and otherwise), a pipe bomb, and welding equipment that could have been used to build the pipe bomb, all of which officials seized. U.S. v. Sells, 463 F.3d 1148, 1162 (10th Cir. 2006). The court described the Medlin rule as one in which "flagrant disregard [for] the permissible scope, duration, and intensity of the search" permitted by the warrant "would require the 'extreme remedy' of total suppression," but concluded that the facts there did not demonstrate such disregard. Id.

The 10th Circuit also found no basis for suppression in United States v. Webster, 809 F.3d 1158 (10th Cir. 2016). There, two teams of local officers executed a warrant to seize drugs and drug paraphernalia from the defendant's home. The execution was accomplished by the first team, a group specializing in forced entries, entered and secured the defendant's home, followed by a narcotics team that actually conducted the search for and seizure of drugs and other items mentioned in the warrant. At some point thereafter, the defendant noticed that other items of his personal property, including cash, a cell phone, and a game console were missing. Although the defendant proceeded to plead guilty to the drug charges, he later learned from FBI officials that certain members of the forced entry team that executed the warrant had been discovered to be stealing personal property during searches, and one member had been found in possession of the defendant's game console, among other items. The defendant sought to withdraw his guilty plea and seek suppression of the fruits of the warrant, but the 10th Circuit rejected the argument. Carefully distinguishing Medlin and Foster, the court observed that: (i) unlike Medlin, there was no evidence that members of the narcotics team who actually seized the drug evidence knew of or condoned the forced entry officers' taking of the defendant's other property; and (ii) unlike Foster, the narcotics officers did not unduly extend their time in the defendant's house in order to search for other evidence beyond that listed in the warrant. Id. at 1169-70.

13

In sum, blanket suppression is predominantly applied where agents grossly disregard the specific limits of a warrant and proceed to search for and seize property that is entirely unrelated to that authorized by the warrant.

B. Suppression Resulting From General Disregard for Constitutional Rights

Suppression of evidence is also sometimes warranted where law enforcement acts particularly reprehensibly, with flagrant disregard for a suspect's constitutional rights. U.S. v. Edwards, 666 F.3d 877, 886 (4th Cir. 2011); United States v. Thompson, 667 F.Supp.2d 758 (S.D. Ohio 2009). The question of whether law enforcement officers acted with such extreme disregard for the intended intensity of a search that suppression is required to deter such conduct is resolved on a case by case basis. United States v. Penn, 647 F.2d 876, 882 n. 7 (9th Cir. 1980), cert den'd, 449 U.S. 903, 101 S. Ct. 276, 66 L. Ed. 2d 134.

3. Exposing Mr. Wyatt to Media Coverage
The Supreme Court has, on several occasions, held that police officers' inviting members of the media to observe the execution of a warrant to constitute a Fourth Amendment violation. Wilson v. Layne, 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2D 818 (1999); Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2D 978 (1999); see also Robinson v. City & County of Denver, 39 F.Supp.2d 1257, 1265 (D. Colo. 1999).

Defendant alleges that there were many defects in the warrant executed by TCSO, and that the TCSO exceeded the scope of the warrant when seizing evidence. Where, but-for the illegal conduct, the contested evidence would not have been discovered. Government exhausted tremendous resources trying to build a case on defendants since 2003. They were not able to build a case by following the constitutional norms so they decided to disregard those norms and operate outside of the bounds that the Constitution sets limits on. Just because they are law enforcement officials does not mean they can violate defendants right with impunity. TCSO and FBI used the search warrants as a fishing expedition. Defendant is respectfully requesting the court to grant a blanket suppression.

14

Article 11, Section 10 of the New Mexico Constitution provides, "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures...." In Gutierrez, we stated that this clause is an expression of " the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusion." 116 N.M. At 444, 863 P.2d at 1065. The court emphasized that the purpose of the exclusionary rule is not to deter or ensure judicial integrity, but to " effectuate in the pleading case the constitutional right of the accused to be free from unreasonable search and seizure. " Gutierrez 116 N.M. At 446, 863 P.2d at 1067. We find no mandate in the text of Article 11, Section 10, nor in our jurisprudence interpreting this clause, to selectivity protect New Mexico's inhabitants from intrusions committed by state but not federal government actors. Nor do we believe such a limitation is appropriate. Unlike the private actors with whom the State compares them, federal agents exercise jurisdiction over New Mexicans and possesses the authority to systematically subject our inhabitants to searches, seizures and other interferences. A federal agent who wields those powers unreasonably commits precisely the sort of " unwarranted governmental intrusion" against which the New Mexico Constitution ensures. We hold that when a Federal agent effectuates such an intrusion and the State proffers the evidence thereby seized in state court, we will subject it to New Mexico's exclusionary rule. See State v. Snyder, 1998 NMCA 166, P11, 126 N.M. 168, 927 P.2d 843 ( applying the exclusionary rule to use, in a New Mexico state court, of evidence seized in New Mexico by federal Border Patrol agents in violation of the New Mexico Constitution); State v, Davis, 313 Ore. 246, 834 P.2d 1008, 1012 ( Or. 1992) ( holding that given the emphasis placed on individual rights by the Oregon Constitution, Oregon's search and seizure provision applies no matter " where that evidence was obtained ( in- state or out- of- state), or what government entity ( local, state, federal, or out- of- state) obtained it.... "); State v. Williams, 94 Wn.2d 531, 617 P.2d 1012, 1017- 18 ( Wash. 1980)( concluding that the Washington privacy Act " fully applies to evidence proffered in state court, even when that evidence was gathered by federal peace officers."); cf. Wilson v. Schnettler, 365 U.S. 381, 391, 5 l. Ed.2d 620, 81 S.Ct. 632 (1961)( Douglas, J., dissenting)( "In the state trial the issue will not be whether the federal agents have acted within the limits of their federal authority , but whether, under the state constitution, the search was a reasonable one."); but see State v. Mollicia, 114 N.J.329, 554 A.2d 1315, 1327 ( N.J. 1989) ( refusing to apply the New Jersey Constitution to the actions of federal officers because such application " would disserve the principals of federalism and comity without properly advancing legitimate state interests.")
The exclusionary rule is meant to deter a "flagrant or deliberate violation of rights." United States v. Otero, 563 F.3d 1127, 1134 ( 10th Cir. 2009)

## *Fifth Amendment*

The Self-Incrimination Clause of the Fifth Amendment provides that "[n]o persons . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2D 694 (1966), the United States Supreme Court held that a suspect must be informed about his or her right against self-incrimination. But the obligation to administer a Miranda warning only arises when a defendant is in custody and being interrogated. Id.

The Fifth Amendment to the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. 5. In order to safeguard that right, the Supreme Court announced in Miranda that "[p]rior to any questioning, the person [in custody] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. The Court held that unless that warning is given and knowingly and voluntarily waived, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." Id. But the Miranda rule does not create an independent constitutional right to such warnings. It is simply "a prophylactic measure to prevent violations of the right protected by the text of the Self-Incrimination Clause-the admission into evidence in a criminal case of confessions obtained through coercive custodial questioning." Chavez v. Martinez, 538 U.S. 760, 772, 123 S. Ct. 1994, 155 L. Ed. 2D 984 (2003).
Although a Miranda violation raises a presumption of coercion, the test is whether a suspect's will was overborne by the circumstances surrounding the giving of the confession, the test is whether a suspect's will was overborne by the circumstances surrounding the giving confession. The test, based upon the totality of the circumstances, considers both the characteristics of the accused and the details of the interrogation. Relevant factors can include: (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) Whether the defendant was advised of his constitutional rights; and (5) Whether the defendant was subjected to physical punishment.

Prior to custodial questioning, a suspect must be warned that he has the right to remain silent, that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Without these warnings, custodial confessions are presumed to be the product of coercion and are generally inadmissible for purposes of the prosecution's case in chief.

ꞇ

Miranda warnings aren't always required. They need only be given once an individual is in custody and subjected to interrogation.

An individual is in custody for Miranda purposes when a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest. This is an objective, fact-intensive inquiry that focuses on the totality of the circumstances. Several relevant factors inform a court's analysis, including: (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made the defendant aware that he or she was free to refrain from answering questions, or to otherwise end the interview.

Vertical stare decisis is absolute and requires an appellate court, as middle-management circuit judges, to follow applicable United States Supreme Court precedent in every case. So once the Supreme Court has adopted a rule, standard, or interpretation, the appellate court must use that same rule, standard, or interpretation in later cases. When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which the appellate court is bound. This is a straightforward task when the Court issues a single majority opinion that agrees on both the result and the reasoning.

### _Sixth Amendment_

Federal law clearly establishes the right to effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 684, 686, 104 S. Ct. 2052, 80 L. Ed. 2D 674 (1984) (recognizing that "the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial," and that "the right to counsel is the right to the effective assistance of counsel" (internal quotation marks omitted)).
Held:
1. The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The same principle applies to a capital sentencing proceeding-such as the one provided by Florida law-that is sufficiently like a trial in its adversarial format and in the existence of standards for decision that counsel's role in the proceeding is comparable to counsel's role at trial.

2. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case.

(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.

3. A number of practical considerations are important for the application of the standards set forth above. The standards do not establish mechanical rules; the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. The principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. And in a federal habeas corpus challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 USC ɛ 2254(d) [28 USCS ɛ 2254(d)], but is a mixed question of law and fact.

Habeas Corpus ɛ 14.5 - unexhausted claims

1. The exhaustion rule, requiring dismissal of mixed federal habeas corpus petitions

2. The Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

3. A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding.

4. That a person who happens to be a lawyer is present at trial alongside the accused is not enough to satisfy the Sixth Amendment; an accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to insure that the trial is fair.

5. The right to counsel is the right to the effective assistance of counsel.

6. Government violates the right to effective assistance of counsel when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.

7. Counsel can deprive a defendant of the right to effective assistance of counsel simply by failing to render adequate legal assistance.

8. The benchmark for judging any claim of the effectiveness of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

9. A capital sentencing proceeding which involves a hearing with a right to an advisory jury, with argument by counsel and findings of aggravating and mitigating circumstances, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial for the purposes of determining constitutionally effective assistance of counsel.

10. A convicted defendant's claim that his counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components, each of which the defendant must show in order to set aside the conviction or death sentence: (1) that counsel's performance was deficient, which requires a showing that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. (Marshall, J., dissented from this holding.)

11. The proper standard for attorney performance is that of reasonably effective assistance; when a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. (Marshall, J., dissented from this holding.)

12. In representing a criminal defendant, counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest, a duty to advocate the defendant's cause, a duty to consult with the defendant on important decisions, a duty to keep defendant informed of important developments in the course of the prosecution, and a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

13. In any case presenting a claim that counsel's assistance was constitutionally ineffective, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances, and prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable, but they are only guides which cannot interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

14. A fair assessment of performance of a criminal defense attorney, under the Sixth Amendment requirement of effective assistance of counsel, requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

15. A court must indulge a strong presumption that criminal defense counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. (Marshall, J., dissented from this holding.)

16. A court deciding a criminal defense counsel's actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. (Marshall, J., dissented from this holding.)

17. A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment; the court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, keeping in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case, and recognizing that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. (Marshall, J., dissented from this holding.)

18. Strategic choices made by criminal defense counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengable, while strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations; in other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, and a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

19. Inquiry into criminal defense counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, since when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether, and when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

20. An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.

21. Any deficiencies in criminal defense counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

22. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.

23. Prejudice to a criminal defendant by reason of his counsel's conflict of interest is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.

21

24. Even if a criminal defendant shows that particular errors of defense counsel were unreasonable, the defendant must show that they actually had an adverse effect on the defense in order to establish ineffectiveness of counsel violative of Sixth Amendment rights.

25. The test for prejudice resulting from the ineffectiveness of criminal defense counsel requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

26. In making the determination whether specified errors by criminal defense counsel resulted in prejudice to the accused, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law, and reasonably, conscientiously, and impartially applied the standards that govern the decision, without considering evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about a particular judge's sentencing practices.

27. When a defendant challenges a conviction on the ground of prejudicial ineffectiveness of counsel, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

28. When a defendant challenges a death sentence on the ground of prejudicially ineffective representation of counsel at the sentencing hearing, the question is whether there is a reasonable probability that, absent the errors the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. (Marshall, J., dissented from this holding.)

29. In determining whether prejudice resulted from a criminal defense counsel's ineffectiveness, the court must consider the totality of the evidence before the judge or jury, taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, and then asking if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. (Marshall, J., dissented from this holding.)

30. In adjudicating a claim of actual ineffectiveness of criminal defense counsel, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged and on whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

31. To the extent that the guiding inquiry in the lower courts on the effectiveness of criminal defense counsel has been with respect to the fundamental fairness of the proceeding, ineffectiveness claims rejected under different standards from those articulated in Strickland v Washington (1984) _ US _, 80 L Ed 2d _, S Ct _, need not be reconsidered.

32. A court need not determine whether criminal defense counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies; if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed, so that ineffectiveness claims do not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

33. The principles governing claims of the ineffectiveness of criminal defense counsel apply in federal collateral proceedings such as habeas corpus as well as on direct appeal or in motions for a new trial.

34. Although state-court findings of fact made in the course of deciding a claim of the ineffectiveness of criminal defense counsel are subject to the deference requirement of 28 USCS ℄ 2254(d), which deals with the weight to be accorded state-court findings in federal habeas corpus proceedings, and although Federal District Court findings are subject to the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure, both the performance and prejudice components of ineffectiveness inquiry, like the conflicts of interest inquiry, are mixed questions of law and fact so that conclusions thereon are not binding under 28 USCS ℄ 2254(d) or Rule 52(a).

35. Criminal defense counsel's conduct at and before his client's state-court sentencing proceeding is not unreasonable where his strategy choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on the defendant's acceptance of responsibility for his crimes is well within the range of professionally reasonable judgments, given the trial judge's views on the importance of owning up to one's crimes, the utterly overwhelming aggravating circumstances, the little help to be expected from character and psychological evidence, and the advantage to be gained from restricting contrary character and psychological evidence and the defendant's criminal history, which counsel successfully moves to exclude. (Marshall, J., dissented from this holding.)

36. A convicted state-court defendant is not prejudiced by his counsel's conduct at and before his sentencing proceeding where the evidence that the defendant argues that his counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge, and might even have been harmful to his case by permitting the admission of his "rap sheet" and psychological reports directly contradicting the defendant's claim that the mitigating circumstance of extreme emotional disturbance apply to his case. (Marshall, J., dissented from this holding.)

## RULES OF PROFESSIONAL CONDUCT

## NMRA 16-101 Competence

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

OFFICIAL COMMENT

Legal Knowledge and Skill

Committee Commentary.- [1] In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.

[2] A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

24

[3] In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required where referral to or consultation or association with another lawyer would be impractical. Even in an emergency, however, assistance should be limited to that reasonably necessary in the circumstances, for ill-considered action under emergency conditions can jeopardize the client's interest.

[4] A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation. This applies as well to a lawyer who is appointed as counsel for an unrepresented person. See Rule 16-602 NMRA.

[5] When the circumstances of the representation require it, a lawyer should counsel the client about the client's use and maintenance of social media including the impact of privacy settings and the consequences of posting and removing content.

Thoroughness and Preparation

[6] Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence. An agreement between the lawyer and the client regarding the scope of the representation may limit the matters for which the lawyer is responsible. See Rule 16-102(C) NMRA.

## 16-102 scope of representation and allocation of authority between client and lawyer

A. Client's decisions. Subject to Paragraphs C and D of this rule, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 16-104 NMRA of the Rules of Professional Conduct, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

B. Representation not endorsement of client's views. A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

C. Limitation of representation. A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

D. Course of conduct. A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent or misleads the tribunal. A lawyer may, however, discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

## 16-103 Diligence

A lawyer shall act with reasonable diligence and promptness in representing a client.

OFFICIAL COMMENT

Committee commentary

Committee Commentary.- [1] A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued. See Rule 16-102 of the Rules of Professional Conduct. The lawyer's duty to act with reasonable diligence does not require the use of offensive tactics or preclude the treating of all persons involved in the legal process with courtesy and respect.

[2] A lawyer's workload must be controlled so that each matter can be handled competently.

[3] Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. A lawyer's duty to act with reasonable promptness, however, does not preclude the lawyer from agreeing to a reasonable request for a postponement that will not prejudice the lawyer's client.

[4] Unless the relationship is terminated as provided in Rule 16-116 of the Rules of Professional Conduct, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved. If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so. For example, if a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client and the lawyer and the client have not agreed that the lawyer will handle the matter on appeal, the lawyer must consult with the client about the possibility of appeal before relinquishing responsibility for the matter. See Subparagraph (2) of Paragraph A of Rule 16-104 of the Rules of Professional Conduct. Whether the lawyer is obligated to prosecute the appeal for the client depends on the scope of the representation the lawyer has agreed to provide to the client. See Rule 16-102 of the Rules of Professional Conduct.

## 16-114 Client with diminished capacity

A. Client-lawyer relationship. When a client's capacity to make adequately considered decisions in connection with the representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

B. Protective action. When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.

C. Protected information. Information relating to the representation of a client with diminished capacity is protected by Rule 16-106 of the Rules of Professional Conduct. When taking protective action pursuant to Paragraph B of this rule, the lawyer is impliedly authorized under Paragraph A of Rule 16-106 of the Rules of Professional Conduct to reveal information about the client, but only to the extent reasonably necessary to protect the client's interests.

OFFICIAL COMMENT

## Committee commentary

Committee Commentary.- [1] The normal client-lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters. When the client is a minor or suffers from a diminished mental capacity, however, maintaining the ordinary client-lawyer relationship may not be possible in all respects. In particular, a severely incapacitated person may have no power to make legally binding decisions. Nevertheless, a client with diminished capacity often has the ability to understand, deliberate upon, and reach conclusions about matters affecting the client's own well-being. For example, children as young as five or six years of age, and certainly those of ten or twelve, are regarded as having opinions that are entitled to weight in legal proceedings concerning their custody. So also, it is recognized that some persons of advanced age can be quite capable of handling routine financial matters while needing special legal protection concerning major transactions.

[2] The fact that a client suffers from diminished capacity does not diminish the lawyer's obligation to treat the client with attention and respect. Even if the person has a legal representative, the lawyer should as far as possible accord the represented person the status of client, particularly in maintaining communication.

[3] The client may wish to have family members or other persons participate in discussions with the lawyer. When necessary to assist in the representation, the presence of such persons generally does not affect the applicability of the attorney-client evidentiary privilege. Nevertheless, the lawyer must keep the client's interests foremost and, except for protective action authorized under Paragraph B, must look to the client and not family members to make decisions on the client's behalf.

[4] If a legal representative has already been appointed for the client, the lawyer should ordinarily look to the representative for decisions on behalf of the client. In matters involving a minor, whether the lawyer should look to the parents as natural guardians may depend on the type of proceeding or matter in which the lawyer is representing the minor. If the lawyer represents the guardian as distinct from the ward and is aware that the guardian is acting adversely to the ward's interest, the lawyer may have an obligation to prevent or rectify the guardian's misconduct. See Paragraph D of Rule 16-102 of the Rules of Professional Conduct.

## Taking Protective Action

[5] If a lawyer reasonably believes that a client is at risk of substantial physical, financial or other harm unless action is taken, and that a normal client-lawyer relationship cannot be maintained as provided in Paragraph A because the client lacks sufficient capacity to communicate or to make adequately considered decisions in connection with the representation, then Paragraph B permits the lawyer to take protective measures deemed necessary. Such measures could include: consulting with family members, using a reconsideration period to permit clarification or improvement of circumstances, using voluntary surrogate decision-making tools such as durable powers of attorney or consulting with support groups, professional services, adult-protective agencies or other individuals or entities that have the ability to protect the client. In taking any protective action, the lawyer should be guided by such factors as the wishes and values of the client to the extent known, the client's best interests and the goals of intruding into the client's decision-making autonomy to the least extent feasible, maximizing client capacities and respecting the client's family and social connections.

[6] In determining the extent of the client's diminished capacity, the lawyer should consider and balance such factors as the client's ability to articulate reasoning leading to a decision, variability of state of mind and ability to appreciate consequences of a decision, the substantive fairness of a decision and the consistency of a decision with the known long-term commitments and values of the client. In appropriate circumstances, the lawyer may seek guidance from an appropriate diagnostician.

[7] If a legal representative has not been appointed, the lawyer should consider whether appointment of a guardian ad litem, conservator or guardian is necessary to protect the client's interests. Thus, if a client with diminished capacity has substantial property that should be sold for the client's benefit, effective completion of the transaction may require appointment of a legal representative. In addition, rules of procedure in litigation sometimes provide that minors or persons with diminished capacity must be represented by a guardian or next friend if they do not have a general guardian. In many circumstances, however, appointment of a legal representative may be more expensive or traumatic for the client than circumstances in fact require. Evaluation of such circumstances is a matter entrusted to the professional judgment of the lawyer. In considering alternatives, however, the lawyer should be aware of any law that requires the lawyer to advocate the least restrictive action on behalf of the client.

## Disclosure of the Client's Condition

[8] Disclosure of the client's diminished capacity could adversely affect the client's interests. For example, raising the question of diminished capacity could, in some circumstances, lead to proceedings for involuntary commitment. Information relating to the representation is protected by Rule 16-106 of the Rules of Professional Conduct. Therefore, unless authorized to do so, the lawyer may not disclose such information. When taking protective action pursuant to Paragraph B, the lawyer is impliedly authorized to make the necessary disclosures, even when the client directs the lawyer to the contrary. Nevertheless, given the risks of disclosure, Paragraph C limits what the lawyer may disclose in consulting with other individuals or entities or seeking the appointment of a legal representative. At the very least, the lawyer should determine whether it is likely that the person or entity consulted with will act adversely to the client's interests before discussing matters related to the client. The lawyer's position in such cases is an unavoidably difficult one.

## Emergency Legal Assistance

[9] In an emergency where the health, safety or a financial interest of a person with seriously diminished capacity is threatened with imminent and irreparable harm, a lawyer may take legal action on behalf of such a person even though the person is unable to establish a client-lawyer relationship or to make or express considered judgments about the matter, when the person or another acting in good faith on that person's behalf has consulted with the lawyer. Even in such an emergency, however, the lawyer should not act unless the lawyer reasonably believes that the person has no other lawyer, agent or other representative available. The lawyer should take legal action on behalf of the person only to the extent reasonably necessary to maintain the status quo or otherwise avoid imminent and irreparable harm. A lawyer who undertakes to represent a person in such an exigent situation has the same duties under these rules as the lawyer would with respect to a client.

[10] A lawyer who acts on behalf of a person with seriously diminished capacity in an emergency should keep the confidences of the person as if dealing with a client, disclosing them only to the extent necessary to accomplish the intended protective action. The lawyer should disclose to any tribunal involved and to any other counsel involved the nature of his or her relationship with the person. The lawyer should take steps to regularize the relationship or implement other protective solutions as soon as possible. Normally, a lawyer would not seek compensation for such emergency actions taken.

**In representing a criminal defendant, counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest, a duty to advocate for the defendant's cause, a duty to consult with the defendant on important decisions, a duty to keep defendant informed of important developments in the course of the prosecution, and a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.**

In analyzing this criteria defendant's counsel; failed to notify defendants that the government was planning on making this case complex. All of counsel was privy to this important information at an early stage of the case. They never informed defendants nor asked them if they wanted to oppose. (See Doc. 47 unopposed motion to declare case complex, October 2, 2018 Doc. 49 Granting unopposed motion designating this case complex). This is something the Court admonished the defendant on his denial of the speedy trail violation motion (See Doc. 388 Speedy trail denial ). Defendant was prejudice by this, they never had an option to oppose the complex case order and preserve it on the records. Defendant would have asserted his speedy rights claims much earlier had he have known. Defendant's lawyer Zach Ives disappeared after the detention hearing in September 2018 defendant could not reach him for months to get an update on his case. Defendant had to have his mother email Zach for an update. When he finally responded to her email he informed her that the court had declared this case complex. ( See Attachment 2 emails from Zach to defendant's mother).

All of defendant's attorneys filed an unopposed motion to stay these proceedings pending competency issues. ( See Doc. 192 February 18, 2020). Wahhaj opposed this stay with his attorneys in private. The boys were never deposed per defendants' directives. The Boys statements are highly relevant to the central issue in the case. Defendants are concerned about their availability, they were 15 and 13 at the time, they could have forgotten. Their testimony should have been preserved this goes to the heart of interest of justice. Defendants asked their counsel for a deposition hearing in order to preserve the boys testimony for trial. This case is predicated on two important facts .1) The illegal search warrant executed by TCSO on August 3, 2018. 2) The illegal interrogation of defendant's minor children. The indictment was exclusively filed from the testimony of defendant's minor children from an illegal coercive interrogation without their Miranda warnings being read, counsel being present, their parents' written or verbal consent, nor a court order, nor verifying their statements. Defendants were denied the Confrontation Clause to confront witnesses against them guaranteed in the 6th Amendment of the Constitution.

31

This is something all of counsel knew in 2018 and never launched a collateral attack. The boys were 15 and 13 respectively. An expert was not called to view the videos to determine if they were coerced, nor an interview was conducted to determine the boys state of mind. 4 years had passed and their memory could have been affected;this greatly prejudiced defendants. This was not argued in the speedy trail motion filed by defendant's counsel but was asserted by defendant to counsel in private. Defendants does not know if their children were scared and were compelled to tell law enforcement agents anything so they would not get in trouble. Lucas Morton filed a motion outlining challenging the validity of the children's statements under coercion and duress on February 10, 2020. ( See Doc. 186 ) His motion was dismissed without prejudice pending competency evaluation. ( See Doc. 193 February 18, 2020 ) Defendant sent a sworn notarized affidavit on June 2020 to his attorneys asserting that right. ( See Attachment 3 letter to attorney)

This is something Judge Khalsa acknowledged at the detention hearing and said it is a legitimate argument that can be raised at a latter time. Mr. Ives stated,what we have are firearms charges. We don't have any charges for conspiring to – conspiring to plot a terrorist attack or providing material support to a designated terrorist. We don't have any of that. So where-- what is the evidence here about so----called jihad and violent attacks? It – as we heard today, it comes from-- almost exclusively from these two minor children who have been questioned repeatedly without their parents, without legal guardians present in the room, and we would ask the court to take that in to considerations. Those statements have not been corroborated, either by writings by Mr. Wahhaj or anything else. These are uncorroborated statements by minor children in a – what we believe is a – is a fairly coercive environment. As to the strength of the evidence, it seems very revealing to me that we didn't hear anything about Mr. Wahhaj's mens rea. This is – this is a case about possession of guns, and as I said, he had a second Amendment right to possess those guns ( indiscernible, audio skips) prohibited person or didn't have the right to possess those guns. What the indictment alleges is that he was part of a conspiracy to " knowingly provide Jany Leveille, an alien, possession of firearms." So knowingly is a  key word there, because it applies, also, to her immigration status. In order to commit this crime, they have to have some evidence that he was aware that she was in the country illegally. It can't just be that he presented a firearm-- or he allowed her access to a firearm, but he didn't know about her immigration status or he thought she was here legally."

"There must be some evidence of knowledge, and that's clear, even for general intent crime, Your Honor. In the Tenth Circuit, very recently, just this year, said, even when specific intent is not required-- and actually conspiracy is a specific intent crime in the Tenth Circuit-- but even where specific intent is not required, criminal status are usually read to require only that the defendant know the facts that make his conduct illegal. So one of the facts that makes it illegal, of course, is that Ms. Leveille was here unlawfully during the time period in question, which we heard no evidence of."

The COURT: "Well, but the Grand Jury's returned an Indictment charging that, and the Grand Jury has found probable cause to charge that. And so, certainly, I'm taking judicial notice of that, but of course, probable cause is not beyond a reasonable doubt, and these are arguments that certainly are appropriate after today's hearing." ( See Detention hearing in Albuquerque September 2018 Pages 158-160 )

Defendants had to sit by for 4 years while counsel refuses to launch a collateral attack on the merits of this case; with an exception of Erlinda Johnson and Thomas Clark, all of the remaining counsel are concerned with is launching endless competency evaluations. Even when counsel files a motion it is watered down not addressing the core issues. This leaves defendants no other other options but to preserve the record of the constitutional violations perpetrated by law enforcement officials themselves. From the inception of this case defendants have been prejudiced. It is going on 4 years, defendants will not sit by and watch counsel continue to ignore these serious constitutional violations. It is very pertinent to preserve the record in pretrial motions. It is the defendant's assessment, based on facts, that the defendants will not get a fair trail.

It is defendants only line of defense is to preserve these unconstitutional violations themselves because counsel refuses to address them. Counsel can not explain away or make excuses why they did not launch a collateral attack on the validity of this case from the inception. This is something defendants requested and were denied. They all knew this case was predicated on the falsifying of the search warrant by TCSO and the illegal coerced interrogation of defendants minor children by the FBI. Most of defendant's attorneys know very little about Islam. They do not know what governs Muslims and why. How can they adequately launch a collateral attack outlying the religious discrimination perpetrated by law enforcement officials if they are not willing to learn/ and or get practicing Muslim experts that are well versed in Islamic practices and belief. The FBI deliberately targeted defendants because they are Muslims.

33

At the core of this case is religious persecution and discrimination. Islamic devotion in the eyes of Muslims can be interpreted as religious fanaticism/ or delusional in the eyes of someone who knows very little about Islam. This greatly prejudice defendants because under the First Amendment and RFRA religious practices may not be burdened. If counsel does not preserve this on the record this greatly prejudices defendants. Either defendant's lawyers are incompetent or they are complicit to the conspiracy to violate defendant's constitutional rights in order to further their careers. This case may be a career changer for them. Interestingly enough two of defendant's (Mr. Wahhaj) former counsels was promoted to state appellate judges by the Governor of New Mexico.

By counsel consistently raising the issue of competency they are implying that defendants have diminished capacity counsel are opening up the possibility for them to take protective action, or at the very least it taints the court's views that there are some potential serious mental issues; this causes defendants irreparable harm. The court may not take any of defendant's motions seriously like Lucas Morton's motion. ( See Doc. 186) Counsel showed their hand in the motion they jointly objected to filing of motion for CIPA pretrial Conference......In addition to violating the Court's stay, the *ex parte* submission called four of the five defendants are in competency proceedings and cannot participate in their defense, and implicates those Defendants' counsels' professional responsibility to take reasonably necessary protective action for clients with diminished capacity. (See Doc. 260 Pages 1, 2 Rule 16- 114 (B) NMRA)

Under the Sixth Amendment's Confrontation Clause, a criminal defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This includes the right to cross-examine witnesses. See Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2D 347 (1974); United States v. Begay, 937 F.2d 515, 523 (10th Cir. 1991) (stating, "to establish [a] 6th Amendment violation, defendant must show that he was precluded from offering evidence material and favorable to his defense" (quotations omitted)). "[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316-17.

The right to cross examine includes the right to impeach the alleged victim by establishing and explaining the victim's motivation to lie. Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 102 L. Ed. 2D 513 (1988). But, "[t]he Confrontation Clause does not require the admission of potentially inflammatory and irrelevant testimony when a defendant has other avenues to attack a witness's credibility." United States v. Oliver, 278 F.3d 1035, 1041 (10th Cir. 2001).

The Supreme Court has long held that the rights to confront and cross-examine witnesses and to call witnesses in one's behalf are essential to due process. See Chambers v. Mississippi, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Indeed, the Court has emphasized that cross-examination "is critical for ensuring the integrity of the fact-finding process" and "is the principal means by which the believability of a witness and the truth of his testimony are tested." Stincer, 482 U.S. at 736; Davis v. Alaska, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). Accordingly, we recently held that a "defendant's right to confrontation may be violated if the trial court precludes an entire relevant area of cross-examination." United States v. Lonedog, 929 F.2d 568, 570 (10th Cir. 1991) (citing United States v. Atwell, 766 F.2d 416 (10th Cir.), cert. denied, 474 U.S. 921, 88 L. Ed. 2d 259, 106 S. Ct. 251 (1985)).

### *Fourteenth Amendment*

First, the state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse. Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125; Ram v, Rubin, 118 F.3d 1306, 1311 ( 9th Cir. 1997)( " An indictment or serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger."); Good, 891 F.2d 1087, 1093 ( 3d Cir. 1989) ( citing Mincey v. Arizona, 437 U.S. 385, 393, 57 L. Ed. 2D 290, 98 S. Ct.2408 (1978)); see also Campbell, 141 F.3d at 927; Franz, 997 F.2d 784; Hurlman v. Rice, 927 F.2d 74, 80 ( 2d Cir. 1991) ( collecting cases). Moreover, the police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it not clear that a crime has been – or will be- committed. See Sevigny v. Dickey, 846 F.2d 953, 957 ( 4th Cir. 1988)( holding that child abuse investigator has a duty to investigate information that would have clarified matters prior to separating children from their parents); BeVier v. Hucal, 806 F.2d 123, 128 ( 7th Cir. 1986) ( officer has duty to " make a thorough investigation and exercise reasonable judgment before involving the awesome power of arrest and detention"). Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations.

The claims of the parents in this regard should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association. Campbell v. Burt, 141 F.3d 927 (9th Cir. 1998); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1991). Because only the children were subject to a seizure, their claims should properly be assessed under the Fourth Amendment. Donald v. Polk County, 836 F.2d 376 ( 7th Cir. 1988); but see J.B. v. Washington County, 127 F.3d 919, 928 (10th Cir.19970 ( noting that there may be circumstances in which a parent has standing to bring a Fourth Amendment claim for seizure of a minor child). As the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for removal of children.

All eleven children were taken in protective custody by Affiant and later turned over to CYFD case worker Tony. The three females were taken to Community Against Violence ("CAV") and not initially criminally charge it was Affiant's belief that prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. It should be noted that the women have since been re-interviewed by investigator and FBI agents and none have stated they were held at this compound against their will nor have they given any additional information as to the whereabouts of AG Wahhaj. ( See Exhibit K BN 2492 Affiant  Second search warrant)

TCSO arrested Wahhaj, Lucas Morton, and the women, children were taken to CYFD initially. The women was then illegally separated from their children and placed in CAV. Alexs Kostich on cross examination of Sheriff Jerry Hogfre. Q. Okay. So they were taken into custody without incident? A. Largely. The two males... please understand the females were not charged on the 3rd , on that first day. They were not taken into custody. That didn't happen until after further investigation, Safe room, and so forth had led us additional information believing that they had involvement with the health and welfare of the child; that they certainly were not held against their own will. They, therefore, making in the absence of those statements, they were an active participant in the treatment of these children. (See Taos detention hearing page 41 lines 8-14)

Defendant's family were illegally evicted from their residence; TCSO SGT Rael had a conversation with defendant's family on August 3, 2018 at CYFD. The following is a summary of my conversation with the adult females, at CYFD, August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during my conversation at CYFD, August 3, 2018. I did explain the reason for my contact with them was the property owner Jason Badger, wanted his property back. I also explained I was aware of the fact Lucas Morton has been to court and the case was dismissed.

36

I explained I had checked with Taos County Assessor's office and the land they had built their home on did belong to Jason Badger. I advised them I was going to issue them a non- traffic citation for trespassing. I did also advised them that the citation was going to be a summons to court and that by signing the citation it was not an admission of guilt, but rather a promise to appear. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property. I advised the females that I was not going to go further into questing regarding the reason we had to remove then from the property. I did advise them the main reason we were at the property was the fact we were looking for AG, and the last indication we had was he was last known to be with them, but we did not find him. I advised them Siraj Wahhaj had a warrant issued for his arrest, and that's why he was taken into custody. I advised them he was held at ADC, and also charged with a state charge of being a fugitive from justice. All three females appeared to not have knowledge of Siraj having a warrant. Jany Leveille asked about child custody and stated Siraj had joint custody, she was not clear as to why Siraj was charged with kidnapping his own child. I advise the only knowledge I had was from detective in Georgia. I did also advised the three of them Lucas Morton was held at ADC. I then advised them CYFD was involved in the case and they have their own process, but the children will be receiving food and clothing. During my time speaking to the females CYFD Tony Barajas entered the room. I handed out the citations and asked them if they had a New Mexico mailing address, They told me they did not have a mailing address. The three signed the citation and I provided them a copy of their citation. This was the extent of my interactions with the three females at CYFD. ( See Exhibit B BN 2720 Sergeant Jason Rael report)

On or about June 12, 2018, I was made aware J. Badger had filed civil processes' paperwork at TCSO in an effort to have Lucas Morton removed from the property, Sgt. Gilbert Atencio placed the paperwork on my desk as he knew I was working this case. I then advised Undersheriff Steve Miera of the civil process and he advised to place the paperwork in his box, and he would take care of it. I don't recall the date I received information the civil process regarding the J. Badegr case was dismissed by Magistrate Judge E. Ortega. I was also made aware J Badger called NMSP and asked officer to assist in going to his property and evict Lucas Morton. NMSP Sgt. Cox told me a NMSP uniformed officer drove up the compound and was met at the roadway by Lucas Morton. Lucas Morton was by all accounts nice to the officer and the officer left the property without incident. (See Exhibit B BN 2714  Sergeant Jason Rael report)

There are several important points in this report that needs to be unpacked. 1) Sgt. Rael confirmed Jason Badger attempted to evict defendants from the property but the case was dismissed . 2) He failed to include in his report that the case was dismissed with prejudice. 3) Defendants established residency on the property they were living there for more than 6 months. 4) Sgt. Rael did not state in his report it was a hazard to leave the women, children on the property and they had a court order signed by the magistrate judge ordering their removal. 5) Undersheriff Steve Miera illegally persuaded a neutral Magistrate Judge E. Ortega to dismiss the civil case without allowing J. Badger to exercise his due process rights. 6) TCSO intentionally, recklessly denied J. Badger due process rights in order to further the investigations. 7) When it was beneficial to deny J. Badger's civil process rights TCSO did not hesitate in order to further the investigation. 8) Sgt. Rael stated I advised them I was going to issue them a non- traffic citation for trespassing. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property. This was a false pretense to illegally removed defendants from the property. 9) There would be documentation in the courts of J. Badger civil filings, magistrate Judge E. Ortega dismissal with prejudice and a report on NMSP officer traveling to Subject Property. ( See Attachment 4 Badger civil filings Case No. M-53-CV-2018-00076 ) 10) J. Badger filed civil process on June 12, 2018, Lucas Morton was served on June 18, 2018, dismissed with prejudice on June 27, 2018, disposition for lack of prosecution. 11) There was no Writ of Restitution just an illegal removal from defendant's residence. 12) Sgt. Rael advised the females that he was not going to go further into question regarding the reason they had to remove the defendants from the property. He knew the removal was illegal he did not want to entertain any question to why defendants were forcibly being removed.

N.M Stat. Ann.§ 47-8-37 Notice of termination and damages 47-8-46. Writ of Restitution is defined as the act or process of legally dispossessing a person of land or rental. N.M. Stat. Ann.§ 47-8-3

Mr. Krache on direct exaltation of SA Taylor. Q. Now, after they all arrived in Amalia, New Mexico, did they establish a residence there? A. They did. Q. Okay. And was there already any kind of residence there? Any kind of dwelling? A. No ( See Detention hearing in Albuquerque )

Jason and Tanya Badger had a real estate sale and purchase agreement signed by J. Badger on April 5, 2018, Tanya Badger on April 12, 2018, and Lucas Morton April 18, 2018 ( See Attachment 5 Real Estate Sale and Purchase Agreement )

At that point the females were not charged with child abuse. In order for TCSO to legally separate defendant's children from their parents TCSO needed justification . This is when the unholy illegal alliance started to take shape.

38

TCSO filed false child abuse charges against defendants; separated the children from defendants; placed the defendant's children in the care of CYFD; CYFD delayed 4 days in filing a petition of abuse in violation of NMRA 10-312; CYFD illegally allowed the FBI to interrogate defendant's children without their parents knowledge, written or verbal consent, nor counsel being present, nor without their Miranda rights read, nor without a court order. On cross examination of SA Taylor by Mr. Clark. Q. Good afternoon. A. Good afternoon. Q. So the children, F.L. And J.L., one is thirteen and one is fifteen? A. Yes, sir Q. And was any guardian or any of their parents present when you spoke to them? A. CYFD were his guardian at the time and they consented to bring him to the FBI space and a separate interview was done at CYFD, brought by foster mom at the time. Q. So nobody from either one of these boys' real families were there when they were talked to by the FBI, right? A. Correct. Q. Okay. So the fact is you, or whoever, law enforcement, spoke to these fifteen-year-old and thirteen-year-old, they would have been separated from any member of their biological family or [inaudible 02:34:52] family, correct? A. Correct. ( See Taos detention hearing Pages 69,70 lines 23-28 and 1-12)

From these Due Process violations manufactured terrorism charges were filed against defendants. TCSO seized defendants children on August 3, 2018, placed them on a 48 hour hold, filed criminal child abuse charges on August 5, 2018, dismissed on August 23, 2018. CYFD filed civil child abuse charges on August 7, 2018 4 days after TCSO seized defendant's children in violation of NMRA 10-312, in order to gain information to further the investigation. NMRA 10-312 B. **Time limits** if a child is taken into custody, a petition alleging abuse or neglect shall be filed by department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not field within the time set forth in this paragraph, the child shall be released to the child's parents,guardian,or custodian.

CYFD investigator Tony Barajas had a duty to investigate information that would have clarified matters prior to separating the children from their parents. Interestingly enough the FBI interrogated defendant's children before Mr. Barajas did. Mr. Barajas was suppose to make a thorough investigation and exercise reasonable judgment before CYFD removed defendant's children from their custody. CYFD false investigation for alleged child abuse was a pretense for the seizure of defendant's children in the first place; it was clear that those falsified allegations where not the main reason for the seizure, it was to pursue the FBI misguided terrorism investigations aspirations .

The Affaint intentionally, recklessly mislead Judge Backus to illegally gain entry to Subject Property that was egregious enough, but what he did after was impeachable and oppressive. He unlawfully seized and removed defendant's children from their parent's custody without justification in order to further the investigation in violation of the Fourteenth Amendment. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BN 2492 Affiant second search warrant)

The Affiant seized defendant's children before criminally charging defendants. As a result of this malfeasance defendant's children were illegally interrogated by the FBI without defendant's written or verbal consent, without counsel being present, nor with the children Miranda rights being read, and without a court order. From this illegally coerced interrogation federal charges were filed against defendants in violation of the 4th ,5th and 14th Amendment's of the constitution. Defendants were initially fraudulently charged with child abuse and neglect; Judge Backus saw right through this deception and stated she did not see any child abuse.  (See Taos County detention hearing)

The TCSO filed criminal charges on August 5, 2018 and were dismissed without prejudice on August 23, 2018 never refiled again. Interestingly enough CYFD maliciously pursued the removal of defendant's children from their custody. The original plot failed; the criminal charges against defendants were dropped but the other plot succeeded in separating defendant's children from them in order to further the investigation. The conduct of these law enforcement officials exceeded all possible boundaries. With the complicity of CYFD the prosecution continued. The FBI needed time to illegally manufacture federal charges against defendants. This could have not happened if defendant's children were returned to defendants. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BI! 2492 Affiant second search warrant)

TCSO was engaging in a fishing expedition it was their hope by isolating the defendant's children from their parents under the guise of CYFD conducting safe room interviews in order to further the investigation. The normal legitimate legal ways of surveillance, intelligence gathering techniques did not turn up any fruits so they had to resort to illegal tactics. TCSO could not say that they had reasonable cause to believe that defendant's children were in imminent danger of serious bodily injury and that the scope of the intrusion was reasonably necessary to avert that specific injury.

Defendant's children could have not been in imminent danger because TCSO prolonged the charges in order to give CYFD time to conduct safe room interviews. Exigent circumstances did not exist at the time TCSO executed a falsified search warrant on August 3, 2018. Therefore the seizure of defendant's children was a violation of defendant's Fourteenth Amendment of the Constitution. TCSO and CYFD were in violation of Interference with the right to family association protected by the Fourteenth Amendment of the Constitution. Defendant is asserting a pre-deprivation due process claim because their children were taken from their custody without sufficient investigation and a court order. The principle of procedural due process also applies in this context. Defendant's children were unlawfully seized and removed from their parent's custody without justification in order to further the investigation in violation of the Fourteenth Amendment.

It was the Affiant's belief by prolonging the charges in order to give CYFD time to conduct safe room interviews in order to further the investigation. ( See Exhibit BN 2492 Affiant Affidavit for second search warrant) CYFD was a willing collaborator in the conspiracy to deprive defendants from their Due Process rights. CYFD knew they had 2 days to file the petition in order for them to legally take custody of defendant's children. They prolonged the filing in order to fulfill TCSO wishes in order to further the investigation.  NMRA 10-312 B. **Time limits** If a child is taken into custody, a petition alleging abuse or neglect shall be filed by the department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not filed within the time set forth in this paragraph, the child shall be released to the child's parents, guardian, or custodian.

TCSO seized defendant's children on August 3, 2018 filed criminal abuse charges on August 5, 2018. TCSO placed defendant's children on a 48 hour hold in the care of CYFD on August 3, 2018. CYFD intentionally and recklessly delayed the filing petition of abuse for 4 days on August 7, 2018 in violation of NMRA 10-312 B. The FBI first interrogated defendant's children on August 7, 9th 2018. Taos County District Court entered an ex parte custody order on August 9, 2018 and subsequent custody Hearing Order entered on August 17, 2018. Defendants had a CYFD first appearance on August 17, 2018, by that time defendant's children had already been illegally interrogated twice by the FBI without defendant's knowledge or consent. The FBI interrogated them on August 7, 9th , 2018 and the third time was August 21, 2018. Defendant's parental rights were illegally terminated on December 10, 2018. Prior to that illegal relinquishment defendants had full parental rights. CYFD could not have made decisions regarding defendant's children without their parents consent.

There would have not been any civil CYFD charges without TCSO illegal search and seizure. CYFD could not have allowed the FBI to illegally interrogate defendant's minor children without CYFD first seizing defendant's children. Rachel Kolman, CYFD's children's Court Attorney lied on her response to respondent Wahhaj's Amended motion to reopen and set aside Termination of parental rights. On page 7 paragraph 31. Respondent Wahhaj erroneously argues that the Sheriff prolonged charging the defendants in the children's court case, stating that the kids were removed on August 3, 2018 and the case was not filed until August 5, 21018. Law enforcement, including Sheriffs, do not bring civil actions regarding abuse and neglect of children in New Mexico, CYFD does. In this case, CYFD Filed a petition alleging that the children were abuse and neglected children on August 5, 2018, the 2nd business day after the children were placed in its custody by law enforcement in accordance with NMRA 10-312. That was a blatant lie because CYFD file their petition on August 7, 2018, it clearly states in NMRA 10-312 B. **Time limits** If a child is taken into custody, a petition alleging abuse or neglect shall be filed by the department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not filed within the time set forth in this paragraph, the child shall be released to the child's parents guardian or custodian. ( See Attachment 6 Response To Respondent Wahhaj's Amended motion to reopen and set aside termination of parental rights On page 7 paragraph 31. on November 20, 2020).

CYFD knew that according to NMRA 10-312 B rules they were suppose to file a petition of abuse 2 days after TCSO placed them in their custody. TCSO placed the children in their custody on August 3, 2018 and CYFD was suppose to file the petition on August 5, 2018. CYFD intentionally and recklessly delayed 4 days on August 7, 2018 for filing the petition in order to allow time to conduct safe room interview in order to further the investigation.

TCSO placed defendant's children on a 48 hour hold not a 96 hour hold. CYFD was complicit in the conspiracy to violate defendant's constitutional rights. CYFD were fulfilling the wishes of TCSO by prolonging the charges in order to further the investigation. ( See Attachment 7 Taos County Case Summary Page 1 Filed Petition on August 7, 2018)

On August 15, 2018, CYFD filed a motion to excuse Farrol Louis Jaques and Jamil Louis Jaques from the custody hearing. (See Attachment 7 Taos County Case Summary Page 4) Judicial Officer Sarah Backus entered an order on August 17, 2018 excusing Farrol and Jamil from the custody hearing. On August 21, 2018, CYFD filed another petition to excuse Farrol and Jamil from custody hearing.

Defendant notes that the same day CYFD filed a second motion to excuse the boys from the custody hearing , CYFD allowed the FBI to illegally interrogate the boys for a third time on August 21, 2018. ( See Attachment 7 Taos County Case Summary Page 4) CYFD needed to keep the children isolated from their parents at all cost while the FBI continued to build their illegal manufactured charges. Over the weekend of August 3rd - 5th 2018, Farrol and Jamil talked to CYFD Naomi prior to talking with Karen prior to them speaking with the FBI on August 7, 2018. That interview was important in order to obtain background information that could assist the FBI in their illegal interrogation of Defendant's minor children. On August 9, 2018 SA Taylor interviewed foster mom Clara Mendoza to clarify the false accusation of school shootings. At 3:24 she stated the boys said my dad would never shoot anybody. TCSO leaked false information to the media about an alleged school shooting Clara was very upset because she did not say Defendant (Mr. Wahhaj) gave a gun to his son for a school shooting. Farroll clarified that he was talking about an incident that happened at earth ship school that he attended with his uncle and some one brought a riffle on the premises to go hunting after the earth ship classes and they were not allowed to have firearms on the premises. This was clarified prior to SA Taylor's filing his sworn affidavit on August 11, 2018, he knew the alleged school shooting was false yet he intentionally, recklessly kept out that verified false information in the search warrant affidavit.

Furthermore at 8:33 Jamil stated does this mean we don't have to talk to the FBI again. At 8:59 Jamil asked to see his mom . SA Taylor responded he does not have any thing to do with that he would have to check with CYFD. ( See August 9, 2018 audio FBI interview with Clara Mendoza and the boys at CYFD)

It is important to not loose sight of why defendant's children were in CYFD custody in the first place. TCSO seized defendant's children placed them on a 48 hour hold in the care of CYFD. CYFD intentionally and recklessly delayed the filing of a petition of abuse for 4 days in violation NMRA 10-312 B in order to gain information from safe room interviews in order to further the investigation. According to TCSO that allowed the time CYFD needed to conduct safe room interviews, and allowing the FBI to illegally interrogate defendant's children without their knowledge, without their written or verbal consent, nor counsel present, nor their Miranda rights read, nor without a court order. All of that was done in order to further the investigation. From that illegal interrogation, federal criminal charges were filed against defendants. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BN 2492 Affiant second search warrant)

44

Defendant's federal charges all stem exclusively from those illegal interrogations of defendant's minor children without defendant's knowledge, written or verbal consent, nor without a court order. Ms Bhalla on cross examination of SA Taylor. Q. Okay. I want to move forward a little bit to your testimony about when defendants left Georgia. You prepared a number of Affidavits for search warrants in this case. Do you recall that? A. Yes ma'am. Q. Okay I believe that one was filed on August 16th. Is that correct? A. I don't recall the exact dates. Q. Does it sounds about right? A. Approximately, yes. Q. Would it help to refresh your memory if I handed you a stack of your Affidavits for search warrants? A. Sure. Q. Okay. And then maybe you can identify the date? May I approach, Your Honor. THE COURT: You may. Q. ( By Ms BHALLA) Does that refresh your recollection, agent Taylor, as to when-A. Yes ma'am, it says August 16th .Q. Okay. So one of those search warrants was prepared on August 16th . is that correct ? A. That's what it says. Q. Okay. Do you have any reason to doubt that that's when you filed them? A. No ma'am. Q. And that- and we can go through the rest of these later, but is it fair to say that you relied heavily on the statements that you took from F.L. and J.L. in preparing these Affidavits? A. In several of the Affidavits, those testimonies are there, as well as Jany's book. Q. Okay. So it's fair to say, then that you ( indiscernible, audio skips ) J.L. and N.L. statements to prepare your affidavits for the search warrants? A. Yes, ma'am. (See Detention hearing in Albuquerque September 2018 Page 75 Lines 9-18)

SA Travis and SA Hartman did not adequately advise the thirteen-and fifteen-year-old of their Miranda and statutory rights and then invite ~~the~~ them to explain, on the record, their actual comprehension and appreciation of each Miranda warning. It was more important to have the boys to keep talking than to exercise their constitutional rights. They were not warned of their constitutional and statutory rights, and did not knowingly, intelligently, and voluntarily waived each right. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K  BN 2492 Affiant Affidavit for second search warrant)

The principle of substantive due process protects the fundamental right of parents in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2D 599 (1982). However, because "the State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse,"this fundamental right is not absolute. Mueller v. Auker, No. CV-04-399-S-BLW, 2005 U.S. Dist. LEXIS 64274, 2005 WL 8159827, at *7 (D. Idaho Apr. 13, 2005) (unpublished) (internal quotation marks and alteration omitted).



"To state a claim for violation of their substantive due process rights in this context, plaintiffs must allege conduct by defendants which is so arbitrary and unreasonable as to shock the conscience of the court." Faulkner v. Reeves, 1992 U.S. Dist. LEXIS 5814, 1992 WL 96286, at *9 (D. Pa. 1992) (citing Fanning v. Montgomery County Children & Youth Servs., 702 F. Supp. 1184, 1190 (D. Pa. 1988), and In Re Scott County Master Docket, 672 F. Supp. 1152, 1166-67. (D. Minn. 1987)); see also Sinaloa Lake Owners Ass'n v. City of Simi Valley, 864 F.2d 1475, 1484 (9th Cir. 1989) (stating that the right to substantive due process is violated if the challenged action "was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare") (internal quotation marks omitted).

The principle of procedural due process also applies in this context. Parents may assert a pre-deprivation due process claim if their children were taken from their custody without sufficient investigation and a court order. A claim that children were unlawfully seized and removed from a parent's custody is "assessed under the Fourteenth Amendment standard for interference with the right to family association." Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000) (as amended).

More particularly, the "Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." Mabe, 237 F.3d at 1107. Officials may remove a child from a parent's custody "without prior judicial authorization only if the information they possess at the time of the seizure" gives the officials "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." Wallis, 202 F.3d at 1138. To determine whether the Fourteenth Amendment was violated with respect to the removal of a child without a court order, a court "must balance the fundamental liberty interests of the family unit with the compelling interests of the state in protecting children from abuse." Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997).

It is well- established that " a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." Whitlock v. Brueggmann, 682 F.3d 567, 580 ( 7th Cir. 2012). To establish such a violation, the plaintiffs must demonstrate not only that the defendant officers" created evidence that they knew to be false, " Petty, 754 F.3d at 423, but also that the evidence was used " in some way" to deprive them of liberty, Whitlock, 682 F.3d at 580.

The police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been, or will be committed. Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations. See Sevigny v. Dickey, 846 F.2d 953, 957 ( 4th Cir. 1988)

It is the defendant's belief upon information the Affiant never had the initial search warrant or if he did he obtained it after the seizure of the property. The Affiant never displayed a search warrant, never left a copy with the property and refused to show the search warrant to defendants upon request.

On August 3, 2018, Sheriff Jerry Hogrefe Return and Inventory, I received the attached Search Warrant on 8 , 2018, and executed said Search Warrant on 8- 3, 2028 at ___ hours. I searched the persons or premises described in Affidavit supporting said Search Warrant and I left a copy of said Search Warrant with _____, together with a copy of inventory of items seized. Affiant did not show defendants the search warrant nor did he leave a copy of the search warrant with the property. He left the time he executed the search warrant blank, he changed the date that he initial received authorization for the search warrant, and did not initial it. ( Exhibit A BN 2478-2481 Sheriff Jerry Hogrefe Return and Inventory).

On August 5, 2018, SGT Jason Rael Return and Inventory, I received the attach Search warrant on August 5, 2018, and executed said Search Warrant on August 6, 2018 at 09: 35 hours. I searched the person or premises described in Affidavit supporting said Search warrant and left a copy of said Search Warrant with Lot 2 Unit 28 Costilla Meadows subdivision, Amaila, NM, together with a copy of inventory of items seized. ( Exhibit B BN 15968-15981 SGT Jason Rael Return and Inventory)

On August 14, 2018, Return and Inventory witnessed by officer Paul Garcia. I received the attached Search Warrant on August 14, 2018, and executed said Search Warrant on August 14, 2018 at 1102 hours. I searched the person or premises described in Affidavit supporting said Search Warrant and left a copy of said Search Warrant with Kenny Jenkins, together with a copy of inventory of items items seized. ( Exhibit L BN 2475, 2476 Return and Inventory witnessed by officer Paul Garcia) All of the ensuring Return and Inventory followed federal procedures."



Sheriff Jerry Hogrefe is the head of TCSO he could not state it was an over sight that he did not follow the search warrant procedures and all of his deputies did. This was not a good faith error. What's troubling is Deputy Jake Cordova filed a Statement of Probable cause on August 6, 2018, to support the above charges when arrest is made without a warrant. ( Attachment 8 Deputy Jake Cordova Statement of Probable Cause). The Affaint is in violation of the Federal Rules of Criminal Procedures by not showing defendants the search warrant, nor leaving a copy of seized property return and inventory with Subject Property.

Deputy Jake Cordova knew Sheriff Hogrefe did not have a search warrant. If Affiant did have a search warrant Deputy Cordova would have not filed a statement of probable cause when an arrest is made without a search warrant. Deputy Cordova's statement of probable cause does not cure the illegal search warrant executed by TCSO. Deputy Cordova wanted to protect himself from the after math of an illegal search.

Federal Rules of Criminal Procedures:
Warrant. A warrant must;
(A) contain the defendant's name or, if it is unknown, a name or description by which the defendant can be identified with reasonable certainty;
(B) describe the offense charged in the complaint;
(C) command that the defendant be arrested and brought without unnecessary delay before a magistrate judge or, if none is reasonable available, before a state or local judicial officer; and
(D) be signed by a judge.
Summons. A summons must be in the same form as a warrant except that it must require the defendant to appear before a magistrate judge at a stated time and place.
Execution or Service, and return
By Whom. Only marshal or other authorized officer may execute. Any person authorized to serve a summons.
Location. A warrant may be executed, or a summons served, within the jurisdiction of the United states or anywhere else a federal statue authorizes an arrest. A summons to an organization under Rule 4(c)(3)(D) may also be served at a place not within a judicial district of the United States manner.

(B) A summons is served on an individual defendant;
by delivering a copy to the defendant's residence or usual place of abode with a person of suitable age and discretion residing at the location and by mailing a copy to the defendant's last known address.

46

## CHALLENGING THE CHILDERN'S STATEMENTS

Once the adversary judicial process has been initiated, the Sixth Amendment to the United States Constitution-, U.S. Const. amend. VI, and N.M. Const. art. II, ⌐ 14 guarantees defendants the right to have counsel -present at all critical stages of criminal proceedings. Any interrogation by the State once proceedings ha-ve begun, regardless of a defendant's custodial status, constitutes a critical stage for purposes of the -Sixth Amendment analysis. The Sixth Amendment right may be waived as long as the relinquishment is voluntary, knowing, and intelligent, and a defendant may often validly waive his Sixth Amendment right after receiving only the warnings prescribed by Miranda, which has its source in the Fifth Amendment to the United States Constitution, U.S. Const. amend. V.

The right to counsel under the Sixth Amendment to the United States Constitution, U.S. Const. amend. VI, and N.M. Const. art. II, ⌐ 14 differs from the right against self-incrimination in the Fifth Amendment to the United States Constitution, U.S. Const. amend. V. The Sixth Amendment right is narrower in at least one sense, it is offense-specific, unlike Miranda's Fifth Amendment right against self-incrimination, and is thus of no help with respect to questioning regarding matters not yet subject to adversarial proceedings. In many other ways, however, the Sixth Amendment protection may be understood as broader than the Fifth Amendment protection.

The Sixth Amendment right is integral to the protection of fundamental rights of criminal defendants and ensures fairness throughout the criminal proceeding. In advancing those goals, the Sixth Amendment guarantees defendants the right to rely on counsel as intermediary between themselves and the State, not just at trial, but from the time of initiation of criminal proceedings onward, when consultation, thorough-going investigation and preparation are vitally important for purposes of promoting fundamental fairness. Children are different and must be treated differently for purposes of the right to counsel analysis under the Sixth Amendment to the United States Constitution, U.S. Const. amend. VI. Accordingly, the juvenile Sixth Amendment right to counsel is absolute and indelible; once the right has attached, it may not be waived outside the presence of counsel.

The Delinquency Act,, N.M. Stat. Ann. ɛ 32A-2-14(F) (2009), requires the State to prove by clear and convincing evidence that at the time a thirteen-or fourteen-year-old child makes a statement, confession, or admission to a person in a position of authority, the child (1) was warned of his or her constitutional and statutory rights, and (2) knowingly, intelligently, and voluntarily waived each right.

To prove the second element, the recording of the custodial interrogation which resulted in the statement, confession, or admission must prove clearly and convincingly that the child's answer to open-ended questions demonstrated that the thirteen-or fourteen-year-old child has the maturity to understand each of his or her constitutional and statutory rights and the force of will to insist on exercising those rights. Expert testimony may assist the fact-finder in understanding the evidence or determining the facts necessary to satisfy this requirement, but it is not essential.

The Fifth Amendment to the United States Constitution provides individuals a constitutional right against self-incrimination by providing that an individual shall not be compelled in any criminal case to be a witness against himself or herself. U.S. Const. amend. V.

In Miranda, the United States Supreme Court articulated warnings that law enforcement must give to a suspect before the suspect can be subjected to a custodial interrogation without compromising his or her privilege against self-incrimination. Prior to any questioning, the person must be warned that he or she has a right to remain silent, that any statement he or she does make may be used as evidence against him or her, and that he or she has a right to the presence of an attorney, either retained or appointed.

After such warnings have been given, and such opportunity afforded him or her, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he or she wishes to remain silent, the interrogation must cease.

While the federal constitution provides a minimum level of protection below which the states may not descend, states remain free to provide greater protection. Hence, it is completely within the Legislature's authority to provide greater statutory protection than accorded under the federal Constitution. The New Mexico Legislature did just that by its enactment of the Delinquency Act, N.M. Stat. Ann. §§ 32A-2-1 to 32A-2-33 (1993, as amended through 2009).

The Delinquency Act provides children with greater protections than those constitutionally afforded to adults with regard to the admissibility of a child's statements or confessions. N.M. Stat. Ann. § 32A-2-14(C)-(G) (1993, as amended through 2009). The courts look first to the plain language of the statute. However, the courts look not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied.

48



In doing so, the courts examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish. One of the express purposes of the Delinquency Act is to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions to the extent of the child's age, education, mental and physical condition, background and all other relevant factors. N.M. Stat. Ann. ɛ 32A-2-2(A) (1993, as amended through 2009). This express purpose is consistent with the over-arching legislative goals of the Children's Code, N.M. Stat. Ann. ɛɛ 32A-1-1 to 32A-24-5 (1993, as amended through 2009), which ensures that children's constitutional and statutory rights are recognized and enforced.

See the Children's Code, N.M. Stat. Ann. ɛ 32A-1-3(A)-(B) (1993, as amended through 2009).

The Legislature chose to treat thirteen-and fourteen-year-old children differently than children older than fourteen or younger than thirteen. Delinquency Act, N.M. Stat. Ann. ɛ 32A-2-14(F) (1993). The fact that the Legislature drew a distinction between children of different ages demonstrates its clear intent to treat the groups differently, and the plain language of this statute explains the nature of that difference. By categorizing children into different age groups, the Legislature distinguished between the different age groups' intellectual and developmental capacities to knowingly, intelligently, and voluntarily waive their Miranda and statutory rights. For example, although ɛ 32A-2-14 provides greater protections for all children than does Miranda, the Legislature treats children fifteen and older as having the intellectual and developmental capacity of adults to waive their constitutional and statutory rights. Like adults, children over fifteen are unlikely to make involuntary statements after Miranda warnings due to their higher level of sophistication.

Unlike children fifteen and older, the Legislature precludes the introduction of confessions, statements, or admissions against a child under the age of thirteen on the allegations of a delinquency petition, regardless of the context in which or to whom the statements were made. Delinquency Act, N.M. Stat. Ann. ɛ 32A-2-14(F) (2009). The Legislature has made the policy decision that children younger than thirteen lack the maturity to understand their constitutional and statutory rights and the force of will to assert those rights. Accordingly, ɛ 32A-2-14(F) provides no exceptions permitting the admission of statements made by children under thirteen.

49

By creating fundamentally distinct protections for children fifteen and older and for children younger than thirteen, the Legislature intended to draw a line between children who are too young to waive their rights and those who are not. The Legislature chose not to treat thirteen-and fourteen-year-old children categorically as belonging at one end or the other of this childhood developmental spectrum. Some may lack the maturity to understand their constitutional and statutory rights and the force of will to assert those rights, and some may not.

The purpose of a burden of proof is to instruct the factfinder concerning the degree of confidence the society thinks he or she should have in the correctness of factual conclusions for a particular type of adjudication.

The legislative history of the Delinquency Act, N.M. Stat. Ann. ᴄ 32A-2-14(F) (2009), and the importance of protecting children younger than fifteen years of age from unknowing or involuntary waivers of their rights leads to the conclusion that clear and convincing evidence is the proper burden of proof for rebutting the presumption of inadmissibility under ᴄ 32A-2-14(F).

The State must first prove by clear and convincing evidence that at the time the thirteen-or fourteen-year-old child made his or her statement to a person in a position of authority, the child had the maturity to understand his or her constitutional and statutory rights and the force of will to assert those rights. It is not necessary to prove that the child had the maturity and intellectual capacity of an average fifteen-year-old child.

Absent an evaluation by an expert, interrogators in a position of authority can preserve the evidence needed by the State to rebut the presumption of inadmissibility for thirteen-and fourteen-year-old children under the Delinquency Act, N.M. Stat. Ann. ᴄ 32A-2-14(F) (2009).

N.M. Stat. Ann. ᴄ 29-1-16 (2006) requires law enforcement officers, with limited exceptions, to electronically video and audio record their custodial interrogations.

In order to obtain the clear and convincing evidence needed to rebut the presumption of inadmissibility, the interrogator who is in a position of authority must first adequately advise the thirteen-or fourteen-year-old child of his or her Miranda and statutory rights and then invite the child to explain, on the record, his or her actual comprehension and appreciation of each Miranda warning.

50

This could be done by having the child explain in his or her own words, without suggestions by the interrogator, what each of the rights means to the child. An effective inquiry into a thirteen-or fourteen-year-old child's actual comprehension and appreciation of each right under Miranda requires more than simple "yes" answers or a signed Miranda notification and consent form on the child's part, when the child may or may not be able to fully process a formal recitation of the four warnings. It is through the child's articulation of his or her understanding that a fact-finder could assess whether the child appreciated the function and significance of each right in the context of not only police questioning, but in future court proceedings.

A court deciding a motion to suppress pursuant to the Delinquency Act, N.M. Stat. Ann. ɛ 32A-2-14(F) (2009), would be able to assess the child's actual understanding of the Miranda rights and whether the child made a rational choice based on the child's appreciation of the consequences of his or her decision from evidence developed at the time of his or her interrogation. Ultimately, a district court judge should suppress any statement made by a thirteen-or fourteen-year-old child unless the judge finds that the child clearly and convincingly demonstrated his or her maturity to understand his or her constitutional and statutory rights and possessed the force of will to assert those rights.

Persons in a position of authority must advise thirteen-and fourteen-year-old children of their constitutional and statutory rights in a clear and intelligible manner if they want to rebut the presumption under the Delinquency Act, N.M. Stat. Ann. ɛ 32A-2-14(F) (2009). The manner in which a child is informed of his or her constitutional and statutory rights is relevant to whether the child knowingly waived his or her rights.

The moment that the unambiguous statement is made, the interrogator must "scrupulously honor" the suspect's or person's right by ceasing the interrogation.

As noted, our Legislature, clearly cognizant of the ways in which children experience the adversarial process differently, has also established special protections for juveniles in our Children's Code. A buffer, for example, between child and investigator already exists at the charging stage: officers must refer any allegations of delinquency to a juvenile probation office, which makes its own inquiry and recommendation to the children's court as to whether a delinquency petition is appropriate. See, e.g., NMSA 1978, ɛ 32A-2-7(A) (2005). Upon filing a petition, moreover, the children's court must appoint counsel if the child has not already retained an attorney and, at any point in the proceeding, may in addition appoint a guardian to advocate for the child's best interests, which are not often coextensive with the family's interests or even the child's legal interests. See ɛ 32A-2-14(H), (J), (K).

51

The Children's Code provisions also require that the court advise both the child and any parent, guardian, or custodian that counsel will represent the child at all stages of the proceeding, evincing an intent to provide both the child and any interested parties with the information that the child is entitled to rely on counsel as intermediary in every adversarial encounter along the way. Section 32A-2-14(H).

The defining characteristics of youth recognized by those cases and the attendant risks, coupled with the various legislative directives of our Children's Code provisions, compel us to conclude that children are different and must be treated differently for purposes of the Sixth Amendment counsel analysis.

Accordingly, the juvenile Sixth Amendment right to counsel is absolute and indelible; once the right has attached, it may not be waived outside the presence of counsel. See, e.g., Grice, 794 N.E.2d at 10 ("[I]nterrogation is prohibited unless the right is waived in the presence of counsel."); see also Darryl P., 63 A.3d at 1191 ("The constitutional right against uncounseled interrogation is significantly broader than the prophylactic right against uncounseled self-incrimination."); cf. State v. Lawson, 296 Kan. 1084, 297 P.3d 1164, 1173 (Kan. 2013) ("[A]fter the statutory right to counsel has attached, the defendant's uncounseled waiver of that right will not be valid unless it is made in writing and on the record in open court.").

The Delinquency Act,, N.M. Stat. Ann. ⌐ 32A-2-14(F) (2009), requires the State to prove by clear and convincing evidence that at the time a thirteen-or fourteen-year-old child makes a statement, confession, or admission to a person in a position of authority, the child (1) was warned of his or her constitutional and statutory rights, and (2) knowingly, intelligently, and voluntarily waived each right.

(1) Three general differences between juveniles under 18 and adults demonstrated that juvenile offenders could not with reliability be classified among the worst offenders:

(a) As any parent knew, and some scientific and sociological studies tended to confirm, a lack of maturity and an underdeveloped sense of responsibility were (i) found in youth more often than in adults; and (ii) more understandable among the young. These qualities often resulted in impetuous and ill-considered actions and decisions. It had been noted that adolescents were overrepresented statistically in virtually every category of reckless behavior. In recognition of the comparative immaturity and irresponsibility of juveniles, almost every state prohibited those under 18 years of age from voting, serving on juries, or marrying without parental consent.

53



(b) Juveniles were more vulnerable or susceptible to negative influences and outside pressures, including peer pressure, than were adults. This was explained in part by the prevailing circumstance that juveniles had less control, or less experience with control, over their own environment.

(c) The character of a juvenile was not as well formed as that of an adult. The personality traits of juveniles were more transitory, less fixed.

(2) These differences rendered suspect any conclusion that a juvenile fell among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior meant that their irresponsible conduct was not as morally reprehensible as that of an adult. Juveniles' vulnerability and comparative lack of control over their immediate surroundings meant that juveniles had a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggled to define their identity meant that it was less supportable to conclude that even a heinous crime committed by a juvenile was evidence of irretrievably depraved character. From a moral standpoint, it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility existed that a minor's character deficiencies would be reformed.

(Kennedy, J., joined by Stevens, Souter, Ginsburg, and Breyer, JJ.)

[1e][9] Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Johnson, supra, at 367, 125 L Ed 2d 290, 113 S Ct 2658; see also Eddings, supra, at 115-116, 71 L Ed 2d 1, 102 S Ct 869 ("Even the normal 16-year-old customarily lacks the maturity of an adult"). It has been noted that "adolescents are over-represented <*pg. 22> statistically in virtually every category of reckless behavior." Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Review 339 (1992). In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent. See Appendixes B-D, infra.

54

[9b] The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. Eddings, supra, at 115, 71 L Ed 2d 1, 102 S Ct 869 ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage"). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) (hereinafter Steinberg & Scott) ("[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968).

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." Thompson, supra, at 835, 101 L Ed 2d 702, 108 S Ct 2687 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See Stanford, 492 US, at 395, 106 L Ed 2d 306, 109 S Ct 2969 (Brennan, J., dissenting).

The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." Johnson, supra, at 368, 125 L Ed 2d 290, 113 S Ct 2658; see also Steinberg & Scott 1014 ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood").

The FBI relied heavily on the boys testimony in filing the search warrant that brought defendants in Federal custody. The FBI knew the children's maturity, deposition and maliciously exploited that in order to further the investigation.

SA Travis and SA Hartman did not adequately advise defendant's thirteen-and fifteen-year-old of their Miranda and statutory rights and then invite them to explain, on the record, their actual comprehension and appreciation of each Miranda warning. It was more important to have the boys to keep talking than to exercise their constitutional rights. They were not warned of their constitutional and statutory rights, and did not knowingly, intelligently, and voluntarily waived each right. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( Exhibit B BN 2492 Affiant second search warrant) Defendant is requesting that the statements of the children be suppressed.

### *Perjury general*
Whoever

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

### False declaration before grand jury or court

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceeding before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if

(1) each declaration was material to he point in question, and

(2) each declaration was made within the period of the statue of limitations for the offense charged under this section.

In any prosecution under section, the falsity of declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declaration material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant the first sentence of this subsection that the defendant at the time he made each declaration believe the declaration was true.

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at time the admission is made, manifest that such falsity has been or will be exposed.

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such ~~such~~ proof be made by any particular number of witnesses or by documentary or other type of evidence

## LAW REGARDING GRAND JURY TRANSCRIPTS

In recognition of the Grand Jury's status as an independent institution, courts afford Grand Jury proceedings a presumption of regularity. See <u>United States v. Johnson</u>, 319 U.S. 503, 512- 13 91943). " This presumption attaches even after the Grand jury has returned an initial indictment. After all, superseding indictments setting forth new charges or adding new defendants are familiar fare." <u>United States v. Flemmi</u>, 245 F.3d 24, 28 ( 1st Cir. 2001).



A "' Grand Jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the Grand Jury process.'" United States v. R. Enters., 498 U.S. 292, 301 (199910 ( quoting United States v. Mechanik, 475 U.S. 66,75 (1986)( O' Connor, J., concurring)).To be entitled to production, the defendant must show a " particularized need" for the documents that out weighs the public policy of Grand Jury secrecy. United States v. Warren, 747 F. 2d 1339, 1347 ( 10th Cir. 1984).

The particularized need requirement, however, is not satisfied when a party attempts to engage in a fishing expedition in the hopes of discovering useful material. See United Sates v. Kim, 577 F.2d 473, 478 ( 9th Cir. 1978). " A simple desire for Grand Jury transcripts in the unsubstantiated hope that something might turn up is insufficient to require disclosure." United States v. Battle,1997 WL 447814, at *18 ( D. Kan. June 27, 1997)( Crow, J.)

In Douglas Oil. Co. v. Petrol Stops Northwest, 441 U.S. 211 ( 1979), the Supreme Court sets forth the standard for the reviewing whether Gran Jury transcript should be produced: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed. Such a showing must be made even when the Grand Jury whose transcripts are sought has concluded its operations . . . [ T] he interest in Grand Jury secrecy, although reduced, are not eliminated merely because the Grand jury has ended its activities. Douglas Oil, Co. v. Petrol Stops Nw., 411 U.S. At 222( footnotes omitted)

" Despite the strong policy of maintaining the secrecy of Grand Jury proceedings,in certain situations disclosure of Grand Jury minutes is appropriate where justice demands." United states v. Pottorf, 769 F. Supp. 1176, 1180 ( D. kan. 1991)( Saffels, J.). The decision whether the district should release Grand Jury transcripts is committed to the district court's sound discretion. See In re Lynde, 922 F.2d 1448, 1451 ( 10th Cir. 1991).

" The rule is as exacting when the defendant asks for the protected materials in order to challenge the propriety of the grand jury proceedings. " United States v. Battle , 1997 WL 447814, at * 18. " Before disclosure of the Grand Jury transcripts, which would corroborate the Defendants' arguments[,] can be ordered, the

Defendants must offer evidence of a substantial likelihood of gross or prejudicial irregularities in the conduct of the Grand Jury." United States v. Cannistraro, 800 F. Supp. 30, 50 ( D.N.J. 1992) (Lechner, J.) ( quoting United States v. Budzanoski, 462 F. 2d 443, 454 ( 3d Cir. 1972)). Mere speculation over what may have occurred is not enough to meet this burden or to overcome the presumption of regularity attached to Grand jury proceedings. See United States v. Santoro, 647 F. Supp. 153, 172-73 ( E.D.N.Y. 1986)( Mclauglin, J.), rev'd on other grounds, Unites States v. Davidoff, 845 F. 2d 1151 (2d Cir. 1988).

   " Notwithstanding the presumption of regularity, prosecutions do not have carte blanche in Grand jury matters." United States v. Flemmi, 245 F. 3d at 28. However, a party asserting a claim of Grand jury abuse must shoulder a heavy burden. One way to carry this burden is to show that the government used the Grand jury principally to prepare pending charges for trial." United States v. flemmi, 245 F. 3d at 28. the United States may not use the Grand jury solely to bolster its case, " although this may be an incidental benefit." United States v. Gibbsons, 607 F. 2d 1320, 1328 ( 10th Cir. 19790)

( " [ i]t is improper to use the Grand Jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery.")

   " However, where there is another legitimate purpose behind the Grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit." Unites States v. Gibbsons, 607 F.2d at 1328( holding that the defendant did not show an abuse of the Grand jury system, because he did" not demonstrate[ ] that [ a witness'] testimony before the Grand jury was for sole or dominant purpose of preparing a pending indictment for trial").

   Accord United States v. Woods, 5444 F.2d 242 ( 6th Cir. 1976)( " [S]o long as it is not the sole or dominant purpose of the Grand Jury to discover facts relating to ( a defendant's ) pending indictment, the Court may not interfere with the Grand Jury's investigation.")

   These proposition are more simply stated than applied. See United States v. Flemmi, 245 F. 3d at 28. In United states v. Flemmi, the United States Court of Appeals for the First Circuit recognized that there is a fine line between an improper " trial preparation " use of a Grand jury and a proper " continuing investigation" use. This fine line is difficult to plot and, in most instances, determining whether a prosecutor has overstepped it will depend on the facts and circumstances of the particular case.

To assist in the inquiry, courts have devised certain proxies. Thus, if a Grand Jury's continuing investigation results in the indictment of parties not previously charged, the presumption of regularity generally persists. Unites States v. Gibbons, 607 F.2d 1320, 1328-29 (10th Cir. 19790. So too when the Grand Jury's investigation leads to filing of additional charges against previously indicted defendants. In re Grand Jury Proceeding ( Johanson), 632 F. 2d 1033, 1041 ( 3d Cir. 1980)

These purposes befitting the accepted institutional objectives of the Grand Jury, and their presence bears convincing witness to the property of the prosecutor's stewardship. See United States v. Sasso, 59 F.3d 341, 351-52 ( 2d Cir. 1995); In re Maury Santiago, 533 F.2d 727, 730 ( 1st Cir. 1976); United States v. Dardi, 330 F.2d 316, 336 ( 2d cir. 1964). United States v. Flemmi, 245 F.3d at 28.
Defendant is asking for protected materials in order to challenge the propriety of the Grand Jury proceedings.

The FBI intentionally, recklessly omitted from the criminal complaint and grand jury indictment that Jany was legally in the country and had deferred status. SA Adelfa Garcia swore on his affidavit that Jany would be consider unlawfully in the United States when her visa expired; in other words, six months after her entry into the United States B2 Visitor on June 24, 1998. at present, Jany does not have any pending application and no pending deferred action. On June 24, 1998, Jany entered the United States at New York City, NY as a non- immigrant B-2 visitor and was admitted for a period not to exceed six (6) months. After this visa expired, Jany received no subsequent visas or authorization to remain in the United States. On March 6, 2017 Jany submitted I-765, Application for Employment Authorization. On April 20, 2017,United States Customs and Immigration Services (USCIS) approved the application. On April 16, 2018. Jany's Employment Authorization Document (EAD) expired;no new application has been filed. On May 1, 2017 Jany submitted and I-485 application to adjust her status. On June 29, 2018, the USCIS sent Jany a rejection notice. USICS Atlanta confirmed that Jany's I-485 application for permanent residency was denied. Jany abandoned her application by failing to appear to two scheduled interviews. At the present time Jany is without lawful status. (See Doc.1 SA Garcia Criminal Complaint )

Compare his falsified sworn affidavit to the actual immigration documents file number 088372419 from Jany's true immigration status. On August 7, 2018 information on Leveille was received from the Albuquerque FBI office. The Albuquerque FBI office indicated that Leveille was born in Haiti and requested that her immigration status be determine. On August 8, 2017 the Taos Sheriff office contacted ERO to determine alienage of Leveillle.

Immigration History on June 24, 1998, Leveille's last documented entry in the United states was on or near New York City, NY as a B2 visitor On April 17, 2006 Leveille submits an I-360 petition under the name Jany Louis Jacques. On October 31, 2007 USCIS sent approval notice I-360 petition. On May 1, 2008 Leveille submits I-485 application to adjust status to permanent resident. On May 16, 2008 Leveille submits I-485 application to adjust to permanent resident. On July 28, 2008 USICS sent rejection notice for I-485 application. On December, 2008 USICS sends approval notice for I-130 petition. On May 1, 2017 Leveille submits I-485 application to adjust status to permanent resident.

On April 16, 2018 Leveille's Employment Authorization Document expires. On June 29, 2018 USICS sent rejection notice for I-485 application Office of the Chief Counsel indicated that if Leveille was issued the Employment Authorization Document (EAD), by USICS, under deferred action based on the approved I-360 petition, Leveille may not be amenable removal. Form I-797, notice of action dated October 31, 2007 indicates that Leveille was granted deferred action for a period of 15 months from the date of notice.

The I-797 notice indicates that in order to extend deferred action Leveille would either have to submit a request in writing for an extension or have an approval form I-765 for employment authorization. As stated above, Leveille's Employment Authorization Document expired on April 16, 2018 and there is no record found that Leveille has filed form I-765 to request an extension of employment authorization or submitted a written request. Based on this information Leveille no longer has deferred action as her I-485 was denied and her EAD expired in April 2018 a long with no record of requesting an extension. With OCC concurrence Jany Leveille will be placed into immigration proceeding.

This document clearly shows that not only SA Garcia knew Jany Leveille was legally in the U.S. and had EAD authorization approval from October 31, 2007 and she renewed it continuously each year until it expired on April 2018. Her deferred status was adjusted. TSCO and FBI both knew Jany's true status. SA Garcia intentionally, recklessly omitted Jany's true status in order to manufacture criminal charges. SA Garcia intentionally, recklessly left out every application Jany filed and was approved from 1998 to 2017. SA Garcia swore to the veracity of the complaint which he intentionally, recklessly committed perjury.



Amazingly enough SA Taylor knew SA Garcia's Criminal Complaint was false. On Ms. Converse cross examination of SA Taylor: Q. "Agent Taylor, towards the end of your testimony, answering Mr. Kraehe's questions, you said that my client was- had entered the country on a visitor visa and had been out status for 20 years? A. I believe I said that she's been out of status for 20 years." Q. "She entered as a 15-year – old with her mother, didn't she? A. "To the best of my recollection, that's what I know (Indiscernible)" Q. And that was in 1998? A. "I don't know the exact date." Q. "You wrote that date in your-" A. "It was approximately 20 years ago. Q. "Okay. A. "And I believe that that is the date, but I don't recall from that time period." Q. "And nine years after that, in 2007, she applied for and received protection under the Violence Against Women Act, which is a temporary immigration status, didn't she? A. "I do not know-- I don't recall that exact fact." Q. "You knew that she received it at some point, if not in 2007? A. "I know she received-- or applied for several visas during her time here, but I do not recall exactly what for." Q. "And she got – your Complaint Affidavit mentioned one time when she applied for a renewal of employment authorization, but there were actually many times when she renewed that, didn't she?"

A. "Are you taking about the arrest Complaint? Q. " Yes the Criminal Complaint, document 1 in this case. A. "I did not swear to that Compliant." Q. "Okay. Were you consulted on it? A. "To a degree, yes." Q. "Do you believe-- is any of the information in there inaccurate? A. "Not to my knowledge, no." Q. Are you aware that she applied for renewals of her employment authorization from the Immigration Service repeatedly? A. "From the best of – to the best of my knowledge, yes." Q. "And one of those times was March 3rd of 2017. Is that right? A. "I do not know the exact date." Q. "Okay. If that's the date in the Complaint, would you dispute that? A. "No." Q. "And if the Complaint said that that was approved by Immigration Services on April 20th of 2017, you wouldn't dispute that, would you? A. "I would not dispute that date." Q. "And a little after that , she files another Application for adjustment of status. Isn't that right? A. "I believe that's correct." Q. "That would be May 1st, according to the Compliant? A. "I would not dispute that." Q. "And adjustment of status is changing from a non- immigration status to a permanent resident status. Is that right? A. "To the best of my knowledge, but I'm not an immigration official. I don't know exactly how it works." Q. "And on April 16th of this year, her last employment authorization expired. Is that true? A. "To the best of my knowledge." Q. "And then after two months after that, her adjustment of status was denied because she failed to appear for a hearing. Is that right? A. "To the best of my knowledge." Q. "Do you know where the notices of that hearing were sent? A. "I do not." Q. Do you know whether they were sent to New Mexico? A. "I do not." Q. "Or Alabama? A. I do not." Q. "So you don't have any knowledge whether she ever received it? A. "Not to my knowledge." ( See Detention hearing in Albuquerque September 2018 Pages 84-87 )

SA Taylor is the case agent in this case. He knew the Criminal Complaint was false that is why he did not swear to it. He was consulted for this case, he knew Jany applied for and was approved for multiple (EAD) from October 2007 to April 2018. It was the FBI Albuquerque office who sought Jany's Immigration status in August 7, 2018 and received her status on August 8, 2018. He testified that Jany was out of status for 20 years that was a blatant lie. Mr. Kraehee on direct examination of SA Taylor: Q. And do you have any knowledge regarding her immigration status? A. Per Immigration Customs Enforcement agency, she's been out of status for approximately 20 years." Q. And to your knowledge is she unlawfully and illegally in the United States? A. Yes sir." (See Detention hearing in Albuquerque September 2018 Page 55 lines 10-16 )

The perjury committed by these law enforcement officials has no bounds. He knew the facts of the Complaint were false and inaccurate this underscores the misconduct. He is responsible for the conspiracy to violate defendant constitutional rights. He purposely mislead the veracity of the facts in the Criminal complaint that is why he did not swear to it.

The prosecutor committed abuse of the grand jury by deliberately withholding from the grand jury material and exculpatory evidence of which they had knowledge thereby creating false impression of the evidence to the grand jury. In violation to this commitment, and without any proper justification. The government placed before the Grand Jury a barred from prosecution by the commitment. This mass of information also improperly prejudice the Grand Jury and so vitiated its independence that Mr. Morton has been denied his right to be free from indictment except by an impartial finding of probable cause as guaranteed by the Fourth and Fifth Amendment's to the Constitution. SA Taylor presented perjured information before the Grand jury. The Grand jury returned an indictment. Magistrate Judge Khalsa used the Grand jury findings of probable cause to detain Morton and Co defendants pending trial denying them Due Process. (See Detention hearing in Albuquerque September 2018 Pages 160,161 lines 21-25, lines 1-4 )

The total conduct of the United States officials and SA Taylor, SA Garcia, officials acting as agents of the United States (officials) or independently as they relate to the defendant are such a nature as to both shocking and offend the American notions of justice. Continued judicial proceedings in this cause will make the court a party to such illicit and immoral conduct and will cause it to become negligent in its duty to supervise the administration of justice in federal criminal cases brought before it. Mr. Morton suffered great prejudice as a result of the government's action. The government used the Grand jury principally to prepare pending charges for trial. The United Sates used the Grand jury solely to bolster its case.

In order to dismiss an indictment based on constitutional,offensive,proprietorial misconduct, " Such as misleading or misinforming the grand jury," the court must either find that the "defendant suffers prejudice as a result of the government's actions," United States v. Piedrahita, 791 F. Supp. 418, 420 ( S.D. N.Y. 1992), Citing bank of Novia Scotia v. United States v. Brio, 907 F.2d 392, 394 (2d Cir. 1990), or " a history of proprietorial misconduct that is so systematic and pervasive and that it affects the fundamental fairness of the proceedings or if the independence grand jury is substantially infringed," Red Elk, 955 F. Supp. At 1174, citing Bank of Novia Scotia, 487 U.S. at 259, 108 S.ct. At 2375-76, Isgro, 974 F.2d at 1094. Prejudice may be presumed from constitutional error " where the structural protection of the grand jury has been so compromised as to render the proceedings fundamentally unfair...." Bank of Novia Scotia, 487 U.S. at 257, 108 S.ct. At 2374-75, Citing Rose v. Clark, 478 U.S. 570, 577-78, 106 S.ct. 3101, 3105-06 ( 1986).

Stated another way, a defendant is prejudiced when " it is established that the violation substantially influenced the grand jury decisions to indict was free from substantial influence of such indictments. Bank of Novia Scotia, 487 U.S. at 256, 108 S.Ct. At 2374, quoting United States v. Mechanik, 475 U. S. 66, 78, 106 S.Ct.938, 946 ( 1986). See also  United States v. Breslin, 916 f. Supp. 438, 441 L.e.d. P.A 9 1996)

### RELEVANT LAW REGARDING RFRA

Under RFRA, the federal " Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except that the federal " government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to a person (1) is in furtherance of a compelling state interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C § 20000bb-1(a)-(b). " Government" is defined in part as " a branch, department, agency, instrumentality, and official ( or other person acting under color of law) of the United States." 42 U.S.C § 2000bb-2(1).

Further, "a person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C § 20000bb-1(c). Congress therefore has expressly legislated that plaintiffs may sue federal agencies under RFRA. Finally, RFRA applies " to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."42 U.S.C § 2000bb-3(a).

64

The Supreme Court of the United States has explained that a plaintiff carries the initial burden of showing a prima facie RFRA case, namely that the United States' action " would (1) substantially burden (2) a sincere (3) religious exercise." <u>Gonzales v. O Centro Espirita Beneficente Uniado do Vegetal</u> , 546 U.S. 418, 428 (2006) (Roberts, C.J.)

The Government has burden*ed* defendant's religious exercise by charging the practice of ruqyah, belief in the second coming of prophet Jesus (Isa son of Maryam May GOD's peace and blessing's be upon both of them) as elements towards conspiracy crimes. They charged that in their indictment. Ruqyah is divine speech as a means of curing physical and spiritual illnesses. You recite some passages from the Quran ( GOD's Words) over the sick person's whole body or body parts. The objective of the recitation is for healing.

This religious activity is protected by the RFRA. Prophecies is very common in the Quran. It is also protected by the RFRA. Again belief in the second coming of Jesus, ruqyah, prophecies is all protected by the RFRA. As a Muslim you are required to believe in the second coming resurrection of (Isa) Jesus son of Mary,May GOD be pleased with them both. Therefore, the court should dismiss the case against defendants because RFRA protects the activity in which defendants were engaged in.

The Establishment Clause prohibits "law[s] respecting an establishment of religion." U.S. Const. amend. I. In particular, it "mandate[s] governmental neutrality between religion and religion, and between religion and nonreligion." O'Connor v. Washburn Univ., 416 F.3d 1216, 1223 (10th Cir. 2005) (internal quotation marks omitted).

"To assess an Establishment Clause challenge, we follow the tripartite test from Lemon v. Kurtzman," which provides that "government action does not violate the Clause if (1) it has a secular purpose; (2) its principal or primary effect is one that neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion." Medina v. Catholic Health Initiatives, 877 F.3d 1213, 1230 (10th Cir. 2017) (internal quotation marks omitted).7 The purpose and effect prongs "look[ ] through the eyes of an objective observer, aware of the purpose, context, and history of the government action in question." Id. at 1230-31 (internal quotation marks omitted). The First Amendment provides that Congress shall make no law respecting an establishment of religion. U.S. Const. amend. 1.

65

To assess an Establishment Clause challenge, courts follow the tripartite test from the Lemon decision. As the United States Court of Appeals for the Tenth Circuit has explained, government action does not violate the Clause if: (1) it has a secular purpose, (2) its principal or primary effect is one that neither advances nor inhibits religion, and (3) it does not foster an excessive government entanglement with religion. The Tenth Circuit interprets the first and second prongs of the Lemon test in light of Justice O'Connor's endorsement test. That is, the court asks whether government's actual purpose is to endorse or disapprove of religion, and whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. The Tenth Circuit evaluates the government's actions from the perspective of a reasonable observer who is aware of the history, purpose, and context of the act in question. The test is conjunctive: failing any prong of the Lemon test means that the government action cannot withstand Establishment Clause scrutiny. The Tenth Circuit therefore considers each prong separately.

## Foreign Intelligence Surveillance Act (FISA)

The legislative history of FISA confirms Congress's intent to displace the remedy of dismissal for the common law state secrets privilege. FISA was enacted in response to "revelations that warrantless electronic surveillance in the name of national security ha[d] been seriously abused." S. Rep. No. 95-604, pt. 1, at 7 (1978), reprinted in 1978 U.S.C.C.A.N. 3904, 3908. The Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, a congressional task force formed in 1975 and known as the Church Committee, exposed the unlawful surveillance in a series of investigative reports. The Church Committee documented "a massive record of intelligence abuses over the years," in which "the Government ha[d] collected, and then used improperly, huge amounts of information about the private lives, political beliefs and associations of numerous Americans." S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Book II: Intelligence Activities and the Rights of Americans{2019 U.S. App. LEXIS 62}, S. Rep. No. 94-755, at 290 (1976). The Committee concluded that these abuses had "undermined the constitutional rights of citizens . . . primarily because checks and balances designed by the framers of the Constitution to assure accountability [were not] applied." Id. at 289.
Urging "fundamental reform," id. at 289, the Committee recommended legislation to "make clear to the Executive branch that it will not condone, and does not accept, any theory of inherent or implied authority to violate the Constitution," id. at 297.

Observing that the Executive would have "no such authority after Congress has . . . covered the field by enactment of a comprehensive legislative charter" that would "provide the exclusive legal authority for domestic security activities," id. At 297, the Committee recommended that Congress create civil remedies for unlawful surveillance, both to "afford effective redress to people who are injured by improper federal intelligence activity" and to "deter improper intelligence activity." Id. at 336. Further, in recognition of the potential interplay between promoting accountability and ensuring security, the Committee noted its "belie[f] that the courts will be able to fashion discovery procedures, including inspection of material in chambers, and to issue orders as the interests of justice require, to allow plaintiffs with substantial claims to uncover enough factual material to argue their case, while protecting the secrecy of governmental information in which there is a legitimate security interest." Id. at 337.

FISA implemented many of the Church Committee's recommendations. In striking a careful balance between assuring the national security and protecting against electronic surveillance abuse, Congress carefully considered the role previously played by courts, and concluded that the judiciary had been unable effectively to achieve an appropriate balance through federal common law:

[T]he development of the law regulating electronic surveillance for national security purposes has been uneven and inconclusive. This is to be expected where the development is left to the judicial branch in an area where cases do not regularly come before it. Moreover, the development of standards and restrictions by the judiciary with respect to electronic surveillance for foreign intelligence purposes accomplished through case law threatens both civil liberties and the national security because that development occurs generally in ignorance of the facts, circumstances, and techniques of foreign intelligence electronic {916 F.3d 1234}surveillance not present in the particular case before the court. . . . [T]he tiny window to this area which a particular case affords provides inadequate light by which judges may be relied upon to develop case law which adequately balances the rights of privacy and national security.H. Rep. No. 95-1283, pt. 1, at 21. FISA thus represents an effort to "provide effective, reasonable safeguards to ensure accountability and prevent improper surveillance," and to "strik[e] a fair and just balance between protection of national security and protection of personal liberties." S. Rep. No. 95-604, pt. 1, at 7.

Section 110 of the Foreign Intelligence Surveillance Act (FISA), codified at 50 U.S.C.S. ɛ 1810, creates a private right of action for an individual subjected to electronic surveillance in violation of FISA's procedures. It provides, in part: An aggrieved person who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation. 50 U.S.C.S. ɛ 1810.

This statutory text refers to another section, c 1809. That section, in turn, proscribes as criminal offenses two types of conduct: (1) intentionally engaging in electronic surveillance under color of law except as authorized by FISA, the Wiretap Act, the Stored Communications Act, or the pen register statute, or any express statutory authorization, and (2) intentionally disclosing or using information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance without authorization. 50 U.S.C.S. c 1809(a).

The procedures outlined in 50 U.S.C.S. c 1806(f) provide a detailed regime to determine whether surveillance was lawfully authorized and conducted, and constitute Congress's specific and detailed description for how courts should handle claims by the government that the disclosure of material relating to or derived from electronic surveillance would harm national security.

To determine whether plaintiffs plausibly allege a cause of action under 50 U.S.C.S. c 1810, the court must decide (1) whether plaintiffs are "aggrieved persons" within the meaning of the statute, (2) whether the surveillance to which they were subjected qualifies as "electronic surveillance," and (3) whether the complaint plausibly alleges a violation of 50 U.S.C.S. c 1809. An "aggrieved person" is defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C.S. c 1801(k).

50 U.S.C.S. c 1810 specifically creates a private right of action for an individual subjected to electronic surveillance in violation of the Foreign Intelligence Surveillance Act (FISA). FISA prohibits, for example, electronic surveillance of a U.S. person solely upon the basis of activities protected by the First Amendment to the Constitution of the United States. 50 U.S.C.S. c 1805(a)(2)(A).

FISA's legislative history confirms that c 1806(f)'s procedures were designed to apply in both civil and criminal cases, and to both affirmative and defensive use of electronic surveillance evidence. The Senate bill initially provided a single procedure for criminal and civil cases, while the House bill at the outset specified two separate procedures for determining the legality of electronic surveillance.30 In the end, the conference committee adopted a slightly modified version of the Senate bill, agreeing "that an in camera and ex parte proceeding is appropriate for determining the lawfulness of electronic surveillance in both criminal and civil cases." H.R. Rep. No. 95-1720, at 32.

By the statute's terms, the procedures set forth in 50 U.S.C.S. ᴄ 1806(f) are to be used-where the Attorney General files the requisite affidavit-in the following circumstances: whenever a court or other authority is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter. 50 U.S.C.S. ᴄ 1806(f).

50 U.S.C.S. ᴄ 1810 specifically creates a private right of action for an individual subjected to electronic surveillance in violation of the Foreign Intelligence Surveillance Act (FISA). FISA prohibits, for example, electronic surveillance of a U.S. person solely upon the basis of activities protected by the First Amendment to the Constitution of the United States. 50 U.S.C.S. ᴄ 1805(a)(2)(A).

The 50 U.S.C.S. ᴄ 1806(f) procedures are expressly available, as well as mandatory, for affirmative claims brought by an aggrieved person pursuant to any statute or rule of the United States before any court of the United States. 50 U.S.C.S. ᴄ 1806(f). This provision was meant to make very clear that these procedures apply whatever the underlying rule or statute at issue, so as to prevent these carefully drawn procedures from being bypassed by the inventive litigant using a new statute, rule or judicial construction.

According to 50 U.S.C.S. 1810, defendant (mr.Wahhaj) fits the definition of aggrieved persons. FBI NY opened a full investigation into Wahhaj in 2003 based on information indicating he was involved in training activities related to sutra teams (closed in 2009). FBI ATL opened preliminary investigation into Wahhaj in July 2015 based on information indicating Wahhaj was engaging in firearms training. (Exhibit H BN #3150)

In order for the FBI to conduct surveillance on said defendant they would have had to file a FISA application. If continued FISA coverage on a U.S. Person is deemed necessary, the FBI must request from the FISC a renewal of its authorization every 90 days. According to FBI policy, the case agent is required to re-verify the statements of fact repeated in a renewal applications from an initial FISA applications which remains true and must obtain supporting documentation for any new statements of fact included in the renewal applications that goes to the FISC for approval.

The FBI opened up the full investigation into Wahhaj in 2003 which closed in 2009. The FBI would have had to renew the FISA applications 4 times a year and 24 times in the course of 6 years, Where are those FISA applications? What information was collected? What was done with the information collected? How was the information collected?

It is said defendant's right to have access to the applications which the FBI was supposed to file; verify the accuracy of the information in order to conduct surveillance on a U.S. Person. If that was not done then that was a violation of said defendant's constitutional rights. After 2001 the FBI had launched an unjust illegal covert investigations into Muslims nationwide.

The Woods Procedures implemented in 2001 is directly reflected because of those constitutional violations. **FBI Woods Procedures, " Woods Files, " and Certain Oversight mechanism** The FBI implemented its Woods procedures in 2001 following errors in numerous FISA applications submitted to the FISC in FBI counterterrroism investigation, The stated purposes of the Woods Procedures are to minimized factual inaccuracies in FISA applications and to ensure that statements contained in applications are " scrupulously accurate." FBI policy requires the case agent who will be requesting the FISA applications to create and maintain an accuracy sub- file (known as a Woods File") that contains; (1) supporting documentation for every factual assertion contained in a FISA applications, and 2) supporting documentation and the results of required database searches and the other verification. Following the creation of the Woods File, the case agent signs the " FD-1079 FISA Verification Form" "( Woods Form) to affirm the accuracy of each and every assertion.......and that back- up documentation for each such fact has been retained" in the Woods File. The supervisory special agent is also required to sign the form, confirming that the supervisory special agent has reviewed the Woods File and determined that it contains supporting documentation for every factual assertion within the FISA applications. This from must be completed prior to an applications being submitted to the FISC.

FBI policy also states that the FBI and DOJ's NSD " have instituted two broad oversight mechanism designed to ensue that FISA applications contain accurate and verified information." Specifically, the FBI requires its Chief Division Counsel (CDC) in each FBI field office to perform each year an accuracy review of at least one FISA applications from that field office. Similarly, NSD's Office of Intelligence (OI) conducts its own accuracy review each year of at least 1 FISA applications originating from each of the approximately 25 to 30 different FBI field offices, Both the FBI's and NSD's accuracy reviews are performed on applications that have already been submitted to and approved by the FISC. The agreed- upon procedures for these accuracy reviews are memorialized in a 2009 joint FBI- NSD memorandum.

In 42 FISA applications only 3 of 42 did not identify any deficiencies, the reports covering the remaining 3 applications identified a total of about 390 issues including unverified, inaccurate, or inadequately supported facts, as well as typographical errors. That is, the accuracy reviews were not being used by the FBI as a tool to help assesses the FBI's compliance with its Woods Procedures, we have identified 4 applications for which, as of the date of this memorandum, the FBI either has been unable to locate the Woods File that was prepared at the time of the applications or for which FBI personnel suggested a Woods File was not complete. ( See Attachment 9 Woods File)

Ironically The government flied a motion to address Classified Information procedures act ( " CIPA" )  18 U.S.C. App.III § 2 while this case was stayed. ( See Doc. 255) The government's attempts to cover the fact that they were conducting illegal surveillance on defendant since 2003. That illegal investigation reflected a discriminatory policy of profiling Muslims. The FBI was Electronic Eavesdropping on Muslims in their houses of worship (Masjids), sending CI's in illegally obtaining audio and video recordings that defendants had a reasonable amount of privacy. This policy reflected a nationwide covert operations targeting innocent Muslims illegally collecting data on Muslims towards the war on Islam. Now they want to conceal the illegally obtained information. The heart of the issue are Muslims afforded the protection of the constitution? Because defendant is a Muslim is the court going to turn a blind eye to the deprave conduct of law enforcement officials? Do law enforcement have carte blanche when it comes to the rights of Muslims? Is this court going to hold all those who were responsible for violating defendants constitutional rights accountable. Or is the court going to be complicit to the egregious conduct of law enforcement officials who swore an oath to uphold the constitution and are in great violation of.

The FBI placed defendant, on a watch list despite the fact that he did not pose, have never posed, and have never been accused of posing, a threat to aviation safety. The FBI had Immigration Custom Enforcement (ICE) border agents detain Wahhaj every time he entered the country and in some instances when he left the country. At the behest of the FBI, ICE agents would photo copy defendant's documents, download the contents of his phone, and interrogate him for hours each time he traveled abroad.

In an effort to ensure aircraft security, Congress directed the transportation Security Administration ("TSA") to establish procedures for notifying appropriate official of the identity of individuals " known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S. U.S.C. 114 (b)(2) TSA was further instructed to " utilize all appropriate records in the consolidated and integrated terrorist watch list maintained by Federal Government" to perform a passenger prescreening function.

Footnote ★ -said defendant refers to Mr. Wahhaj   71

The " No Fly list" is one such terrorist watch list and is part of a broader database developed and maintained by the Terrorist Screening Center ("TSC"). Which is administrated by the FBI. The TSC shares names of individuals who are known or reasonably suspected of being involved in terrorist activity. The TSC shares the names of individuals on the " No fly list" with federal and state law enforcement agencies, the TSA, airline representatives, and cooperating foreign governments.

Federal law enforcement and intelligence agencies may" nominate" an individual for inclusion in the TSC's database, including the " No fly list," if there is " reasonable suspicion" that the person is a " known or suspected terrorist". In order for a nominated individual to be added to the " No fly list," there must be additional " derogatory information' showing that the individual " poses a threat of committing a terrorist act with respect to an aircraft. Any person placed on the "No fly list" is barred from boarding a plane that starts in, ends in, or flies over the Unites States.

The Department of homeland Security ("DHS") has a traveler Redress Inquiry Program (" TRIP") an administrative mechanism for filing a complaint about placement on the " No fly list". Filing a subpoena of TSC's, ICE records in conjunction with a TRIP complaint will confirm that the FBI placed the defendant McWahhaj on the watch list.

The statutory scheme embodied in the Aviation and Transportation Security Act, enacted after the terrorist attacks of September 11, 2001, In brief, the "no-fly list" is a part of this scheme -- it is a list of individuals that have been deemed by the federal government "to pose, or [as] suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. 114(h)(2). This list is accessible to "the Administrator of the Federal Aviation Administration, appropriate State and local law enforcement officials, and airport or airline security officers." Ibid. Section 114(h)(3)(B) instructs, "if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." The "no-fly list" refers to both the "no-fly" list, which allegedly contains names of people that airlines are prohibited from transporting, and the "selectee" list, which allegedly contains names of people who are subject to additional screening prior to boarding a plane.

Where is the derogatory information showing defendant Mr. Wahhaj poses a threat of committing a terrorist act with respect to an aircraft? If that was not done then placing defendant on a watch list, selecting him for additional screening, hindering his travels abroad, disrupting his security business, is a violation of defendant's constitutional rights and he is asserting those rights.

In 2003 the FBI opened a full investigation on Mr. Wahhaj in 2005 the effects of that investigation was felt on Wahhaj's travels abroad. The case was closed in 2009 yet defendant was still being detained after traveling abroad. From 2009 until current defendant is still being harassed every time he travels abroad. (Exhibit H BN #3150)

The FBI had Immigration Custom Enforcement (ICE) border agents detain Wahhaj every time he entered the county and in some instances when he left the country. ICE is allowed to randomly screen passengers when entering the U.S., defendant Mr. Wahhaj does not have an issue with that, however those screens were far from random, they were targeted. DHS could not say perpetual detaining of Wahhaj was random or misidentification because the FBI admitted that they opened a full investigation on Wahhaj in 2003, closed in 2009 and reopened in 2015.

On numerous occasions before landing the flight attendants would make an announcement to have passenger's passports out for inspection prior to leaving the plane. At the exit door of the plane two Ice agents would inspect passports until defendant reaches them then they would reply " We got him". They would discontinue their search and would escort defendant straight to the backroom where the secondary detention is held. This happens every time defendant travels abroad when he is screened by that countries' ICE agents, the computer says to call first.

While in Canada on an executive protection detail for defendant's (Mr. Wahhaj) high profile client, defendant was detained, questioned, and released, that is when he had learned that the government put a hold on him. This hampers said defendant's security business because his client has to wait for him to clear customs. This puts defendant's high profile clients in a perilous position sitting there exposed, waiting for him. After these experiences defendant's clients would not want to retain his services any longer, because it gives the impression defendant is not reliable and is being monitored by the government.

While Canada's ICE agents were conducting their investigation on defendant Mr. Wahhaj, he was engaged in a conversation with them and they revealed to him that Canada does not have an issue with defendant it is the U.S. that placed a hold on him. In essence, every time a country enters Wahhaj's name/passport information in their computer there is going to be a red flag. This causes Wahhaj irreparable harm while traveling abroad. If Wahhaj never traveled to a country before as he enters that country the computer tags him. This causes that country to look at defendant with suspicion and can cause them to conduct unnecessary surveillance on him or worst. This is done intentionally, recklessly to let Wahhaj know the U.S. has a long reach. It is the heart of the oppression.

73

The FBI has no boundaries that they will not cross, even when Wahhaj returned home from making the once in a lifetime, mandatory for all Muslims, Hajj pilgrimage he was detained in Abu Dubai, documents photo copied, phone downloaded and interrogated. The ICE agents applied a tactic that if Wahhaj does not cooperate they will intentionally, recklessly cause him to miss his flight. From Morocco, UK, HAJJ, and Canada, Wahhaj's travels all ended the same with intrusion and constitutional violations.

Mr. Wahhaj documented those constitutional violations by filing a law suit against ICE in 2005. ( See law suit Doc. : 1: 05-CV-01851- RJD-LB) All of these statements can be corroborated by viewing defendant's passport for dates; subpoena ICE's reports and filing a TRIP complaint. The FBI used law enforcement agencies to besiege, help conduct illegal investigations, and violate, Wahhaj's constitutional rights.

What is more troubling than the egregious conduct of these law enforcement officials is defendant confided to counsel in private that he wanted the FISA applications. Now conveniently the government files a motion stating that specifically Siraj Wahhaj has sought disclosure of additional materials, which are classified. It did not state that all the defendants wanted additional materials which are classified information. (See Doc. 255 Page 2)

Defendants situation is similar to Tanvir v. Tanzin 894 F.3d 449 458 (2d Cir. 2018); and Fazaga v. FBI 2020 U.S. App. LEXIS 22775 (9th Cir. Cal., July 20, 2020) In the aforementioned cases the Government had collected, and then used improperly, huge amounts of information about the private lives, political beliefs, and associations of Muslims nationwide. They were all targeted by the FBI because they practice the religion of Islam. The FBI violated their constitution rights by conducting illegal surveillance, storing the illegally obtained information and using that information to prosecute defendants. This was a reflection on a covert policy by the government targeting the religion of Islam nationwide.

Ironically the government is attempting to conceal their convert activities of law enforcement officials by sighting classified doctrine. They are very concerned about being exposed on how extensive this illegal massive data collecting of Muslims nationwide really is. They will do anything to keep that information from getting out to the public. If the public finds out the egregious covert policies aimed at the discrimination of Muslims nationwide it would cause an outage. This is one of the reasons why motions are being filed sealed and exparte. It is an attempt to keep this case out of the public violating defendant's constitutional rights.

The Government has no real hard evidence against the defendants. The crux of the government's case was the testimony of two minor children obtained illegally in a highly coercive environment, without their Miranda rights being read, nor with the consent of their parents. Executed by a search warrant by an Affiant that committed perjury all through his sworn affidavit in violation of defendant's constitutional rights. There is no mens rea, no records, no surveillance of these alleged institutions, no Ci's, no undercover stings, no points of radicalization. No Isis videos, thousands hours of video pole cam, drone, UA footage that shows nothing. Just regular Muslim citizens living their life. The timeline to key events in this case is critical.

The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." Convictions based on evidence obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience" violate the Due Process Clause. Rochin v California, 342 US 165, 172, 174, 96 L Ed 183, 72 S Ct 205 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping). See also Breithaupt v Abram, 352 US 432, 435, 1 L Ed 2d 448, 77 S Ct 408 (1957) (reiterating that evidence obtained through conduct that "'shock[s] the conscience'" may not be used to support a criminal conviction). Although Rochin did not establish a civil remedy for abusive police behavior, we recognized in County of Sacramento v Lewis, 523 US 833, 846, 140 L Ed 2d 1043, 118 S Ct 1708 (1998), that deprivations of liberty caused by "the most egregious official conduct," id., at 846, 847-848, n 8, 140 L Ed 2d 1043, 118 S Ct 1708, may violate the Due Process Clause. While we rejected, in Lewis, a ɛ 1983 plaintiff's contention that a police officer's deliberate indifference during a high-speed chase that caused the death of a motorcyclist violated due process, id., at 854, 140 L Ed 2d 1043, 118 S Ct 1708, we left open the possibility that unauthorized police behavior in other contexts might "shock the conscience" and give rise to ɛ 1983 liability. Id., at 850, 140 L Ed 2d 1043, 118 S Ct 1708.

By its terms, the Fifth Amendment itself has no application to the States. It is, however, one source of the protections against state actions that deprive individuals of rights "implicit in the concept of ordered liberty" that the Fourteenth Amendment guarantees. Indeed, as I pointed out in my dissent in Oregon v Elstad, 470 US 298, 371, 84 L Ed 2d 222, 105 S Ct 1285 (1985), it is the most specific provision in the Bill of Rights "that protects all citizens from the kind of custodial interrogation that was once employed by the Star Chamber, by 'the Germans of the 1930's and early 1940's,' and by some of our own police departments only a few decades ago."2Whenever it occurs, as it did here, official interrogation of that character is a classic example of a violation of a constitutional right "implicit in the concept of ordered liberty."3

As we noted in Lewis, the official conduct "most likely to rise to the conscience-shocking level" is the "conduct intended to injure in some way unjustifiable by any government interest." Id., at 849, 140 L Ed 2d 1043, 118 S Ct 1708.
The conclusion that the Self-Incrimination Clause is not violated until the government seeks to use a statement in some later criminal proceeding strips the Clause of an essential part of its force and meaning.

This is no small matter. It should come as an unwelcome surprise to judges, attorneys, and the citizenry as a whole that if a legislative committee or a judge in a civil case demands incriminating testimony without offering immunity, and even imposes sanctions for failure to comply, that the witness and counsel cannot insist the right against compelled self-incrimination is applicable then and there. Justice Souter and Justice Thomas, I submit, should be more respectful of the understanding that has prevailed for generations now. To tell our whole legal system that when conducting a criminal investigation police officials can use severe compulsion or even torture with no present violation of the right against compelled self-incrimination can only diminish a celebrated provision in the Bill of Rights. A Constitution survives over time because the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom. ( Map vs. Ohio 367 U.S. 643 )

There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine "[t]he criminal is to go free because the constable has blundered." People v Defore, 242 NY, at 21, 150 NE, at 587. In some cases this will undoubtedly be the result.9 But, as was said in Elkins, "there is another consideration-the imperative of judicial integrity." 364 US, at 222. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in Olmstead v United States, 277 US 438, 485, 72 L ed 944, 959, 48 S Ct 564, 66 ALR 376 (1928): "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. ... If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." Nor can it lightly be assumed that, as a practical matter, adoption of the exclusionary rule fetters law enforcement. Only last year this Court expressly considered that contention and found that "pragmatic evidence of a sort" to the contrary was not wanting. Elkins v United States, supra (364 US at 218). The Court noted that yet it has not been suggested either that the Federal Bureau of Investigation10 has thereby been rendered ineffective, or that the administration of criminal justice in the federal courts has thereby been disrupted. Moreover, the experience of the states is impressive. ... The movement towards the rule of exclusion has been halting but seemingly inexorable." Id. 364 US at 218, 219.

The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest.11 Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

"[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."8

The case of Rochin v California,9 which we decided three years after the Wolf Case, authenticated, I think, the soundness of Mr. Justice Bradley's and Mr. Justice Rutledge's reliance upon the interrelationship between the Fourth and Fifth Amendments as requiring the exclusion of unconstitutionally seized evidence. In the Rochin Case, three police officers, acting with neither a judicial warrant nor probable cause, entered Rochin's home for the purpose of conducting a search and broke down the door to a bedroom occupied by Rochin and his wife. Upon their entry into the room, the officers saw Rochin pick up and swallow two small capsules. They immediately seized him and took him in handcuffs to a hospital where the capsules

[367 US 664]
were recovered by use of a stomach pump. Investigation showed that the capsules contained morphine and evidence of that fact was made the basis of his conviction of a crime in a state court.

When the question of the validity of that conviction was brought here, we were presented with an almost perfect example of the interrelationship between the Fourth and Fifth Amendments. Indeed, every member of this Court who participated in the decision of that case recognized this interrelationship and relied on it, to some extent at least, as justifying reversal of Rochin's conviction. The majority, though careful not to mention the Fifth Amendment's provision that "[n]o person ... shall be compelled in any criminal case to be a witness against himself," showed at least that it was not unaware that such a provision exists, stating: "Coerced confessions offend the community's sense of fair play and decency. ... It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach."10 The methods used by the police thus were, according to the majority, "too close to the rack and the screw to permit of constitutional differentiation,"11 and the case was reversed on the ground that these methods had violated the Due Process Clause of the Fourteenth Amendment in that the treatment accorded Rochin was of a kind that "shocks the conscience," "offend[s] 'a sense of justice' " and fails to "respect certain decencies of civilized conduct."12 I concurred in the reversal of the Rochin Case, but on the ground that the Fourteenth Amendment made the Fifth Amendment's provision against self- incrimination

applicable to the States and that, given a broad rather than a narrow construction, that provision barred the introduction of this "capsule" evidence just as much as it would have forbidden the use of words Rochin might have been coerced to speak.13 In reaching this conclusion I cited and relied on the Boyd Case, the constitutional doctrine of which was, of course, necessary to my disposition of the case. At that time, however, these views were very definitely in the minority for only Mr. Justice Douglas and I rejected the flexible and uncertain standards of the "shock- the-conscience test" used in the majority opinion.14

Two years after Rochin, in Irvine v California,15 we were again called upon to consider the validity of a conviction based on evidence which had been obtained in a manner clearly unconstitutional and arguably shocking to the conscience. The five opinions written by this Court in that case demonstrate the utter confusion and uncertainty that had been brought about by the Wolf and Rochin decisions. In concurring, Mr. Justice Clark emphasized the unsatisfactory nature of the Court's "shock-the-conscience test," saying that this "test" "makes for such uncertainty and unpredictability that it would be impossible to foretell-other than by guesswork-just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution.  In truth, the practical result of this ad hoc approach is simply that when five Justices are sufficiently revolted by local police action, a conviction is overturned and a guilty man may go free."16

Only one thing emerged with complete clarity from the Irvine Case-that is,that seven Justices rejected the "shock-the-conscience" constitutional standard enunciated in the Wolf and Rochin Cases. But even this did not lessen the confusion in this area of the law because the continued existence of mutually inconsistent precedents together with the Court's inability to settle upon a majority opinion in the Irvine Case left the situation at least as uncertain as it had been before.17 Finally, today, we clear up that uncertainty. As I understand the Court's opinion in this case, we again reject the confusing "shock-the-conscience" standard of the Wolf and Rochin Cases and, instead, set aside this state conviction in reliance upon the precise, intelligible and more predictable constitutional doctrine enunciated in the Boyd Case. I fully agree with Mr. Justice Bradley's opinion that the two Amendments upon which the Boyd doctrine rests are of vital importance in our constitutional scheme of liberty and that both are entitled to a liberal rather than a niggardly interpretation. The courts of the country are entitled to know with as much certainty as possible what scope they cover. The Court's opinion, in my judgment, dissipates the doubt and uncertainty in this field of constitutional law and I am persuaded, for this and other reasons stated, to depart from my prior views, to accept the Boyd doctrine as controlling in this state case and to join the Court's judgment and opinion which are in accordance with that constitutional doctrine.

As stated in the Weeks Case, if evidence seized in violation of the Fourth Amendment can be used against an accused, "his right to be secure against such searches and seizures is of no value, and ... might as well be stricken from the Constitution." 232 US, at 393.

When we allowed States to give constitutional sanction to the "shabby business" of unlawful entry into a home (to use an expression of Mr. Justice Murphy, Wolf v Colorado, at 46), we did indeed rob the Fourth Amendment of much meaningful force.  There are, of course, other theoretical remedies. One is disciplinary action with the hierarchy of the police system, including prosecution of the police officer for a crime.  Yet as Mr. Justice Murphy said in Wolf v Colorado, at 42, "Self-scrutiny is a lofty ideal, but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered."

The only remaining remedy, if exclusion of the evidence is not required, is an action of trespass by the homeowner against the offending officer. Mr. Justice Murphy showed how onerous and difficult it would be for the citizen to maintain that action and how meagre the relief even if the citizen prevails. 338 US 42-44. The truth is that trespass actions against officers who make unlawful searches and seizures are mainly illusory remedies.

Without judicial action making the exclusionary rule applicable to the States, Wolf v Colorado in practical effect reduced the guarantee against unreasonable searches and seizures to "a dead letter," as Mr. Justice Rutledge said in his dissent. See 338 US, at 47.

Wolf v Colorado (US) supra, was decided in 1949. The immediate result was a storm of constitutional controversy which only today finds its end. I believe that this is an appropriate case in which to put an end to the asymmetry which Wolf imported into the law. See

Stefanelli v Minard, 342 US 117, 96 L ed 138, 72 S Ct 118; Rea v United States, 350 US 214, 100 L ed 233, 76 S Ct 292; Elkins v United States, 364 US 206, 4 L ed 2d 1669, 80 S Ct 1437, supra; Monroe v Pape, 365 US 167, 5 L ed 2d 492, 81 S Ct 473. It is an appropriate case because the facts it presents show-as would few other cases-the casual arrogance of those who have the untrammelled power to invade one's home and to seize one's person

Petitioner filed this action on July 6, 2006. 3 He raises the following thirteen grounds for relief: (1) legal insufficiency of the evidence; (2) uncorroborated accomplice witness testimony; (3) no evidence that he was a party to the offense; (4) no evidence that he used or exhibited a deadly weapon in the commission of the offense or knew that a deadly weapon would be used or exhibited; (5) admission of hearsay at trial; (6) admission of prejudicial photographs; (7) omission of lesser-included-offense instruction; (8) erroneous exclusion of testimony; (9) erroneous "reasonable doubt" instruction; (10) actual innocence; (11) denied right to confront witness; (13) ineffective assistance of trial counsel. Petitioner claims that his attorney rendered ineffective assistance in the following respects: (a) advising petitioner not to testify; (b) failing to call witnesses on his behalf; (c) failing to object to hearsay; (d) failing to rebut witness testimony with evidence favorable to the defense; and (e) waiving petitioner's right to suppress petitioner's statements, an alleged accomplice's confession, and a hearing to determine the admissibility of such statements.

## Jurisdiction

A. Federal Rule of Civil Procedure 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction." Home Depot U.S.A., Inc. v. Jackson, 139 S. Ct. 1743, 1746, 204 L. Ed. 2D 34 (2019) (quotation omitted). A federal court's "power to hear cases" is defined by "[the] court's subject-matter jurisdiction." Lightfoot v. Cendant Mortg. Corp., 137 S. Ct. 553, 560, 196 L. Ed. 2D 493 (2017) (citing cases). Without "a grant of subject-matter jurisdiction covering the case before it" a court has no "power to adjudicate the case." Id. at 560-61 (citing Pennoyer v. Neff, 95 U.S. 714, 733, 24 L. Ed. 565 (1878)).

"Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a claim for lack of subject-matter jurisdiction, mounting either a facial or factual attack." Baker v. USD 229 Blue Valley, 979 F.3d 866, 872 (10th Cir. 2020). "A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction. A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction." Id. (citing Pueblo of Jemez v. United States, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015)).

"Motions to dismiss for lack of subject matter jurisdiction generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." City of Albuquerque v. United States DOI, 379 F.3d 901, 906 (10th Cir. 2004) (internal citations omitted). If the motion challenges the sufficiency of the complaint's jurisdictional allegations, the court must accept all such allegations as true. Holt v. United States, 46 F.3d 1000, 1002 (10th Cir. 1995). If there is a challenge to the actual facts, the court has discretion to allow affidavits and other documents to resolve disputed facts. Id. at 1003. See Cochran v. City of Wichita, No. 18-1007-JWB, 2018 U.S. Dist. LEXIS 134294, 2018 WL 3772681, at *2 (D. Kan. Aug. 9, 2018).

A writ of habeas corpus ad prosequendum "permits one sovereign-called the 'receiving sovereign'-to 'borrow' temporarily a person in the custody of another sovereign-called the 'sending sovereign'- for the purpose of prosecuting him." Jake v. Herschberger, 173 F.3d 1059, 1061 n.1 (7th Cir. 1999). The "sending sovereign" is the sovereign who obtained primary jurisdiction over the prisoner by being the first sovereign to take the prisoner into custody. Newman v. Cozza-Rhodes, 526 Fed. App'x. 818, 821 (10th Cir. 2013) (unpublished).2"Because the receiving sovereign merely obtains limited jurisdiction over the 'borrowed' prisoner, the prisoner is still under the jurisdiction of the sending sovereign, and is considered to be in the custody of the sending sovereign not the receiving sovereign." Jake, 173 F.3d at 1061 n.1; see also United States v. Welch, 928 F.2d 915, 916 n.2 (10th Cir. 1991) (noting that a "state does not relinquish jurisdiction when it delivers a prisoner for federal prosecution pursuant to a federal writ of habeas corpus ad prosequendum....The state merely 'lends' the prisoner...."). Thus, although a prisoner might be in the physical custody of the receiving sovereign, the prisoner remains a prisoner of the sending sovereign for the duration of the receiving sovereign's proceedings against him. Id.; see also Hernandez v. U.S. Attorney General, 689 F.2d 915, 918 (10th Cir. 1982) (concluding that a Colorado prisoner transferred to federal custody pursuant to a writ of habeas corpus ad prosequendum remained a "state prisoner").

Mr. Justice Whitedelivered the opinion of the Court.

[1] In 1970 Congress enacted the Interstate Agreement on Detainers Act, 18 USC App, pp 1395-1398 (1976 ed), joining the United States and the District of Columbia as parties to the Interstate Agreement on Detainers (Agreement).1The Agreement, which has also been enacted by 46 States, is designed "to encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Art I. It prescribes procedures by which a member State may obtain for trial a prisoner incarcerated in another member jurisdiction and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction. In either case, however, the provisions of the Agreement are triggered only when a "detainer" is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner; to obtain temporary custody, the receiving State must also file an appropriate "request" with the sending State.

Art IV(c) requires the receiving State to try the prisoner on the outstanding charge before returning him to the State in which he was previously imprisoned: "If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

Article V(c) similarly provides that the "indictment, information, or complaint on the basis of which the detainer has been lodged" shall be dismissed if the prisoner is not brought to trial within the period specified in Art IV(c).

United States district courts are authorized by 28 USCS ℄ 2241(a) [28 USCS ℄ 2241(a)] to grant writs of habeas corpus; expressly included within this authority is the power to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial. ℄ 2241(c)(5). This Court has previously examined in great detail the history of the writ of habeas corpus ad prosequendum, observing that ℄ 14 of the first Judiciary Act, 1 Stat 81, authorized courts of the United States to issue writs of habeas corpus. Carbo v United States, 364 US 611, 614, 5 L Ed 2d 329, 81 S Ct 338 (1961). Although ℄ 14 did not expressly state that the courts could issue ad prosequendum writs, the Court in an opinion by Mr. Chief Justice Marshall, Ex parte Bollman, 4 Cranch 75, 2 L Ed 554 (1807), interpreted the words "habeas corpus" as being a generic term including the writ "necessary to remove a prisoner in order to prosecute him in the proper jurisdiction wherein the offense was committed." Carbo, supra, at 615, 5 L Ed 2d 329, 81 S Ct 338 (emphasis omitted).

On August 2018 the FBI removed defendant Mr.Wahhaj from Taos County Adult Detention Center ("TCADC") without a writ of habeas corpus ad prosequendum they just displayed a criminal complaint and TCSO released defendant into federal custody. The FBI was supposed to file a writ of habeas corpus ad prosequendum to transfer defendant from one jurisdiction to another/ one sovereign to another. Every time defendant brings the jurisdictional issue fore-front to past and present counsel they all clam up. Counsels' position is defendant Mr.Wahhaj does not have a claim. This is further from the truth, subject-matter jurisdiction can be raised at any time. Ironically defendant's CYFD attorney Terrance Cady filed a writ of habeas corpus ad prosequendum to transfer defendant from federal custody to state custody where the original place of imprisonment happened to adjudicate his CYFD case.  This was the proper jurisdiction wherein the alleged offense was committed. ( See Attachment 10 Writ of Habeas filed by Cady)

It is TCSO who executed an illegal search warrant on August 3, 2018; the FBI was not present for that search warrant. TCSO arrested defendants and placed them in the TCDC. It was the FBI who processed the crime scene. On SA Travis affidavit for search warrant he admitted that TCSO had jurisdiction. Therefore, ~~while~~ TCSO may have been the proper authorities to conduct searches of these items. The proper authorities SA Travis is stating is jurisdictional. The FBI did not not have the authority to enter the premises. Nor did they have probable cause to execute a search warrant. ( See SA Travis Application for search Warrant August 11, 2018 Page 12 # 39)

The evidence to be searched in Attachment A is currently in the possession of the TCSO in connection with operations resulting in the arrest of JANY, SIRAJ, MORTON, SUBHANAH, and HUJRAH and the search of the compound on state child abuse warrants. Therefore, while TCSO may have been the proper authorities to conduct searches of these items, the FBI seeks the federal warrant to properly seize and search such items for evidence related to the on going federal investigation into this matter, and to be certain that an examination of evidence as described in Attachment A will comply with the Fourth Amendment and other applicable laws. 41) Based on my training and experience, I believe evidence of the target offense will be located with the items listed within Attachment A based on information I obtained during witness interviews, information from state and local law enforcement who searched the premises where the property was located and information collected during the course of the FBI investigation into this matter.  ( See SA Travis Application for search Warrant Page 12,13 # 39,41)

TCSO devised a secret, evil plot to seized defendant's minor children in order to allow CYFD time to conduct safe room interviews in order to further the investigation. Meanwhile the FBI was secretly monitoring events from behind the scenes because they did not have jurisdiction nor probable cause to legally enter the Subject Property to execute the search warrant. Yet it was the FBI who illegally interrogated, defendant's minor children without their parents written or verbal consent, counsel being present, nor with the children's Miranda rights being read, nor without a court order. It is from the illegal interrogation of the children perpetrated by SA Travis and Sam that federal charges were filed.

It is the TCSO that falsified the search warrant in order to gain access to defendant's property. It is the TCSO that conspired with CYFD and FBI to seize defendant's children in order to illegally interrogate them, in order to further the investigation.

84

It was CYFD who brought defendant's children to FBI head quarters in Santa Fe in order for them to be interrogated. It was the FBI who illegally interrogated defendant's minor children without their parents written or verbal consent, without a court order, Miranda rights being read, and counsel being present. From that illegal coerced interrogation federal criminal charges were filed against the defendants.

Defendant is respectfully requesting the court to dismiss the indictment with prejudice due to failure of the government to prosecute defendant Mr.Wahhaj before returning him to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

## PREJUDICE

It is defendants contention based on facts that the FBI opened a full investigation into Wahhaj in 2003 closed in 2009 opened back up in 2015, that the illegally obtained information from all those years was used to prejudice defendants in this current case. Amazingly Joint Terrorist Task Force ("JTTF") was called in to investigate a missing person because a father allegedly absconded with his son. The missing persons case was a false pretense for the FBI to continue the illegal investigation into Wahhaj that was started back in 2003. JTTF was responsible for blocking Jason Badger's constitutional civil proceedings trying to regain his property. JTTF could not justify a continuous investigation into Wahhaj without documenting that in their FISC applications. JTTF used the guise of a missing persons to pursue their misguided terrorism aspirations. Per NCIC reports defendant Mr.Wahhaj was considered as armed and dangerous. ( See Exhibit M BN 2687)

Defendant will remind the court that the FBI and TCSO swore an oath to uphold the Constitution from foreign and domestic threats. It is their job to uphold the rule of law not to break it in order to manufacture cases. The Supreme Court has explained that the " function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Congress could not have intended that its statues were to be enforced by tempting innocent persons into violation." Sherman v. United States, 356 U.S. 369, 372, 78 S.ct 819 2L.ed.2d 848(1958)

It is not illegal to live off the grid. It is not illegal to live in unconventional housing, especially in Northern New Mexico. It is very common in that area for people to live in unique structures that they have built for themselves. Yet you do not find mass arrest and prosecutions because of how people choose to live which is a fundamental right in this country. It was the FBI who opened up an investigation into Wahhaj in 2003, closed in 2009 and opened back up in 2015.

In the FBI misguided attempt to use the absconding" as a ruse to investigate terrorism, they had an investigative Strategy. If Wahhaj agrees to be interviewed, we would like to address the firearms training and multiple firearms, reason for leaving Atlanta, his trip overseas in 2017 and the meeting with an Imam who taught him exorcism. Upon return from his overseas trip in 2017, Wahhaj told his wife Ramzi to stop giving AG medication and said he would perform exorcism to heal AG. ( Exhibit N BN 2730 )

It was Sheriff Hogfre who repeatedly lied on his sworn Affidavit to establish probable cause when in fact probable cause did not exist. It was TCSO who illegally seized defendants from their property who established residency. TCSO did not have a writ of Restitution signed by magistrate judge to legally remove defendants from their property.

It was TCSO who prolonged charges and placed defendant's minor children in the care of CYFD in order to allow CYFD to conduct safe room interviews in order to further the investigation. It was CYFD who delayed 4 days for filing a petition with the court for custody of defendant's children in violation of NMRA. It was CYFD who allowed the FBI to interrogate defendant's minor children on the same day CYFD filed a petition with the court for allege abuse. TCSO seized defendant's minor children on August 3, 2018, placed them in the care of CYFD, CYFD delayed 4 days to file the petition on August 7, 2018 in violation of NMRA, on the same day CYFD allowed the FBI to illegally interrogate defendant's minor children without their parents consent, nor without counsel being present, nor their Miranda rights being read, and without a court order.

It was from that illegal interrogation that the FBI filed federal criminal charges against defendants. It was defendant's children who have been displaced from their home. CYFD forced defendants to relinquish their parental rights. Defendant's children continue to suffer today because of the illegal separation perpetrated by TCSO and CYFD.

Their children are in therapy as a result from the trauma they suffered from the depraved conduct of law enforcement officials and CYFD. Clara Mendoza CYFD foster mom beat defendant's (Mr. Wahhaj) 8 year old daughter at the time; 15 times and intentionally, recklessly fed her pork, separated her from her siblings in order to torture her.

This is what happens inside children when they are forcibly separated from their parents. Their heart rate goes up. Their body releases a flood of stress hormones such as cortisol and adrenaline. Those stress hormones can start killing off dendrites- the little branches in brain cells that transmit messages.

In time, the stress can start killing off neutrons and — especially in young children-wrecking dramatic and long - term damage, both psychologically and to the physical structure of the brain. " The effect is catastrophic," said Charles Nelson, a pediatrics professor at Harvard Medical School. " There's so much research on this that if people paid attention at all to the science, they would never do this." ( See Attachment 11 Washington Post article ) This court denied a grieving husband's (Mr. Wahhaj) motions twice to do a monitored welfare check on his wife because she made some credible allegation of guards sexually assaulting her. What part of a presumption of innocence until proven guilty is that. ( See Exparte Doc.257 And )

Defendant's (Mr. Wahhaj) seven- year - old son wets the bed, has nightmares, hears voices and is afraid to sleep in the room by himself. He is terrified of the police, every-time he sees them he is in a frozen state of fear. TCSO pointed guns at defendant's children and told them not to move. Defendant's (Mr. Wahhaj) five- year -old daughter was one at the time of the invasion. Defendants did not get a chance to bond with her.

As a result she was shy to speak with her father. She stated that she did not know him. All of this trauma defendant's children suffered from because of the illegal separation perpetrated by the FBI, TCSO and CYFD in order to further the investigation. Defendant's children did not have any of these serious psychological issues prior to the illegal search and seizure.

While incarcerated defendants contracted the deadly contagious disease Corona virus that no one knows the long term damage. Defendants were punished in pretrial detention. The conditions and confinement that defendants had to endue were are inhumane and in violation of defendant's due process rights. ( See Attachment 12 Declaration of Siraj Wahhaj)

CCCC denied defendant access to the courts; his legal materials were read by staff, confiscated, altered, he was sanctioned, and thrown in the SHU for 30 days for attempting to retrieve his legal materials that were illegally stolen from him by staff. ( See Attachment 13 Declaration Deny access to the courts) Husbands were separated from their wives, wives were separated from their husbands, brothers from sisters, and children from their parents. Defendant's property/ land was dismantled, businesses lost, character maligned all over the media.

The Government has no real hard evidence against the defendants. The crux of the government's case was the testimony of two minor children obtained illegally in a highly coercive environment, without their Miranda rights being read, counsel present, nor with the consent of their parents. Executed by a search warrant by an Affiant that committed perjury all through his sworn affidavit in violation of defendant's constitutional rights. There is no mens rea, no records, no surveillance of these alleged institutions, no Ci's, no undercover stings, no points of radicalization, no Isis videos, thousands hours of video pole cam, drone, AS footage that shows nothing. Just regular Muslim citizens living their life. The timeline to key events to this case is critical. The indictment charges conspiracy and facts reveal there is going to be extensive hearsay testimonies by co conspirators.

What you have is over zealous law enforcement officials whose discrimination against Muslims knows no bounds. The illegal investigation into Muslims nationwide is just the tip of the iceberg. This case could not pass the litmus test. There are too many egregious violations that the government will not be able to over come leaving this court no choice but to dismiss this indictment with prejudice. The court is of the opinion that all of these constitutional violations are minor prejudices. That defendants can stay in pretrial detention indefinitely; that law enforcement has free range to do as it pleases. If all of this oppression perpetrated by law enforcement officials and CYFD is minor prejudices than it is clear that the constitution is not for Muslims.

This court is bound by the federal constitution, TCSO by the state, CYFD by NMRA The FBI proffered evidence seized from the TCSO premised on an illegal search warrant. These are not isolated incidents if TCSO, FBI and CYFD records are pulled it will show a pattern of egregious conduct. Specifically all those who were involved in this case. It was TCSO, FBI and CYFD secret conference that set forth these constitutional violations.

TCSO and FBI despaired of defendant because they were watching defendant's property for months through drones, UV aerial and physical surveillance without any concrete nexus that defendant was on the property, so they falsified sworn Affidavits in order to illegally enter defendant's property. TCSO, FBI and CYFD did fail in their duty to uphold the constitution. The penalty of perjury in clear, is that penalty extended to law enforcement officials or is it just for those whom they prosecute. What is the punishment for law enforcement officials if they continuously intentionally, recklessly lie on sworn affidavits in order to further investigations.

From those perjured Affidavits defendants were incarcerated. What happens if the wrongdoers are not the defendants, but law enforcement officials themselves who swore an oath to uphold the constitution. Unlike TCSO, FBI and CYFD falsified documents. Defendant can verify through law enforcement's own police reports and their sworn Affidavits of their egregious conduct. The Constitution is clear when law enforcement officials conduct "most likely to rise to the conscience-shocking level" is so outrages the remedy is suppression and dismissal. The First Amendment gives a person the right to petition the government for redress of grievances. What can be a bigger grievance than when law enforcement officials who have incredible power to prosecute, violate their responsibility trusted to them by the people, commits outrageous conduct.

TCSO, FBI and CYFD all made a conscious decision to deprive defendants from their Due Process rights. Using their awesome law enforcement powers to manufacture charges against defendants by any illegal means. TCSO, FBI and CYFD actions are all intertwined, each one needed each other to execute the conspiracy. They had motive, plan, intent, and knowledge. They all acted in concert to deprive defendants from their constitutional rights. TCSO, FBI and CYFD all committed perjury. Is the committing of perjury nonpunishable? Do TCSO, FBI and CYFD have a separate set of rules they are govern by where they are exempt from following the constitution? Is the suffering of Muslims at the hand of TCSO, FBI and CYFD going to be condone? Is freedom of religion, which is guaranteed in the First Amendment not applicable for Muslims? It is going to be extremely difficult for the government to navigate through the cumulative effect of TCSO, FBI and CYFD egregious conduct that is overwhelmingly clear.

This court is bound to uphold the constitution/ rule of law which these law enforcement officials and CYFD egregiously violated. These were not good faith errors that the court may turn a blind eye to.

These were intentionally and reckless constitutional violations perpetrated by law enforcement officials in order to further the investigation. Defendant is challenging the actual facts upon which subject matter jurisdiction is based.

The is outrageous conduct perpetrated by the FBI, TCSO and CYFD caused defendants irreparable harm. It will take years of therapy to try to get back to normalcy because of their conduct. It is defendant's hope by preserving the record of these egregious constitutional violations perpetrated by law enforcement officials and CYFD that the blinders would be lifted from the court and its vision restored back in order to administer the justice it is tasked with.

Defendant was left with no choice but to file this omnibus motion himself because counsel refused to launch a collateral attack against the validity of this case.

## CONCLUSION

Wherefore, for the foregoing reasons, the defendants' respectfully urge this Court to dismiss the indictment with prejudice.

I swear under penalty of perjury that these statements are true and correct.   /.

Lucas Morton #00413151

02-08-2020
Date

All the defendants in this case are in support of this motion.
The government however opposes this motion.
Defendant intends to file a supplemental to this motion containing exhibits to this motion.

This is a (90) page motion for the District Court.

@UCC 1-308

Lucas Morton 00413151

12-08-2022
Date

STATE OF NEW MEXICO
NOTARY PUBLIC
SANDRA R SERRANO
COMMISSION # 1130567
COMMISSION EXPIRES 09/14/2024

Sandra R. Serrano

Lucas Morton #0041315]
CCC.C
P.O. Box 3540
Milan, NM, 87021

For Domestic Use Only

UNITED STATES
POSTAL SERVICE®

PRIORITY
★ MAIL ★

TRACKED
★ ★ ★
INSURED

Label 107R, July 2013

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

DEC 13 2022

MITCHELL R. ELFERS
CLERK

7013 0600 0000 5874 8005



Legal Mail

Pete V. Domenici U.S. Courthouse
333 Lomas Blvd NW, Suite 270
Albuquerque, NM 87102

