IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA      )
                              )
            Plaintiff,        )        18-CR-02945-WJ **FILED**
                              )
                              )        UNITED STATES DISTRICT COURT
      vs.                     )        ALBUQUERQUE, NEW MEXICO
                              )
                              )            DEC 27 2022
LUCAS MORTON                  )
                              )        MITCHELL R. ELFERS
                              )             CLERK
            Defendant,        )

AMENDED-PURSUANT TO DNMLR-CR 47.9
## DEFENDANT'S MOTION TO DISMISS INDICTMENT WITH PREJUDICE AS A RESULT OF VIOLATIONS OF THE 1st, 2nd, 4th, 5th, 6th and 14th AMENDMENTS OF THE CONSTITUTION AND THE RELIGIOUS FREEDOM RESTORATION ACT ("RFRA") PERPETRATED BY LAW ENFORCEMENT OFFICIALS

COME NOW, Defendant Lucas Morton (Morton), pursuant to the U.S. Const. Amendment's 1st, 2nd, 4th, 5th, 6th and 14th Amendments and Religious Freedom Restoration Act, respectfully move this court to dismiss the indictment with prejudice due to the constitutional violations perpetrated by law enforcement officials. In support thereof, Defendant submit the following:

## INTRODUCTION

"Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." As we noted in Lewis, the official conduct "most likely to rise to the conscience shocking level" is the "conduct intended to injure in some way unjustifiable by any government interest." Id., at 849, 140 L Ed 2d 1043, 118 S Ct 1708. The conclusion that the Self-Incrimination Clause is not violated until the government seeks to use a statement in some later criminal proceeding strips the Clause of an essential part of its force and meaning.

I

This is no small matter. It should come as an unwelcome surprise to judges, attorneys, and the citizenry as a whole that if a legislative committee or a judge in a civil case demands incriminating testimony without offering immunity, and even imposes sanctions for failure to comply, that the witness and counsel cannot insist the right against compelled self-incrimination is applicable then and there. Justice Souter and Justice Thomas, I submit, should be more respectful of the understanding that has prevailed for generations now. To tell our whole legal system that when conducting a criminal investigation police officials can use severe compulsion or even torture with no present violation of the right against compelled self-incrimination can only diminish a celebrated provision in the Bill of Rights. A Constitution survives over time because the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom.

Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

"[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Mapp v. Ohio, 367 U.S. 643, 648, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961).

Where, but-for the illegal conduct perpetrated by FBI, TCSO, CYFD and other law enforcement officials who swore an oath to uphold the constitution, defendants would not have been incarcerated for 4 years. It is imperative that the Court hone in on these constitutional violations perpetrated by law enforcement officials. It is because of their flagrant disregard for defendants constitutional rights why we are here. The contested evidence would not have been discovered.

2

## FACTUAL BACKGROUND

On August 2, 2018 , Taos County Sheriff Jerry Hogrefe ( the " Affiant"), submitted a search warrant affidavit ( the " Affidavit" ) to New Mexico District Court Judge Sarah Backus. ( Exhibit A, BN 23619). The Affidavit requested authorization to search Unit 2 Lot 28 ( the " Subject property"), a 10-acre parcel of Costilla meadows subdivision in Taos County, New Mexico. ( Exhibit A, BN 23616) The Affiant alleged probable cause existed that (1) " Siraj Wahhaj and others are likely on the property described above and that both an arrest order and child pickup order exist" and (2) " there is now information that the children are being neglected of food and/ or basic needs and the totality of what is presented in this affidavit rises to the need for law enforcement to enter and search the property for the missing child, the wanted felon, and to check the welfare of any persons/ children that may be present." ( Exh, A,BN 23618).

The Affidavit's factual basis contained various false statements and material omissions. Specifically, the Affiant averred that on May 15, 2018, he became aware of a missing child bulletin from Clayton County, Georgia and that Siraj Ibn Wahhaj ( Mr. " Wahhaj") and his son, Abdul- Ghani Wahhaj ( "AG"), may be residing in New Mexico ( "N.M"). (Exhibit A, BN 23617).

The Affiant, however, was aware much earlier than May 15 that Mr. Wahhaj and his son may be in New Mexico. Indeed, on January 2, 2018, the Affiant sent Taos County Sheriff's Office ( " TCSO") Sergeant Jason Rael an email indicating Mr. Wahhaj and AG may be residing in Costilla, N.M. ( Exhibit B. BN 233790)

Further, the Affiant represented that the bulletin stated Mr. Wahhaj may have abducted his son, AG, who suffers from Hypoxic Ischemic Encephalopathy (HIE), and it was unknown if his son had been receiving his medication. ( Exhibit A, BN 23617). Affiant also averred that the child is described as having a " limp," but the Affiant knew AG could not walk. ( Exhibit A, BN 23617). Ironically, the Affaint attached two documents indicate that AG's mother stated AG" cannot walk." ( Exhibit A, BN 23621, 236230.

The Affidavit goes on to described law enforcement's purported investigation, noting that during the investigation, TCSO officers Flores and Rael received information, on an unknown date, that the father, child, and others may be residing at property in Costilla, N.M. ( Exhibit A, BN 23617). Affiant wrote that officers traveled to Costilla, N.M. Where area residents told the officers that persons who "resemble" Mr. Wahhaj and his son occupy a property on Juniper Road. ( Exhibit A, BN 23617).

3

However, neither officer Flores or Rael's report makes any mention that any area residents told them persons who" resemble" Mr. Wahhaj and his son occupy a property on Juniper Road. (Exhibit C, BN 2689-92; Exhibit B, BN 23786- 23799).

Affiant further attested law enforcement determined the legal description of the property and contacted the registered owner, Jason Badger. ( Exhibit A, BN 23617). according to the Affiant, Badger told investigators that while he and his wife ( the Badgers) owned the Subject property, Mr. Wahhaj, Lucas Morton [sic], and others occupied it. ( Exhibit A, BN 23617). Badger explained that Mr. Morton owned the adjacent property and had accidentally built the living residence on the Badgers' property, but they were in negotiations to exchange properties. ( Exhibit A, BN 23617). However, the Affaint omitted from the Affidavit that on May 14, 2018, Mr. Badger admitted he had actually only seen Mr. Wahhaj " once," ( Exhibit D, Axon Video 22;00-22: 30), and had not seen him or AG " in a long time." ( Exhibit B, BN 23793).

Affiant continued by attesting that FBI aerial surveillance ("AS") documented adult males, females, and children present on the Subject property. ( Exhibit A, BN 23618). However, the FBI surveillance provided not depicted more than one adult male. ( Exhibit E, surveillance video). Additionally, the Affiant indicated that the FBI AS depicted one child walking with a "limp."( Exhibit A, 23617). Surprisingly, the Affiant materially omitted that the child walking with the " limp" was not AG. Law enforcement showed AG's mother the photos, and she told them the child was NOT her son well before the Affidavit was made. ( Exhibit B, BN 23794; Exhibit F, BN 772)

The Affiant also indicated that in December 2017, Siraj Wahhaj had been involved in an accident somewhere and that officers had observed guns and body armor. ( Exhibit A, BN 23618). However, the Affiant failed to note that Mr. Wahhaj was not prohibited from possessing firearms. Additionally, the Affiant labels Mr. Wahhaj as a "wanted felon," however, Mr. Wahhaj was not and is not felon. ( Exhibit A, BN 23618).

The Affiant stated according to the investigation approved by the Georgia courts the father was to preform an exorcism on the child and deny him his prescribe medications. (Exhibit A,BN 2483 Affidavit for search warrant). The Affiant knew that ~~mother~~ the mother states that the father made it known before absconding that he wanted to preform an exorcism on said child because he believes that the child is possessed by the devil. (Exhibit A, BN 2485 Affidavit for search warrant Attachment C). The Affiant falsely added that defendant wanted to deny his child prescription medication to create an impression of exigent circumstances and child abuse, when in fact there was none.

Finally, the Affaint wrote that on August 2, 2018, detective Porter stated he was provided with photographs of messages from one of the females asking for help, stating the family was starving and needed money for food. ( Exhibit A, BN 23618). However, the female sent messages that she needed money because she was starving. (Exhibit G, 2-21273). Mr. Hogrefe falsely mentioned that the messages said the family was starving.

Ultimately, the Affaint included a multitude of false statements and material omissions hidden to Judge Backus to create the impression of probable cause. Unaware of such false statements and omissions, Judge Backus construed the Affidavit as establishing cause and signed the warrant. ( Exhibit A, BN, 23619, 236250.

Following Judge Backus's authorization, law enforcement searched the premises. ( Exhibit A, BN 23626). The Defendants and eleven children were found on the Subject property. ( Exhibit A, BN 23626). Law enforcement arrested Mr. Wahhaj and Morton. (Exhibit A, BN 23626). Additionally, law enforcement seized several weapons from the Subject Residence, ( Exhibit A, BN 23626). Following the search, law enforcement used information obtained in the search to obtain additional search warrants.

In this case, law enforcement constitutionally violated the Defendants' Fourth Amendment rights when they executed a search warrant containing a multitude of misleading information, which falsely created the impression of probable cause. The Affaint's Affidavit contained various intentionally and recklessly made false statements and material omissions. These false statements and omissions purposefully misled Judge Backus into concluding that the search warrant affidavit established probable cause, when it did not. After excising such false statements and including such material omissions, the Affidavit's true character reveals its failure to establish probable cause. There, the evidence derived from the illegal search and seizure of the Subject property described in the search warrant must be also be suppressed, the evidence obtained in the searches following the first search must also be suppressed, as evidentiary fruits of the first search. Defendants respectfully request this Court suppress all evidence seized as a result of the illegal search including any and all evidentiary fruits obtained thereafter.

# ARGUMENT

## *First Amendment*

The First Amendment provides that Congress shall make no law respecting an establishment of religion. U.S. Const. amend. 1.
To assess an Establishment Clause challenge, courts follow the tripartite test from the Lemon decision. As the United States Court of Appeals for the Tenth Circuit has explained, government action does not violate the Clause if: (1) it has a secular purpose, (2) its principal or primary effect is one that neither advances nor inhibits religion, and (3) it does not foster an excessive government entanglement with religion. The Tenth Circuit interprets the first and second prongs of the Lemon test in light of Justice O'Connor's endorsement test. That is, the court asks whether government's actual purpose is to endorse or disapprove of religion, and whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. The Tenth Circuit evaluates the government's actions from the perspective of a reasonable observer who is aware of the history, purpose, and context of the act in question. The test is conjunctive: failing any prong of the Lemon test means that the government action cannot withstand Establishment Clause scrutiny. The Tenth Circuit therefore considers each prong separately.

I am a Muslim of the Islamic faith who follows the Quran revealed over 1400 years ago from Allah the Creator of the heavens and earth and everything in between; delivered by Angel Jibril ( Gabriel ) to Prophet Muhammad ("S.A.W"may GOD's peace and blessings be upon him) the seal of prophet-hood, which has a population of 2 billion Muslims worldwide. Freedom to practice religion; I have a right to live where I want establishing residency/ homesteading living off the land trying to enhance my spiritual connection to GOD. The government alleges future religious prophecies that are separated by space and time depending first on events to happen to be fulfilled as crimes. They classify ruqyah the act of placing ones hands over a body or body parts reciting some passages of the Quran as violation of the law. The Government may not burden the free exercise of religious practices. Because practice of religion is protected by the First amendment, I may not lawfully suffer any legal disabilities or discrimination by virtue of serving GOD, such as to become a target of surveillance under the Foreign Surveillance Intelligence Act ( FSIA), it is a known fact that the defendant Dr. Wahhaj was under extensive surveillance since 2003. FBI NY opened a full investigation into Wahhaj in 2003 and closed in 2009 opened back up in 2015. (Exhibit H BN# 3150)

## Second Amendment

As we stated in Heller and repeated in McDonald," individual self – defense is ' the central component ' of the Second Amendment Right," MC Donald, 561 U.S. , at 767 ( quoting Heller, 554 U.S., at 599); see also id, at 628 ( " the inherent right of self-defense has been central to the Second Amendment right")

Then and now that means, the Second Amendment covers weapons of offense, or armor of defense, or anything that as man wears for his defense, or takes into his hand, or useth in wrath to cast at or strike another. The Second Amendment never put a restriction on the number of guns and ammunition you can own. The Defendant is not a felon prohibited from owning, carrying, or transporting firearms. Per ATF records All of defendant's firearms were purchased legally from a licensed dealer. Defendants' first purchase was in February 14, 2011 and last purchase was May 22, 2018, all purchases was are approved by the FBI from 2011 to 2018 while defendant (Mr.Wahhaj) was under full have investigation. It defies logic that the FBI would approved every back ground check to a suspected terrorist. ( Exhibit I  ATF Trace reports BN 0697- 0708)

## NMRA 14-5190

A person who is defending against attack, defending another from attack or defending property need not retreat. In the exercise of the right of self defense, defense of another or defense of property, a person may stand the person's ground and defense or herself/himself/another the person's habitation or property.

(Mr.Wahhaj)
It is a corroborated fact that the defendant's family fled their home because of an imminent attack. The defendants have a constitutional right to defend themselves. They also have a constitutional right to train their members of their household in self defense. (Mr.Wahhaj) The defendant never left his property; he taught his sons self defense techniques to defend themselves and their property against any intruder without proper credentials who wishes to do them harm.

(Mr.Wahhaj)
The heart of the matter is this; defendant is a practicing Muslim; he is also an advocate of the Second amendment, because the government had launched an illegal investigation into Muslims nationwide they are extremely concerned about Muslims practicing their Second amendment right.

FBI NY opened a full investigation into Wahhaj in 2003 based on information indicating he was involved in training activities related to sutra teams (closed in 2009). FBI ATL opened preliminary investigation into Wahhaj in July 2015 based on information indicating Wahhaj was engaging in firearms training. (Exhibit H BN #3150)

9

*Fourth Amendment : A. Suppression Resulting From Flagrant Disregard for Warrant's Limitations*
*see footnote*

In sum, blanket suppression is predominantly applied where agents grossly disregard the specific limits of a warrant and proceed to search for and seize property that is entirely unrelated to that authorized by the warrant.

## B. Suppression Resulting From General Disregard for Constitutional Rights

Suppression of evidence is also sometimes warranted where law enforcement acts particularly reprehensibly, with flagrant disregard for a suspect's constitutional rights. U.S. v. Edwards, 666 F.3d 877, 886 (4th Cir. 2011); United States v. Thompson, 667 F.Supp.2d 758 (S.D. Ohio 2009). The question of whether law enforcement officers acted with such extreme disregard for the intended intensity of a search that suppression is required to deter such conduct is resolved on a case by case basis. United States v. Penn, 647 F.2d 876, 882 n. 7 (9th Cir. 1980), cert den'd, 449 U.S. 903, 101 S. Ct. 276, 66 L. Ed. 2d 134.

## 3. Exposing Mr. Wyatt to Media Coverage

The Supreme Court has, on several occasions, held that police officers' inviting members of the media to observe the execution of a warrant to constitute a Fourth Amendment violation. Wilson v. Layne, 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2D 818 (1999); Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2D 978 (1999); see also Robinson v. City & County of Denver, 39 F.Supp.2d 1257, 1265 (D. Colo. 1999).

Defendant alleges that there were many defects in the warrant executed by TCSO, and that the TCSO exceeded the scope of the warrant when seizing evidence. Where, but-for the illegal conduct, the contested evidence would not have been discovered. Government exhausted tremendous resources trying to build a case on defendants since 2003. They were not able to build a case by following the constitutional norms so they decided to disregard those norms and operate outside of the bounds that the Constitution sets limits on. Just because they are law enforcement officials does not mean they can violate defendants right with impunity. TCSO and FBI used the search warrants as a fishing expedition. Defendant is respectfully requesting the court to grant a blanket suppression.

Footnote: case law regarding "blanket suppression". See United States v. Webster, 809 F.3d 1158 (10th Cir 2016)(blanket suppression is warranted where searches conducted pursuant to a warrant turn into general searches in disregard of the particularity requirement); United States v. Le, 173 F.3d 1258, 1270 (10th Cir. 1999); United States v. Moraga, 76 Fed Appx 223, 229 (10th Cir. 2003); see also United States v. Shi Yan Liu, 239 F.3d 138, 140-41 (2d Cir. 2000)(the rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith essentially becomes an impermissible general search); United States v. Squillacote, 221 F.3d 542, 556 (4th Cir. 2000)("The extraordinary remedy of blanket suppression of all evidence seized should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search")(quoting United States v. Chen, 979 F.2d 714, 717 (9th Cir. 1992)).

Sixth Amendment

**In representing a criminal defendant, counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest, a duty to advocate for the defendant's cause, a duty to consult with the defendant on important decisions, a duty to keep defendant informed of important developments in the course of the prosecution, and a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.**

In analyzing this criteria defendant's counsel; failed to notify defendants that the government was planning on making this case complex. All of counsel was privy to this important information at an early stage of the case. They never informed defendants nor asked them if they wanted to oppose. (See Doc. 47 unopposed motion to declare case complex, October 2, 2018 Doc. 49 Granting unopposed motion designating this case complex). This is something the Court admonished the defendant on his denial of the speedy trail violation motion (See Doc. 388 Speedy trail denial ). Defendant was prejudice by this, they never had an option to oppose the complex case order and preserve it on the records. Defendant would have asserted his speedy rights claims much earlier had he have known. Defendant's lawyer Zach Ives disappeared after the detention hearing in September 2018 defendant could not reach him for months to get an update on his case. Defendant had to have his mother email Zach for an update. When he finally responded to her email he informed her that the court had declared this case complex. ( See Attachment 2 emails from Zach to defendant's mother).

All of defendant's attorneys filed an unopposed motion to stay these proceedings pending competency issues. ( See Doc. 192 February 18, 2020). Wahhaj opposed this stay with his attorneys in private. The boys were never deposed per defendants' directives. The Boys statements are highly relevant to the central issue in the case. Defendants are concerned about their availability, they were 15 and 13 at the time, they could have forgotten. Their testimony should have been preserved; this goes to the heart of interest of justice. Defendants asked their counsel for a deposition hearing in order to preserve the boys testimony for trial. This case is predicated on two important facts .1) The illegal search warrant executed by TCSO on August 3, 2018. 2) The illegal interrogation of defendant's minor children. The indictment was exclusively filed from the testimony of defendant's minor children from an illegal coercive interrogation without their Miranda warnings being read, counsel being present, their parents' written or verbal consent, nor a court order, nor verifying their statements. Defendants were denied the Confrontation Clause to confront witnesses against them guaranteed in the 6th Amendment of the Constitution.

Footnote: The boys are two minor children of defendants'; at the time FL (15) and JL (13) years old.

31

This is something all of counsel knew in 2018 and never launched a collateral attack. The boys were 15 and 13 respectively. An expert was not called to view the videos to determine if they were coerced, nor an interview was conducted to determine the boys' state of mind. 4 years had passed and their memory could have been affected;this greatly prejudiced defendants. This was not argued in the speedy trial motion filed by defendant's counsel but was asserted by defendant to counsel in private. Defendants does not know if their children were scared and were compelled to tell law enforcement agents anything so they would not get in trouble. Lucas Morton filed a motion outlining/challenging the validity of the children's statements under coercion and duress on February 10, 2020. ( See Doc. 186 ) His motion was dismissed without prejudice pending competency evaluation. ( See Doc. 193 February 18, 2020 ) Defendant sent a sworn notarized affidavit on June 2020 to his attorneys asserting that right. ( See Attachment 3 letter to attorney)

This is something Judge Khalsa acknowledged at the detention hearing and said it is a legitimate argument that can be raised at a latter time. Mr. Ives stated,"what we have are firearms charges. We don't have any charges for conspiring to — conspiring to plot a terrorist attack or providing material support to a designated terrorist. We don't have any of that. So where-- what is the evidence here about so---called jihad and violent attacks? It — as we heard today, it comes from-- almost exclusively from these two minor children who have been questioned repeatedly without their parents, without legal guardians present in the room, and we would ask the court to take that in to considerations. Those statements have not been corroborated, either by writings by Mr. Wahhaj or anything else. These are uncorroborated statements by minor children in a — what we believe is a — is a fairly coercive environment. As to the strength of the evidence, it seems very revealing to me that we didn't hear anything about Mr. Wahhaj's mens rea. This is — this is a case about possession of guns, and as I said, he had a second Amendment right to possess those guns ( indiscernible, audio skips) prohibited person or didn't have the right to possess those guns. What the indictment alleges is that he was part of a conspiracy to "knowingly provide Jany Leveille, an alien, possession of firearms." So knowingly is a key word there, because it applies, also, to her immigration status. In order to commit this crime, they have to have some evidence that he was aware that she was in the country illegally. It can't just be that he presented a firearm-- or he allowed her access to a firearm, but he didn't know about her immigration status or he thought she was here legally."

"There must be some evidence of knowledge, and that's clear, even for general intent crime, Your Honor. In the Tenth Circuit, very recently, just this year, said, even when specific intent is not required-- and actually conspiracy is a specific intent crime in the Tenth Circuit-- but even where specific intent is not required, criminal status are usually read to require only that the defendant know the facts that make his conduct illegal. So one of the facts that makes it illegal, of course, is that Ms. Leveille was here unlawfully during the time period in question, which we heard no evidence of."

The COURT: Well, but the Grand Jury's returned an indictment charging that, and the Grand Jury has found probable cause to charge that. And so, certainly, I'm taking judicial notice of that, but of course, probable cause is not beyond a reasonable doubt, and these are arguments that certainly are appropriate after today's hearing. ( See Detention hearing in Albuquerque September 2018 Pages 158-160 )

Defendants had to sit by for 4 years while counsel refuses to launch a collateral attack on the merits of this case; with an exception of Erlinda Johnson and Thomas Clark, all of the remainder counsel are concern with is launching endless competency evaluations. Even when counsel files a motion it is watered down not addressing the core issues. This leaves defendants no other other options but to preserve the record of the constitutional violations perpetrated by law enforcement officials themselves. From the inception of this case defendants have been prejudiced. It is going on 4 years, defendants will not sit by and watch counsel continue to ignore these serious constitutional violations. It is very pertinent to preserve the record in pretrial motions. It is the defendant's assessment, base on facts, that the defendants will not get a fair trail.

It is defendants only line of defense is to preserve these unconstitutional violations themselves because counsel refuse to address them. Counsel can not explain away or make excuses why they did not launch a collateral attack on the validity of this case from the inception. This is something defendants requested and were denied. They all knew this case was predicated on the falsifying of the search warrant by TCSO and the illegal coerce interrogation of defendants minor children by the FBI. Most of defendant's attorneys know very little about Islam. They do not know what governs Muslims and why. How can they adequately launch a collateral attack outlying the religious discrimination perpetrated by law enforcement officials if they are not willing to learn/ and or get practicing Muslim experts that are well verse in Islamic practices and belief. The FBI deliberately targeted defendants because they are Muslims.

At the core of this case is religious persecution and discrimination. Islamic devotion in the eyes of Muslims can be interpreted as religious fanaticism/ or delusional in the eyes of someone who knows very little about Islam. This greatly prejudice defendants because under the First Amendment and RFRA religious practices may not be burdened. If counsel does not preserve this on the record this greatly prejudices defendants. Either defendant's lawyers are incompetent or they are complicit to the conspiracy to violate defendant's constitutional rights in order to further their careers. This case may be a career changer for them. Interestingly enough two of defendant's (Mr. Wahhaj) former counsels were promoted to state appellate judges by the Governor of New Mexico.

By counsel consistently raising the issue of competency they are implying that defendants have diminished capacity, counsel are opening up the possibility for them to take protective action, or at the very least it taints the court's views that there are some potential serious mental issues; this causes defendants irreparable harm. The court may not take any of defendant's motions seriously like Lucas Morton's motion. ( See Doc. 186) Counsel showed their hand in the motion they jointly objected to filing of motion for CIPA pretrial Conference......In addition to violating the Court's stay, the *ex* parte submission called four of the five defendants are in competency proceedings and cannot participate in their defense, and implicates those Defendants' counsels' professional responsibility to take reasonably necessary protective action for clients with diminished capacity. (See Doc. 260 Pages 1, 2 Rule 16- 114 (B) NMRA)

Under the Sixth Amendment's Confrontation Clause, a criminal defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This includes the right to cross-examine witnesses. See Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2D 347 (1974); United States v. Begay, 937 F.2d 515, 523 (10th Cir. 1991) (stating, "to establish [a] 6th Amendment violation, defendant must show that he was precluded from offering evidence material and favorable to his defense" (quotations omitted)). "[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, 415 U.S. at 316-17.

The right to cross examine includes the right to impeach the alleged victim by establishing and explaining the victim's motivation to lie. Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 102 L. Ed. 2D 513 (1988). But, "[t]he Confrontation Clause does not require the admission of potentially inflammatory and irrelevant testimony when a defendant has other avenues to attack a witness's credibility." United States v. Oliver, 278 F.3d 1035, 1041 (10th Cir. 2001).

Fourteenth Amendment

The claims of the parents in this regard should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association. Campbell v. Burt, 141 F.3d 927 (9th Cir. 1998); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1991). Because only the children were subject to a seizure, their claims should properly be assessed under the Fourth Amendment. Donald v. Polk County, 836 F.2d 376 ( 7th Cir. 1988); but see J.B. v. Washington County, 127 F.3d 919, 928 (10th Cir.19970 ( noting that there may be circumstances in which a parent has standing to bring a Fourth Amendment claim for seizure of a minor child). As the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for removal of children.

All eleven children were taken in protective custody by Affiant and later turned over to CYFD case worker Tony. The three females were taken to Community Against Violence ("CAV") and not initially criminally charge it was Affiant's belief that prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. It should be noted that the women have since been re-interviewed by investigator and FBI agents and none have stated they were held at this compound against their will nor have they given any additional information as to the whereabouts of AG Wahhaj. ( See Exhibit K BN 2492 Affiant  Second search warrant)

TCSO arrested Wahhaj, Lucas Morton, and the women, children were taken to CYFD initially. The women were then illegally separated from their children and placed in CAV. Aleks Kostich on cross examination of Sheriff Jerry Hogfre. Q. Okay. So they were taken into custody without incident? A. Largely. The two males... please understand the females were not charged on the 3rd, on that first day. They were not taken into custody. That didn't happen until after further investigation, Safe room, and so forth had led us additional information believing that they had involvement with the health and welfare of the child; that they certainly were not held against their own will. They, therefore, making in the absence of those statements, they were an active participant in the treatment of these children. (See Taos detention hearing page 41 lines 8-14)

Defendant's family were illegally evicted from their residence; TCSO SGT Rael had a conversation with defendant's family on August 3, 2018 at CYFD. The following is a summary of my conversation with the adult females, at CYFD, August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during my conversation at CYFD, August 3, 2018. I did explain the reason for my contact with them was the property owner Jason Badger, wanted his property back. I also explained I was aware of the fact Lucas Morton has been to court and the case was dismissed.

36

I explained I had checked with Taos County Assessor's office and the land they had built their home on did belong to Jason Badger. I advised them I was going to issue them a non- traffic citation for trespassing. I did also advised them that the citation was going to be a summons to court and that by signing the citation it was not an admission of guilt, but rather a promise to appear. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property. I advised the females that I was not going to go further into questing regarding the reason we had to remove then from the property. I did advise them the main reason we were at the property was the fact we were looking for AG, and the last indication we had was he was last known to be with them, but we did not find him. I advised them Siraj Wahhaj had a warrant issued for his arrest, and that's why he was taken into custody. I advised them he was held at ADC, and also charged with a state charge of being a fugitive from justice. All three females appeared to not have knowledge of Siraj having a warrant. Jany Leveille asked about child custody and stated Siraj had joint custody, she was not clear as to why Siraj was charged with kidnapping his own child. I advise the only knowledge I had was from detective in Georgia. I did also advised the three of them Lucas Morton was held at ADC. I then advised them CYFD was involved in the case and they have their own process, but the children will be receiving food and clothing. During my time speaking to the females CYFD Tony Barajas entered the room. I handed out the citations and asked them if they had a New Mexico mailing address, They told me they did not have a mailing address. The three signed the citation and I provided them a copy of their citation. This was the extent of my interactions with the three females at CYFD. ( See Exhibit B BN 2720 Sergeant Jason Rael report)

On or about June 12, 2018, I was made aware J. Badger had filed civil processes' paperwork at TCSO in an effort to have Lucas Morton removed from the property, Sgt. Gilbert Atencio placed the paperwork on my desk as he knew I was working this case. I then advised Undersheriff Steve Miera of the civil process and he advised to place the paperwork in his box, and he would take care of it. I don't recall the date I received information the civil process regarding the J. Badegr case was dismissed by Magistrate Judge E. Ortega. I was also made aware J Badger called NMSP and asked officer to assist in going to his property and evict Lucas Morton. NMSP Sgt. Cox told me a NMSP uniformed officer drove up the compound and was met at the roadway by Lucas Morton. Lucas Morton was by all accounts nice to the officer and the officer left the property without incident. (See Exhibit B BN 2714  Sergeant Jason Rael report)

There are several important points in this report that needs to be unpacked. 1) Sgt. Rael confirmed Jason Badger attempted to evict defendants from the property but the case was dismissed . 2) He failed to include in his report that the case was dismissed with prejudice. 3) Defendants established residency on the property they were living there for more than 6 months. 4) Sgt. Rael did not state in his report it was a hazard to leave the women, children on the property and they had a court order signed by the magistrate judge ordering their removal. 5) Undersheriff Steve Miera illegally persuaded a neutral Magistrate Judge E. Ortega to dismiss the civil case without allowing J. Badger to exercise his due process rights. 6) TCSO intentionally, recklessly denied J. Badger due process rights in order to further the investigations. 7) When it was beneficial to deny J. Badger's civil process rights TCSO did not hesitate in order to further the investigation. 8) Sgt. Rael stated I advised them I was going to issue them a non- traffic citation for trespassing. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property. This was a false pretense to illegally removed defendants from the property. 9) There would be documentation in the courts of J. Badger civil filings, magistrate Judge E. Ortega dismissal with prejudice and a report on NMSP officer traveling to Subject Property. ( See Attachment 4 Badger civil filings Case No. M-53-CV-2018-00076 ) 10) J. Badger filed civil process on June 12, 2018, Lucas Morton was served on June 18, 2018, dismissed with prejudice on June 27, 2018, disposition for lack of prosecution. 11) There was no Writ of Restitution just an illegal removal from defendant's residence. 12) Sgt. Rael advised the females that he was not going to go further into questions regarding the reason they had to remove the defendants from the property. He knew the removal was illegal he did not want to entertain any questions to why defendants were forcibly being removed.

N.M Stat. Ann.§ 47-8-37 Notice of termination and damages 47-8-46.  Writ of Restitution is defined as the act or process of legally dispossessing a person of land or rental. N.M. Stat. Ann.§ 47-8-3

Mr. Krache on direct exaltation of SA Taylor. Q. Now, after they all arrived in Amalia, New Mexico, did they establish a residence there? A. They did. Q. Okay. And was there already any kind of residence there? Any kind of dwelling? A. No ( See Detention hearing in Albuquerque )

Jason and Tanya Badger had a real estate sale and purchase agreement signed  by J. Badger on April 5, 2018, Tanya Badger on April 12, 2018, and Lucas Morton April 18, 2018 ( See Attachment 5 Real Estate Sale and Purchase Agreement )

At that point the females were not charged with child abuse. In order for TCSO to legally separate defendant's children from their parents TCSO needed justification .This is when the unholy illegal alliance started to take shape.

38

TCSO filed false child abuse charges against defendants; separated the children from defendants; placed the defendant's children in the care of CYFD; CYFD delayed 4 days in filing a petition of abuse in violation of NMRA 10-312; CYFD illegally allowed the FBI to interrogate defendant's children without their parents knowledge, written or verbal consent, nor counsel being present, nor without their Miranda rights read, nor without a court order. On cross examination of SA Taylor by Mr. Clark. Q. Good afternoon. A. Good afternoon. Q. So the children, F.L. And J.L., one is thirteen and one is fifteen? A. Yes, sir Q. And was any guardian or any of their parents present when you spoke to them? A. CYFD were his guardian at the time and they consented to bring him in to the FBI space and a separate interview was done at CYFD, brought by foster mom at the time. Q. So nobody from either one of these boys' real families were there when they were talked to by the FBI, right? A. Correct. Q. Okay. So the fact is you, or whoever, law enforcement, spoke to these fifteen-year-old and thirteen-year-old, they would have been separated from any member of their biological family or [inaudible 02:34:52] family, correct? A. Correct. ( See Taos detention hearing Pages 69,70 lines 23-28 and 1-12)

From these Due Process violations manufactured terrorism charges were filed against defendants. TCSO seized defendants children on August 3, 2018, placed them on a 48 hour hold, filed criminal child abuse charges on August 5, 2018, dismissed on August 23, 2018. CYFD filed civil child abuse charges on August 7, 2018 4 days after TCSO seized defendant's children in violation of NMRA 10-312, in order to gain information to further the investigation. NMRA 10-312 B. **Time limits** if a child is taken into custody, a petition alleging abuse or neglect shall be filed by department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not field within the time set forth in this paragraph, the child shall be released to the child's parents, guardian, or custodian.

CYFD investigator Tony Barajas had a duty to investigate information that would have clarified matters prior to separating the children from their parents. Interestingly enough the FBI interrogated defendant's children before Mr. Barajas did. Mr. Barajas was suppose to make a thorough investigation and exercise reasonable judgment before CYFD removed defendant's children from their custody. CYFD false investigation for alleged child abuse was a pretense for the seizure of defendant's children in the first place; it was clear that those falsified allegations where not the main reason for the seizure, it was to pursue the FBI misguided terrorism investigations aspirations .

The Affaint intentionally, recklessly mislead Judge Backus to illegally gain entry to Subject Property that was egregious enough, but what he did after was impeachable and oppressive. He unlawfully seized and removed defendant's children from their parent's custody without justification in order to further the investigation in violation of the Fourteenth Amendment. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BN 2492 Affiant  second search warrant)

The Affiant seized defendant's children before criminally charging defendants. As a result of this malfeasance defendant's children was illegally interrogated by the FBI without defendant's written or verbal consent, without counsel being present, nor with the children Miranda rights being read, and without a court order. From this illegally coerce interrogation federal charges was file against defendants in violation of the 4th ,5th and 14th Amendment's of the constitution. Defendants were initially fraudulently charged with child abuse and neglect; Judge Backus saw right through this deception and stated she did not see any child abuse.  (See Taos County detention hearing)

The TCSO filed criminal charges on August 5, 2018 and were dismissed without prejudice on August 23, 2018 never refiled again. Interestingly enough CYFD maliciously pursued the removal of defendant's children from their custody. The original plot failed; the criminal charges against defendants were dropped but the other plot succeeded in separating defendant's children from them in order to further the investigation. The conduct of these law enforcement officials exceeded all possible boundaries. With the complicity of CYFD the prosecution continued. The FBI needed time to illegally manufacture federal charges against defendants. This could have not happen if defendant's children were returned to defendants. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BN 2492 Affiant  second search warrant)

TCSO was engaging in a fishing expedition it was their hope by isolating the defendant's children from their parents under the guise of CYFD conducting safe room interviews in order to further the investigation. The normal, legitimate, legal ways of surveillance, intelligence gathering techniques did not turn up any fruits so they had to resort to illegal tactics. TCSO could not say that they had reasonable cause to believe that defendant's children was in imminent danger of serious bodily injury and that the scope of the intrusion was reasonably necessary to avert that specific injury.

Defendant's children could have not been in imminent danger because TCSO prolonged the charges in order to give CYFD time to conduct safe room interviews. Exigent circumstances did not exist at the time TCSO executed a falsified search warrant on August 3, 2018. Therefore the seizure of defendant's children was a violation of defendant's Fourteenth Amendment of the Constitution. TCSO and CYFD were in violation of interference with the right to family association protected by the Fourteenth Amendment of the Constitution. Defendant's asserting a pre-deprivation due process claim because their children were taken from their custody without sufficient investigation and a court order. The principle of procedural due process also applies in this context. Defendant's children were unlawfully seized and removed from their parent's custody without justification in order to further the investigation in violation of the Fourteenth Amendment.

It was the Affiant's belief by prolonging the charges in order to give CYFD time to conduct safe room interviews in order to further the investigation. ( See Exhibit BN 2492 Affiant Affidavit for second search warrant) CYFD was a willing collaborator in the conspiracy to deprive defendants from their Due Process rights. CYFD knew they had 2 days to file the petition in order for them to legally take custody of defendant's children. They prolonged the filing in order to fulfill TCSO wishes in order to further the investigation.  NMRA 10-312 B. **Time limits** If a child is taken into custody, a petition alleging abuse or neglect shall be filed by the department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not filed within the time set forth in this paragraph, the child shall be released to the child's parents, guardian, or custodian.

TCSO seized defendant's children on August 3, 2018 filed criminal abuse charges on August 5, 2018. TCSO placed defendant's children on a 48 hour hold in the care of CYFD on August 3, 2018. CYFD intentionally and recklessly delayed the filing petition of abuse for 4 days on August 7, 2018 in violation of NMRA 10-312 B. The FBI first interrogated defendant's children on August 7, 9th 2018. Taos County District Court entered an ex parte custody order on August 9, 2018 and subsequent custody Hearing Order entered on August 17, 2018. Defendants had a CYFD first appearance on August 17, 2018, by that time defendant's children had already been illegally interrogated twice by the FBI without defendant's knowledge or consent. The FBI interrogated them on August 7, 9th, 2018 and the third time was August 21, 2018. Defendant's parental rights were illegally terminated on December 10, 2018. Prior to that illegal relinquishment defendants had full parental rights. CYFD could not have made decisions regarding defendant's children without their parents consent.

There would have not been any civil CYFD charges without TCSO illegal search and seizure. CYFD could not have allowed the FBI to illegally interrogate defendant's minor children without CYFD first seizing defendant's children. Rachel Kolman, CYFD's children's Court Attorney lied on her response to respondent Wahhaj's Amended motion to reopen and set aside Termination of parental rights. On page 7 paragraph 31. Respondent Wahhaj erroneously argues that the Sheriff prolonged charging the defendants in the children's court case, stating that the kids were removed on August 3, 2018 and the case was not filed until August 5, 21018. Law enforcement, including Sheriffs, do not bring civil actions regarding abuse and neglect of children in New Mexico, CYFD does. In this case, CYFD Filed a petition alleging that the children were abuse and neglected children on August 5, 2018, the 2nd business day after the children were placed in its custody by law enforcement in accordance with NMRA 10-312. That was a blatant lie because CYFD file their petition on August 7, 2018, it clearly states in NMRA 10-312 B. **Time limits** If a child is taken into custody, a petition alleging abuse or neglect shall be filed by the department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not filed within the time set forth in this paragraph, the child shall be released to the child's parents guardian or custodian. ( See Attachment 6 Response To Respondent Wahhaj's Amended motion to reopen and set aside termination of parental rights On page 7 paragraph 31. on November 20, 2020).

CYFD knew that according to NMRA 10-312 B rules they were suppose to file a petition of abuse 2 days after TCSO placed them in their custody. TCSO placed the children in their custody on August 3, 2018 and CYFD were suppose to file the petition on August 5, 2018. CYFD intentionally and recklessly delayed 4 days on August 7, 2018 for filing the petition in order to allow time to conduct safe room interview in order to further the investigation.

TCSO placed defendant's children on a 48 hour hold not a 96 hour hold. CYFD were complicit in the conspiracy to violate defendant's constitutional rights. CYFD were fulfilling the wishes of TCSO by prolonging the charges in order to further the investigation. ( See Attachment 7 Taos County Case Summary Page 1 Filed Petition on August 7, 2018)

On August 15, 2018, CYFD filed a motion to excuse Farrol Louis Jaques and Jamil Louis Jaques from the custody hearing. (See Attachment 7 Taos County Case Summary Page 4) Judicial Officer Sarah Backus entered an order on August 17, 2018 excusing Farrol and Jamil from the custody hearing. On August 21, 2018, CYFD filed another petition to excuse Farrol and Jamil from custody hearing.

Defendant notes that the same day CYFD filed a second motion to excuse the boys from the custody hearing , CYFD allowed the FBI to illegally interrogate the boys for a third time on August 21, 2018. ( See Attachment 7 Taos County Case Summary Page 4) CYFD needed to keep the children isolated from their parents at all cost while the FBI continued to build their illegal manufactured charges. Over the weekend of August 3rd - 5th 2018, Farrol and Jamil talked to CYFD Naomi prior to talking with Karen prior to them speaking with the FBI on August 7, 2018. That interview was important in order to obtain background information that could assist the FBI in their illegal interrogation of Defendant's minor children. On August 9, 2018 SA Taylor interviewed foster mom Clara Mendoza to clarify the false accusation of school shootings. At 3:24 she stated the boys said my dad would never shoot anybody. TCSO leaked false information to the media about an alleged school shooting Clara was very upset because she did not say Defendant gave a gun (now Jahad) to his son for a school shooting. Farroll clarified that he was talking about an incident that happened at earth ship school that he attended with his uncle and some one brought a riffle on the premises to go hunting after the earth ship classes and they were not allowed to have firearms on the premises. This was clarified prior to SA Taylor's filing his sworn affidavit on August 11, 2018, he knew the alleged school shooting was false yet he intentionally, recklessly kept out that verified false information in the search warrant affidavit.

Furthermore at 8:33 Jamil stated does this mean we don't have to talk to the FBI again. At 8:59 Jamil asked to see his mom . SA Taylor responded he does not have any thing to do with that he would have to check with CYFD. ( See August 9, 2018 audio FBI interview with Clara Mendoza and the boys at CYFD)

It is important to not loose sight of why defendant's children were in CYFD custody in the first place. TCSO seized defendant's children placed them on a 48 hour hold in the care of CYFD. CYFD intentionally and recklessly delayed the filing a petition of abuse for 4 days in violation NMRA 10-312 B in order to gain information from safe room interviews in order to further the investigation. According to TCSO that allowed the time CYFD needed to conduct safe room interviews, and allowing the FBI to illegally interrogate defendant's children without their knowledge, without their written or verbal consent, nor counsel present, nor their Miranda rights read, nor without a court order. All of that was done in order to further the investigation. From that illegal interrogation, federal criminal charges were filed against defendants. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K BN 2492 Affiant second search warrant)

44

Defendant's federal charges all stem exclusively from those illegal interrogations of defendant's minor children without defendant's knowledge, written or verbal consent, nor without a court order. Ms Bhalla on cross examination of SA Taylor. Q. Okay. I want to move forward a little bit to your testimony about when defendants left Georgia. You prepared a number of Affidavits for search warrants in this case. Do you recall that? A. Yes ma'am. Q. Okay I believe that one was filed on August 16th . Is that correct? A. I don't recall the exact dates. Q. Does it sounds about right? A. Approximately,  yes. Q. Would it help to refresh your memory if I handed you a stack of your Affidavits for search warrants? A. Sure. Q. Okay. And then maybe you can identify the date? May I approach, Your Honor. THE COURT: You may. Q. ( By Ms BHALLA) Does that refresh your recollection, agent Taylor, as to when-A. Yes ma'am, it says August 16th .Q. Okay. So one of those search warrants was prepared on August 16th . is that correct ? A. That's what it says. Q. Okay. Do you have any reason to doubt that that's when you filed them? A. No ma'am. Q. And that- and we can go through the rest of these later, but is it fair to say that you relied heavily on the statements that you took from F.L. and J.L. in preparing these Affidavits? A. In several of the Affidavits, those testimonies are there, as well as Jany's book. Q. Okay. So it's fair to say, then that you ( indiscernible, audio skips ) J.L. and N.L. statements to prepare your affidavits for the search warrants? A. Yes, ma'am. (See Detention hearing in Albuquerque September 2018 Page 75 Lines 9-18)

SA Travis and SA Hartman did not adequately advise the thirteen-and fifteen-year-old of their Miranda and statutory rights and then invite the them to explain, on the record, their actual comprehension and appreciation of each Miranda warning. It was more important to have the boys to keep talking than to exercise their constitutional rights. They were not warned of their constitutional and statutory rights, and did not knowingly, intelligently, and voluntarily waived each right. It was the Affiant's belief by prolonging charges may benefit CYFD to gather facts about the children and to further the investigation. ( See Exhibit K  BN 2492 Affiant Affidavit for second search warrant)

The principle of substantive due process protects the fundamental right of parents in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2D 599 (1982). However, because "the State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse,"this fundamental right is not absolute. Mueller v. Auker, No. CV-04-399-S-BLW, 2005 U.S. Dist. LEXIS 64274, 2005 WL 8159827, at *7 (D. Idaho Apr. 13, 2005) (unpublished) (internal quotation marks and alteration omitted).

44.5

Perjury before grand jury/court

To assist in the inquiry, courts have devised certain proxies. Thus, if a Grand Jury's continuing indagation results in the indictment of parties not previously charged, the presumption of regularity generally persists. Unites States v. Gibbons, 607 F.2d 1320, 1328-29 (10th Cir. 19790. So too when the Grand Jury's investigation leads to filing of additional charges against previously indicted defendants. In re Grand Jury Proceeding ( Johanson), 632 F. 2d 1033, 1041 ( 3d Cir. 1980)

These purposes befitting the accepted institutional objectives of the Grand jury, and their presence bears convincing witness to the property of the prosecutor's stewardship. See United States v. Sasso, 59 F.3d 341, 351-52 ( 2d Cir. 1995); In re Maury Santiago, 533 F.2d 727, 730 ( 1st Cir. 1976); United States v. Dardi, 330 F.2d 316, 336 ( 2d cir. 1964). United States v. Flemmi, 245 F.3d at 28.
Defendant is asking for protected materials in order to challenge the propriety of the Grand Jury proceedings.

The FBI intentionally, recklessly omitted from the criminal complaint and grand jury indictment that Jany was legally in the country and had deferred status. SA Adelfa Garcia swore on his affidavit that Jany would be consider unlawfully in the United States when her visa expired; in other words, six months after her entry into the United States B2 Visitor on June 24, 1998. at present, Jany does not have any pending application and no pending deferred action. On  June 24, 1998, Jany entered the United States at New York City, NY as a non- immigrant B-2 visitor and was admitted for a period not to exceed six (6) months. After this visa expired, Jany received no subsequent visas or authorization to remain in the United States. On March 6, 2017 Jany submitted I-765, Application for Employment Authorization. On April 20, 2017,United States Customs and Immigration Services (USCIS) approved the application. On April 16, 2018. Jany's Employment Authorization Document (EAD) expired;no new application has been filed. On May 1, 2017 Jany submitted and I-485 application to adjust her status. On June 29, 2018, the USCIS sent Jany a rejection notice. USICS Atlanta confirmed that Jany's I-485 application for permanent residency was denied. Jany abandoned her application by failing to appear to two scheduled interviews. At the present time Jany is without lawful status. (See Doc.1 SA Garcia Criminal Complaint )

Compare his falsified sworn affidavit to the actual immigration documents file number 088372419 from Jany's true immigration status. On August 7, 2018 information on Leveille was received from the Albuquerque FBI office. The Albuquerque FBI office indicated that Leveille was born in Haiti and requested that her immigration status be determine. On August 8, 2017 the Taos Sheriff office contacted ERO to determine alienage of Leveillle.

Immigration History on June 24, 1998, Leveille's last documented entry the in United states was on or near New York City, NY as a B2 visitor On April 17, 2006 Leveille submits an I-360 petition under the name Jany Louis Jacques. On October 31, 2007 USCIS sent approval notice I-360 petition. On May 1, 2008 Leveille submits I-485 application to adjust status to permanent resident. On May 16, 2008 Leveille submits I-485 application to adjust to permanent resident. On July 28, 2008 USICS sent rejection notice for I-485 application. On December, 2008 USICS sends approval notice for I-130 petition. On May 1, 2017 Leveille submits I-485 application to adjust status to permanent resident.

On April 16, 2018 Leveille's Employment Authorization Document expires. On June 29, 2018 USICS sent rejection notice for I-485 application Office of the Chief Counsel indicated that if Leveille was issued the Employment Authorization Document (EAD), by USICS, under deferred action based on the approved I-360 petition, Leveille may not be amenable removal. Form I-797, notice of action dated October 31, 2007 indicates that Leveille was granted deferred action for a period of 15 months from the date of notice.

The I-797 notice indicates that in order to extend deferred action Leveille would either have to submit a request in writing for an extension or have an approval form I-765 for employment authorization. As stated above, Leveille's Employment Authorization Document expired on April 16, 2018 and there is no record found that Leveille has filed form I-765 to request an extension of employment authorization or submitted a written request. Based on this information Leveille no longer has deferred action as her I-485 was denied and her EAD expired in April 2018 a long with no record of requesting an extension. With OCC concurrence Jany Leveille will be placed into immigration proceeding.

This document clearly shows that ~~not only~~ SA Garcia knew Jany Leveille was legally in the U.S. and had EAD authorization approval from October 31, 2007 and she renewed it continuously each year until it expired on April 2018. Her deferred status was adjusted. TSCO and FBI both knew Jany's true status. SA Garcia intentionally, recklessly omitted Jany's true status in order to manufacture criminal charges. SA Garcia intentionally, recklessly left out every application Jany filed and was approved from 1998 to 2017. SA Garcia swore to the veracity of the complaint which he intentionally, recklessly committed perjury.



Amazingly enough SA Taylor knew SA Garcia's Criminal Complaint was false. On Ms. Converse cross examination of SA Taylor: Q. "Agent Taylor, towards the end of your testimony, answering Mr. Kraehe's questions, you said that my client was- had entered the country on a visitor visa and had been out status for 20 years? A. I believe I said that she's been out of status for 20 years." Q. "She entered as a 15-year – old with her mother, didn't she? A. To the best of my recollection, that's what I know (Indiscernible)" Q. And that was in 1998? A. "I don't know the exact date." Q. "You wrote that date in your-" A. It was approximately 20 years ago. Q. Okay. A. "And I believe that that is the date, but I don't recall from that time period." Q. And nine years after that, in 2007, she applied for and received protection under the Violence Against Women Act, which is a temporary immigration status, didn't she? A. "I do not know-- I don't recall that exact fact." Q. You knew that she received it at some point, if not in 2007? A. "I know she received-- or applied for several visas during her time here, but I do not recall exactly what for." Q. "And she got – your Complaint Affidavit mentioned one time when she applied for a renewal of employment authorization, but there were actually many times when she renewed that, didn't she?"

A. "Are you talking about the arrest Complaint? Q. Yes the Criminal Complaint, document 1 in this case. A. I did not swear to that Compliant." Q. "Okay. Were you consulted on it? A. To a degree, yes." Q. Do you believe-- is any of the information in there inaccurate? A. Not to my knowledge, no. Q. Are you aware that she applied for renewals of her employment authorization from the Immigration Service repeatedly? A. From the best of – to the best of my knowledge, yes." Q. "And one of those times was March 3rd of 2017. Is that right? A. I do not know the exact date." Q. "Okay. If that's the date in the Complaint, would you dispute that? A. No." Q. "And if the Complaint said that that was approved by Immigration Services on April 20th of 2017, you wouldn't dispute that date, would you? A. I would not dispute that date." Q. "And a little after that, she files another Application for adjustment of status. Isn't that right? A. I believe that's correct." Q. "That would be May 1st, according to the Compliant? A. I would not dispute that. Q. "And adjustment of status is changing from a non- immigration status to a permanent resident status. Is that right? A. To the best of my knowledge, but I'm not an immigration official. I don't know exactly how it works." Q. "And on April 16th of this year, her last employment authorization expired. Is that true? A. To the best of my knowledge." Q. "And then after two months after that, her adjustment of status was denied because she failed to appear for a hearing. Is that right? A. To the best of my knowledge." Q. "Do you know where the notices of that hearing were sent? A. I do not." Q. Do you know whether they were sent to New Mexico? A. I do not." Q. "Or Alabama? A. I do not." Q. "So you don't have any knowledge whether she ever received it? A. Not to my knowledge." ( See Detention hearing in Albuquerque September 2018 Pages 84-87 )

SA Taylor is the case agent in this case. He knew the Criminal Complaint was false that is why he did not swear to it. He was consulted for this case, he knew Jany applied for and was approved for multiple (EAD) from October 2007 to April 2018. It was the FBI Albuquerque office who sought Jany's Immigration status in August 7, 2018 and received her status on August 8, 2018. He testified that Jany was out of status for 20 years that was a blatant lie. Mr. Kraehree on direct examination of SA Taylor: Q. And do you have any knowledge regarding her immigration status? A. Per Immigration Customs Enforcement agency, she's been out of status for approximately 20 years. Q. And to your knowledge is she unlawfully and illegally in the United States? A. Yes sir. (See Detention hearing in Albuquerque September 2018 Page 55 lines 10-16 )

The perjury committed by these law enforcement officials has no bounds. He knew the facts of the Complaint was false and inaccurate underscores the misconduct. He is responsible for the conspiracy to violate Defendant's constitutional rights. He purposely mislead the veracity of the facts in the Criminal Complaint that is why he did not swear to it.

The prosecutor committed abuse of the grand jury by deliberately withholding from the grand jury material and exculpatory evidence of which they had knowledge thereby creating false impression of the evidence to the grand jury. In violation to this commitment, and without any proper justification. The government placed before the Grand Jury a barred from prosecution by the commitment. This mass of information also improperly prejudice the Grand Jury and so vitiated its independence that Mr. Morten has been denied his right to be free from indictment except by an impartial finding of probable cause as guaranteed by the Fourth and Fifth Amendment's to the Constitution. SA Taylor presented perjured information before the Grand jury. The Grand jury returned an indictment. Magistrate Judge Khalsa used the Grand jury findings of probable cause to detain Morten and Co defendants pending trial denying them Due Process. (See Detention hearing in Albuquerque September 2018 Pages 160,161 lines 21-25, lines 1-4 )

The total conduct of the United States officials and SA Taylor, SA Garcia, officials acting as agents of the United States (officials) or independently as they relate to the defendant are such a nature as to both shocking and offend the American notions of justice. Continued judicial proceedings in this cause will make the court a party to such illicit and immoral conduct and will cause it to become negligent in its duty to supervise the administration of justice in federal criminal cases brought before it. Mr. Morten suffered great prejudice as a result of the government's action. The government used the Grand jury principally to prepare pending charges for trial. The United Sates used the Grand jury solely to bolster its case.

TCSO and FBI despaired of defendant because they were watching defendant's property for months through drones, UV aerial and physical surveillance without any concrete nexus that defendant was on the property, so they falsified sworn Affidavits in order to illegally enter defendant's property. TCSO, FBI and CYFD did fail in their duty to uphold the constitution. The penalty of perjury in clear, is that penalty extended to law enforcement officials or is it just for those whom they prosecute. What is the punishment for law enforcement officials if they continuously intentionally, recklessly lie on sworn affidavits in order to further investigations.

From those perjured Affidavits defendants was incarcerated. What happens if the wrongdoers are not the defendants, but law enforcement officials themselves who swore an oath to uphold the constitution. Unlike TCSO, FBI and CYFD falsified documents. Defendant can verify through law enforcement's own police reports and their sworn Affidavits of their egregious conduct. The Constitution is clear when law enforcement officials conduct "most likely to rise to the conscience-shocking level" is so outrages the remedy is suppression and dismissal. The First Amendment gives a person the right to petition the government for redress of grievances. What can be a bigger grievance than when law enforcement officials who has incredible power to prosecute violates their responsibility trusted to them by the people commits outrages conduct.

TCSO, FBI and CYFD all made a conscious decision to deprive defendants from their Due Process rights. Using their awesome law enforcement powers to manufacture charges against defendants by any illegal means. TCSO FBI and CYFD actions are all intertwined, each one needed each other to execute the conspiracy. They had motive, plan, intent, and knowledge. They all acted in concert to deprive defendants from their constitutional rights. TCSO, FBI and CYFD all committed perjury. Is the committing of perjury nonpunishable? Do TCSO, FBI and CYFD have a separate set of rules they are govern by where they are exempt from following the constitution? Is the suffering of Muslims at the hand of TCSO, FBI and CYFD going to be condone? Is freedom of religion which is guaranteed in the First Amendment not applicable for Muslims? It is going to be extremely difficult for the government to navigate through the cumulative effect, TCSO, FBI and CYFD egregious conduct is overwhelmingly clear.

This court is bound to uphold the constitution/ rule of law which these law enforcement officials and CYFD egregiously violated. These were not good faith errors that the court may turn a blind eye to.

89

These were intentionally, recklessly constitutional violations perpetrated by law enforcement officials in order to further the investigation. Defendant is challenging the actual facts upon which subject matter jurisdiction is based.

These outrages conduct perpetrated by the FBI, TCSO and CYFD caused defendants irreparable harm. It will take years of therapy to try to get back to normalcy because of their conduct. It is defendant's hope by preserving the record of these egregious constitutional violations perpetrated by law enforcement officials and CYFD that the blinders would be lifted from the court and its vision restored back in ordered to administer justice it is tasked with.

Defendant was left with no choice but file this omnibus motion himself because counsel refuses to launch a collateral attacking the validity of this case.

## CONCLUSION

Wherefore, for the foregoing reasons, the defendants respectfully urge this Court to dismiss the indictment with prejudice.

I swear under penalty of perjury that these statements are true and correct.

Lucas Morton #00413151

02-08-2020
Date

90

Lucas Morton # 0041315
P.O. Box 3540
Milan, New Mexico 87021

7033 0600 0000 5874 7992

Legal Mail

Pete V Domenici U.S. Courthouse
333 LOMAS Blvd. N.W., Suite 270
Albuquerque, NM 87102

12-20-2022

Season's Greetings

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

DEC 27 2022

MITCHELL R. ELFERS
CLERK



US POSTAGE
ZIP 87021
02 4W
0000363673DEC 22 2022
$ 006.68°